AP-77,038
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/27/2015 9:30:07 AM
Accepted 8/27/2015 11:10:26 AM
ABEL ACOSTA
CLERK

**No. AP-77,038**

# IN THE TEXAS COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

_____

## US CARNELL PETETAN, JR.,
## a/k/a CARNELL PETETAN, JR., Appellant

*v.*

## THE STATE OF TEXAS

_____

## DIRECT APPEAL FROM THE
## 19TH DISTRICT COURT OF McLENNAN COUNTY
## TRIAL COURT CAUSE NUMBER 2012-2331-C1

_____

## BRIEF FOR APPELLANT

_____

**Richard E. Wetzel**
**State Bar No. 21236300**

**1411 West Avenue, Suite 100**
**Austin, Texas 78701**

**(512) 469-7943**
**(512) 474-5594 – facsimile**
**wetzel_law@1411west.com**

**Attorney for Appellant**
**US Carnell Petetan, Jr.**

## ORAL ARGUMENT REQUESTED

## Identity of Parties and Counsel

Appellant:                              US Carnell Petetan, Jr.

Appellate Counsel:                      Richard E. Wetzel
                                        Attorney at Law
                                        1411 West Ave., Ste. 100
                                        Austin, TX 78701

Trial Counsel:                          Russ Hunt, Sr.
                                        Attorney at Law
                                        P.O. Box 726
                                        Waco, TX 76703-0726

                                        Michelle Tuegel
                                        Attorney at Law
                                        P.O. Box 726
                                        Waco, TX 76703-0726

                                        Walter Reaves, Jr. .
                                        Attorney at Law
                                        100 N. Sixth St., Ste. 802
                                        Waco, TX 76701

Appellee:                               The State of Texas

Trial Counsel:                          Abelino Reyna
                                        Criminal District Attorney
                                        219 North Sixth St., Ste. 200
                                        Waco, TX 76701

                                        Gregory Davis
                                        Assistant Criminal District Attorney
                                        219 North Sixth St., Ste. 200
                                        Waco, TX 76701

                                        Michael Jarrett
                                        Assistant Criminal District Attorney
                                        219 North Sixth St., Ste. 200
                                        Waco, TX 76701

Appellate Counsel:                    Sterling Harmon
                                      Assistant Criminal District Attorney
                                      219 North Sixth St., Ste. 200
                                      Waco, TX 76701

Trial Judge:                          Hon. Ralph Strother
                                      19th District Court
                                      McLennan County, Texas

# Table of Contents

**Page**

Identity of Parties and Counsel . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . iv

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . ix

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . 1

Issues Presented on Appeal . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . 9

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . 54

Point of Error One . . . . . . . . . . . . . . . . . . . . . . . . 57

The trial court abused its discretion by allowing the State to invoke Petetan's attorney-client privilege as to testimony he sought to offer from his former attorney on the issue of competency to stand trial (13 RR 57).

Point of Error Two . . . . . . . . . . . . . . . . . . . . . . . . 63

The trial court abused its discretion by excluding evidence Petetan sought to offer concerning the legal fate of those who obtain an incompetency determination through malingering (13 RR 60).

Point of Error Three . . . . . . . . . . . . . . . . . . . . . . . . 66

The trial court abused its discretion by denying a defense challenge for cause to prospective juror Richard Hester who had a bias against a life sentence without possibility of parole and a bias in favor of a sentence of death (28 RR 89).

Point of Error Four . . . . . . . . . . . . . . . . . . . . . . 72

The trial court abused its discretion by denying a defense challenge for cause to prospective juror Richard Hester who believed law enforcement officers to be more credible than other witnesses (28 RR 89).

Point of Error Five . . . . . . . . . . . . . . . . . . . . . . 75

The trial court abused its discretion by denying a defense challenge for cause to prospective juror Luther Fore who had a bias against a life sentence without possibility of parole and a bias in favor of a sentence of death (30 RR 174).

Point of Error Six . . . . . . . . . . . . . . . . . . . . . . 79

The evidence is insufficient to prove Petetan murdered the complainant while in the course of committing or attempting to commit the offenses of burglary, kidnapping, or retaliation.

Point of Error Seven . . . . . . . . . . . . . . . . . . . . . . 90

The trial court abused its discretion by admitting an extraneous offense showing that on the day of the murder, Petetan told Miller he was going to Waco to buy drugs and would give Miller drugs if he would drive Petetan to Waco (53 RR 31).

Point of Error Eight . . . . . . . . . . . . . . . . . . . . . . 90

The trial court abused its discretion by admitting an extraneous offense showing that on the day of the murder, Petetan told Mouton he was going to Waco to buy drugs and would give Mouton drugs if he would accompany Petetan to Waco (53 RR 31).

Point of Error Nine . . . . . . . . . . . . . . . . . . . . . . 98

The trial court abused its discretion by admitting evidence which undermined defense counsel before the jury and created a conflict of interest which denied Petetan his right to the effective assistance of counsel (59 RR 198).

v

Point of Error Ten . . . . . . . . . . . . . . . . . . . . . . .103

The jury's answer to the intellectual disability special issue is against the great weight and preponderance of the evidence.

Point of Error Eleven . . . . . . . . . . . . . . . . . . . . . . .147

Petetan's intellectual disability renders him ineligible for the death penalty.

Point of Error Twelve . . . . . . . . . . . . . . . . . . . . . . .148

The trial court erred by failing to define the term "militate" within the punishment charge as requested by Petetan (4 CR 1318, 4 CR 1330, and 59 RR 212).

Point of Error Thirteen . . . . . . . . . . . . . . . . . . . . . . .148

The trial court erred by overruling Petetan's objection to the instruction that 10 votes were required for the jury to return a "no" answer to the first special issue concerning future dangerousness (4 CR 1318, 4 CR 1330, and 59 RR 212).

Point of Error Fourteen . . . . . . . . . . . . . . . . . . . . . . .149

The trial court erred by overruling Petetan's objection to the "anti-sympathy" instruction insofar as the instruction would limit the scope of mitigating evidence and or circumstances that jury may consider in returning a life sentence (4 CR 1320, 4 CR 1330, and 59 RR 212).

Point of Error Fifteen . . . . . . . . . . . . . . . . . . . . . . .159

The trial court erred by overruling Petetan's request that the jury be instructed on the concept of mercy and the role it can play in deliberations (4 CR 1320, 4 CR 1330, and 59 RR 212).

Point of Error Sixteen . . . . . . . . . . . . . . . . . . . . . . .151

The trial court erred by submitting a special issue on future dangerousness which was not found by the grand jury or alleged in the indictment returned against Petetan (1 CR 44, 4 CR 1321, 4 CR 1330, and 59 RR 212).

Point of Error Seventeen . . . . . . . . . . . . . . . . . . . . . . .151

The trial court erred by failing to define the term "probability" within the punishment charge as requested by Petetan (4 CR 1321, 4 CR 1330, and 59 RR 212).

Point of Error Eighteen . . . . . . . . . . . . . . . . . . . . . . .152

The trial court erred by failing to define the phrase "criminal acts of violence" within the punishment charge as requested by Petetan (4 CR 1322, 4 CR 1330, and 59 RR 212).

Point of Error Nineteen . . . . . . . . . . . . . . . . . . . . . . .153

The trial court erred by failing to define the phrase "continuing threat to society" within the punishment charge as requested by Petetan (4 CR 1323, 4 CR 1330, and 59 RR 212).

Point of Error Twenty . . . . . . . . . . . . . . . . . . . . . . .154

The trial court erred by failing to submit Petetan's four requested instructions relative to the jury's consideration of victim impact evidence (4 CR 1324, 4 CR 1330, and 59 RR 212).

Point of Error Twenty-One . . . . . . . . . . . . . . . . . . . . . . .155

The trial court erred by failing to define the phrases "personal moral culpability" and "moral blameworthiness" within the punishment charge as requested by Petetan (4 CR 1325, 4 CR 1330, and 59 RR 212).

Point of Error Twenty-Two . . . . . . . . . . . . . . . . . . . . . . .156

The trial court erred by overruling Petetan's objection that the charge unduly limited what factors the jury could consider as mitigating (4 CR 1325, 4 CR 1330, and 59 RR 212).

Point of Error Twenty-Three . . . . . . . . . . . . . . . . . . . . . . .156

The trial court erred by overruling Petetan's objection that the mitigation special issue is unconstitutional for failing to assign a burden of proof and not being susceptible to a sufficiency of the evidence review on appeal (4 CR 1326, 4 CR 1330, and 59 RR 212).

Point of Error Twenty-Four . . . . . . . . . . . . . . . . . . . . . . .157

The trial court erred by overruling Petetan's objection that the jury should be instructed there is a presumption in favor of a life sentence rather than a sentence of death (4 CR 1327, 4 CR 1330, and 59 RR 212).

Point of Error Twenty-Five . . . . . . . . . . . . . . . . . . . . . . .158

The trial court erred by overruling Petetan's objection that the jury should be instructed that if it was unable to agree on a special issue, a mistrial would be declared and life sentence imposed (4 CR 1326, 4 CR 1330, and 59 RR 212).

Point of Error Twenty-Six . . . . . . . . . . . . . . . . . . . . . .159

Imposition of the death penalty violates Petetan's Eighth Amendment and Fourteenth Amendment rights not to be subjected to cruel and unusual punishment.

Point of Error Twenty-Seven . . . . . . . . . . . . . . . . . . . . . . .160

Petetan was denied equal protection of the law and due course of law due to the absence of a unified statutory procedure for pretrial litigation of an *Atkins* assertion of intellectual disability (18 RR 12, 4 CR 1228).

Point of Error Twenty-Eight . . . . . . . . . . . . . . . . . . . . . . .162

The judgment should be modified to properly reflect Petetan was convicted of a capital felony offense rather than a first degree felony offense (4 CR 1343).

Point of Error Twenty-Nine . . . . . . . . . . . . . . . . . . . . . . .163

The judgment should be modified to properly reflect punishment was assessed by the trial court rather than the jury (4 CR 1343).

Prayer . . . . . . . . . . . . . . . . . . . . . . .165

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . .166

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . .166

# Index of Authorities

**Page**

**Constitution**

U.S. CONST. amend. VI . . . . . . . . . . . 103

U.S. CONST. amend. VIII . . . . . . . . . *passim*

U.S. CONST. amend. XIV . . . . . . . . . *passim*

**Cases**

*Abdnor v. State*, 871 S.W.2d 726 (Tex. Crim. App. 1994) . . . . . . . . . . . . 92

*Acosta v. State*, 233 S.W.3d 349 (Tex. Crim. App. 2007) . . . . . . . . . . . 102

*Alba v. State*, 905 S.W.2d 581 (Tex. Crim. App. 1995) . . . . . . . . . . . . 93

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . . . . . . . 151

*Arnold v. State,* 234 S.W.3d 664
(Tex. App.-Houston [14th Dist.] 2007, no pet.) . . . . . . . . . . . . 94

*Atkins v. Virginia,* 536 U.S. 304 (2002) . . . . . . . . . *passim*

*Barber v. State,* 737 S.W.2d 824 (Tex. Crim. App. 1987) . . . . . . . . . . . . 62

*Barefoot v. State*, 596 S.W.2d 875 (Tex. Crim. App. 1980) . . . . . . . . . . . 152

*Bigley v. State*, 865 S.W.2d 26 (Tex. Crim. App. 1993) . . . . . . . . . . . 164

*Bowling* v. *Commonwealth*, 163 S.W.3d 361 (Ky. 2005) . . . . . . . . . . . 139

*Brown v. State*, 554 S.W.2d 677 (Tex. Crim. App. 1977) . . . . . . . . . . . 149

*Brown v. State,* 913 S.W.2d 577 (Tex. Crim. App. 1996) . . . . . . . . . . . . 69

*Brumfield* v. *Cain*, 135 S. Ct. 2269 (2015) . . . . . . . . . . . 130

*Butcher v. State,* 454 S.W.3d 13 (Tex. Crim. App. 2015) . . . . . . . . . . . 127

*Caballero v. State,* 587 S.W.2d 741 (Tex. Crim. App. 1979) . . . . . . . . . . . . 62

*Camacho v. State*, 864 S.W.2d 524 (Tex. Crim. App. 1993) . . . . . . . . . . . 153

*Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997) . . . . . . . . . . . 156

*Chase* v. *State*, 2015 WL 1848126 (Miss. 2015) . . . . . . . . . . 139

*Chester* v. *Thaler*, 666 F.3d 340 (5th Cir. 2011) . . . . . . . . . . 129

*Clark* v. *Quarterman*, 457 F.3d 441 (5th Cir. 2006) . . . . . . . . . . 130

*Coffey v. State*, 979 S.W.2d 326 (Tex. Crim. App. 1998) . . . . . . . . . . 164

*Coleman* v. *State*, 341 S.W.3d 221 (Tenn. 2011) . . . . . . . . . . 139

*Commonwealth* v. *Bracey*, 2015 WL 3751733 (Pa. 2015) . . . . . . . . . . 139

*Commonwealth* v. *DeJesus*, 58 A.3d 62 (Pa. 2012) . . . . . . . . . . 139

*Crane v. State,* 786 S.W.2d 338 (Tex. Crim. App. 1990) . . . . . . . . . . . 94

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) . . . . . . . . . . 102

*Darkins v. State*, 430 S.W.3d 559
(Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) . . . . . . . . . . . 94

*Demouchette v. State,* 731 S.W.2d 75 (Tex.Crim.App.1986) . . . . . . . . . . . 70

*Dobbs v. State,* 434 S.W.3d 166 (Tex. Crim. App. 2014) . . . . . . . . . . . 81

*Eppinger v. State*, 800 S.W.2d 652
(Tex. App.—Austin 1990, pet. ref'd) . . . . . . . . . . . 83

*Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004) . . . . . . . . . *passim*

*Ex parte Butler*, 416 S.W.3d 863 (Tex. Crim. App. 2012) . . . . . . . . . . 136

*Ex parte Cathey*, 451 S.W.3d 1 (Tex. Crim. App. 2014) . . . . . . . . . *passim*

*Ex parte Chester*, 2007 WL 602607 (Tex. Crim. App. 2007) . . . . . . . . . . 135

*Ex parte Clark*, 2004 WL 885583 (Tex. Crim. App. 2004) . . . . . . . . . . 136

*Ex parte Henderson*, 2006 WL 167836 (Tex. Crim. App.) . . . . . . . . . . 132

*Ex Parte McFarland,* 163 S.W.3d 743 (Tex. Crim. App. 2005) . . . . . . . . . . 102

*Ex parte McKenzie,* 582 S.W.2d 153 (Tex. Crim. App. 1979) . . . . . . . . . . . . . 63

*Ex parte Sosa*, 364 S.W.3d 889 (Tex. Crim. App. 2012) . . . . . . . . . . . 134

*Ex parte Taylor*, 2006 WL 234854 (Tex. Crim. App. 2006) . . . . . . . . . . . 133

*Ex parte Tennard,* 960 S.W.2d 57 (Tex.Cr.App.1997) . . . . . . . . . . . 123

*Ex parte Van Alstyne*, 239 S.W.3d 815 (Tex. Crim. App. 2007) . . . . . . . . . . . 129

*Ex parte Weathers*, 2014 WL 1758977 (Tex. Crim. App. 2014) . . . . . . . . . . 136

*Ex parte Winfrey,* 581 S.W.2d 698 (Tex. Crim. App. 1979) . . . . . . . . . . . . 63

*Ex parte Woods*, 296 S.W.3d 587 (Tex. Crim. App. 2009) . . . . . . . . . . 136

*Feldman v. State,* 71 S.W.3d 728 (Tex. Crim. App. 2002) . . . . . . . . . . . . 68

*French v. State*, 830 S.W.2d 607 (Tex. Crim. App. 1992) . . . . . . . . . . . 164

*Gallo* v. *State*, 239 S.W.3d 757 (Tex. Crim. App. 2007) . . . . . . . . . . 126

*Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009) . . . . . . . . . . . 158

*Gaston v. State,* 136 S.W.3d 315
(Tex. App.-Houston [1st Dist.] 2004, pet. struck) . . . . . . . . . . . 103

*Glossip v. Gross*, 576 U.S. ___, 2015 WL 2473454. (2015) . . . . . . . . . . . 159

*Goodwin* v. *State*, 191 S.W.3d 20 (Mo. 2006) . . . . . . . . . . . 143

*Green v. State,* 934 S.W.2d 92 (Tex. Crim. App. 1996) . . . . . . . . . . . . 70

*Greene v. State*, 264 S.W.3d 271
(Tex. App.—San Antonio 2008, pet. ref'd) . . . . . . . . . . . . 62

*Gregg v. Georgia*, 428 U.S. 153 (1976) . . . . . . . . . . . 159

*Guevera* v. *Stephens*, 577 F. App'x 364 (5th Cir. 2014) . . . . . . . . . . . 138

*Hall* v. *Florida*, 134 S. Ct. 1986 (2014) . . . . . . . . . *passim*

*Henderson* v. *Stephens,* 2015 WL 3965828 (5th Cir. 2015) . . . . . . . . . . . 138

*Hernandez v. State*, 563 S.W.2d 947 (Tex. Crim. App. 1978) . . . . . . . . . . . 138

*Hernandez v. State*, 969 S.W.2d 440
(Tex. App.—San Antonio 1998, pet. ref'd) . . . . . . . . . . . . . 82

*Hernandez* v. *Thaler*, 2011 WL 4437091 (W.D. Tex. 2011)
*aff'd*, 537 F. App'x 531 (5th Cir. 2013) . . . . . . . . . . . 136

*Hines* v. *Thaler*, 456 F. App'x 357 (5th Cir. 2011) . . . . . . . . . . . 133

*Holladay* v. *Allen*, 555 F.3d 1346 (11th Cir. 2009) . . . . . . . . . . . 140

*Howell v. State*, 563 S.W.2d 933 (Tex. Crim. App. 1978) . . . . . . . . . . . 162

*Hunter* v. *State*, 243 S.W.3d 664 (Tex. Crim. App. 2007) . . . . . . . . . . . 132

*Ibanez v. State,* 749 S.W.2d 804 (Tex. Crim. App. 1986) . . . . . . . . . . . 82

*In re Allen*, 462 S.W.3d 47 (Tex. Crim. App. 2015) . . . . . . . . *passim*

*Isassi v. State,* 330 S.W.3d 633 (Tex. Crim. App. 2010) . . . . . . . . . . . 81

*Jackson v. State*, 288 S.W.3d 60
(Tex. App. – Houston [1st Dist.] 2009, pet. ref'd) . . . . . . . . . . . 163

*Jackson v. Virginia,* 443 U.S. 307 (1979) . . . . . . . . . . . 81

*Johnson v. State*, 43 S.W.3d 1 (Tex. Crim. App. 2001) . . . . . . . . . . . 96

*Johnson v. State*, 967 S.W.2d 410 (Tex. Crim. App. 1998) . . . . . . . . . . . 95

*Johnston v. State*, 145 S.W.3d 215 (Tex. Crim. App. 2004) . . . . . . . . . . . 92

*Jurek v. Texas,* 428 U.S. 262 (1976) . . . . . . . . . . . 159

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997) . . . . . . . . . . . 61

*Kotteakos v. United States*, 328 U.S. 750 (1946) . . . . . . . . . . . 96

*Ladd* v. *Thaler,* 2013 WL 593927 (E.D. Tex. 2013)
*aff'd*, 748 F.3d 637 (5th Cir. 2014) . . . . . . . . . . . 134

*Lambert* v. *State*, 126 P.3d 646 (Okla. Crim. App. 2005) . . . . . . . . . . . 130

*Land v. State*, 291 S.W.3d 23
(Tex. App. – Texarkana 2009, pet. ref'd) . . . . . . . . . . . 163

*Lizcano v. State*, 2010 WL 1817772 (Tex. Crim. App. 2010) . . . . . . . . . . . 130

*Lockhart v. State*, 847 S.W.2d 568 (Tex. Crim. App. 1992) . . . . . . . . . . . 92

*Lopez v. State,* 200 S.W.3d 246
(Tex.App.-Houston [14th Dist.] 2006, pet. ref'd.) . . . . . . . . . . . 95

*Luna v. State*, 268 S.W.3d 594 (Tex. Crim. App. 2008) . . . . . . . . . . . 155

*Mann v. State,* 718 S.W.2d 741 (Tex. Crim. App. 1986) . . . . . . . . . . . 93

*Manning v. State*, 766 S.W.2d 551
(Tex. App. – Dallas 1989)
*aff'd,* 773 S.W.2d 568 (Tex. Crim. App. 1989) . . . . . . . . . . . 60

*Martinez v. State*, 924 S.W.2d 693 (Tex. Crim. App. 1996) . . . . . . . . . . . 148

*Matamoros* v. *Stephens*, 783 F.3d 212 (5th Cir. 2015) . . . . . . . . . . . 138

*Matamoros* v. *Thaler,* 2010 WL 1404368 (S.D. Tex. 2010)
*modified*, 2012 WL 394597 (S.D. Tex. 2012)
*aff'd*, 783 F.3d 212 (5th Cir. 2015) . . . . . . . . . . . 136

*Matlock v. State*, 392 S.W.3d 662 (Tex. Crim. App. 2013) . . . . . . . . . . . 127

*Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010) . . . . . . . . . . . 154

*Mays* v. *Stephens*, 757 F.3d 211 (5th Cir. 2014) . . . . . . . . . . . 137

*Meyer v. State*, 366 S.W.3d 728
(Tex. App.—Texarkana 2012, no pet.) . . . . . . . . . . . 88

*Montgomery v. State,* 810 S.W.2d 372 (Tex. Crim. App. 1991) . . . . . . . . . . . 59

*Moore v. State,* 999 S.W.2d 385 (Tex. Crim. App.1999) . . . . . . . . . . . 69

*Moses v. State*, 105 S.W.3d 622 (Tex. Crim. App. 2003) . . . . . . . . . . . 92

*Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002) . . . . . . . . . . . 97

*Mozon v. State*, 991 S.W.2d 841 (Tex. Crim. App. 1999) . . . . . . . . . . . 93

*Neal v. State,* 256 S.W.3d 264 (Tex. Crim. App. 2008) . . . . . . . . . . . 127

*Osbourn v. State,* 92 S.W.3d 531 (Tex. Crim. App. 2002) . . . . . . . . . . . . 59

*Patrick v. State,* 906 S.W.2d 481 (Tex. Crim. App. 1995) . . . . . . . . . . . . 68

*Perillo v. Johnson,* 79 F.3d 441 (5th Cir.1996) . . . . . . . . . . . 102

*Proffitt v. Florida,* 428 U.S. 242 (1976) . . . . . . . . . . . 159

*Raby v. State*, 970 S.W.2d 1 (Tex. Crim. App. 1998) . . . . . . . . . . 158

*Rankin v. State*, 953 S.W.2d 740 (Tex. Crim. App. 1996) . . . . . . . . . . . . 92

*Ransom v. State*, 920 S.W.2d 288 (Tex. Crim. App. 1994) . . . . . . . . . . . 71

*Ray v. State,* 178 S.W.3d 833 (Tex. Crim. App. 2005) . . . . . . . . . . . . 60

*Riles v. State,* 595 S.W.2d 858 (Tex. Crim. App. 1980) . . . . . . . . . . . . 82

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . 151

*Robinson v. State,* 236 S.W.3d 260
(Tex. App. -Houston [1st Dist.] 2007, pet. ref'd) . . . . . . . . . . . . 60

*Rodriguez* v. *Quarterman,* 2006 WL 1900630 (W.D. Tex. 2006) . . . . . . . . . . . 136

*Russeau v. State*, 291 S.W.3d 426 (Tex. Crim. App. 2009) . . . . . . . . . . . 153

*Sasser* v. *Hobbs,* 735 F.3d 833 (8th Cir. 2013) . . . . . . . . . . . 140

*Shannon v. State*, 942 S.W.2d 591 (Tex. Crim. App. 1996) . . . . . . . . . . . 157

*Shaver v. State*, 280 S.W.2d 740 (Tex. Crim. App. 1955) . . . . . . . . . . . . 73

*Smith v. State*, 770 S.W.2d 70
(Tex. App. – Texarkana 1989, no pet.) . . . . . . . . . . . . 59

*Sorrells v. State,* 343 S.W.3d 152 (Tex .Crim. App. 2011) . . . . . . . . . . . . 82

*Splawn v. State*, 160 S.W.3d 103
(Tex. App. - Texarkana 2005, pet. ref'd) . . . . . . . . . . . 162

*State* v. *Lombardi,* 303 S.W.3d 523 (Mo. 2010) . . . . . . . . . . . 143

*State* v. *White*, 885 N.E.2d 905 (Ohio 2008) . . . . . . . . . . . 139

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . 102

*Temple v. State,* 390 S.W.3d 341 (Tex. Crim. App. 2013) . . . . . . . . . . . . 82

*Thomas* v. *Allen*, 607 F.3d 749 (11th Cir. 2010) . . . . . . . . . . . 141

*Thuesen v. State*, 2014 WL 792038 (Tex. Crim. App. 2014) . . . . . . . . . . . 150

*Tong v. State*, 25 S.W.3d 707 (Tex. Crim. App. 2000) . . . . . . . . . . . 150

*Torres v. State,* 593 S.W.2d 717 (Tex. Crim. App. 1980) . . . . . . . . . . . . 63

*Turner v. State*, 422 S.W.3d 676 (Tex. Crim. App. 2013) . . . . . . . . . . . . 63

*United States v. Fox,* 613 F.2d 99 (5th Cir.1980) . . . . . . . . . . . 103

*Van Tran* v. *Colson*, 764 F.3d 594 (6th Cir. 2014) . . . . . . . . . . . 137

*Van Tran* v. *State*, 2006 WL 3327828 (Tenn. Crim. App. 2006) . . . . . . . . . . . 139

*Villanueva v. State*, 711 S.W.2d 739
(Tex. App.—San Antonio 1986) *pet. ref'd*
725 S.W.2d 244 (Tex. Crim. App. 1987) . . . . . . . . . . . . 83

*Webb v. State*, 36 S.W.3d 164
(Tex. App.-Houston [14th Dist.] 2000, pet. ref'd) . . . . . . . . . . . . 96

*Wheeler v. State,* 67 S.W.3d 879 (Tex. Crim. App. 2002) . . . . . . . . . . . . 59

*Whitaker v. State*, 286 S.W.3d 355 (Tex. Crim. App. 2009) . . . . . . . . . . . 157

*Whitaker v. State*, 977 S.W.2d 869
(Tex. App.—Beaumont 1998, pet. ref'd) . . . . . . . . . . . . 82

*Williams* v. *Quarterman*, 293 F. App'x 298 (5th Cir. 2008) . . . . . . . . . . . 131

*Williams v. State*, 270 S.W.3d 112 (Tex. Crim. App. 2008) . . . . . . . . . . . 136

*Williams v. State*, 273 S.W.3d 200 (Tex. Crim. App. 2008) . . . . . . . . . . . 151

*Wilson* v. *Thaler,* 450 F. App'x 369 (5th Cir. 2011) . . . . . . . . . . . 131

*Woods* v. *Quarterman*, 493 F.3d 580 (5th Cir. 2007) . . . . . . . . . . . 138

*Wooldridge v. State,* 653 S.W.2d 811 (Tex. Crim. App. 1983)  82

*Ybarra* v. *State*, 247 P.3d 269 (Nev. 2011) . . . . . . . . . . . 139

**Statutes**

IDAHO CODE ANN. § 19-2515A(1)(a) . . . . . . . . . . . 139

KY. REV. STAT. ANN. §  532.130(2) . . . . . . . . . . . 139

MO. REV. STAT. § 565.030(6) . . . . . . . . . . . 139

N.C. GEN. STAT. § 15A-2005(a)(1)(B) . . . . . . . . . . . 139

N.C. GEN. STAT. § 15A-2005(a)(2) . . . . . . . . . . . 139

NEV. REV. STAT. § 174.098(7) . . . . . . . . . . . 139

OKLA. STAT. TITLE 21, § 701.10b(A)(2) . . . . . . . . . . . 139

TEX. CRIM. PROC. CODE art. 35.16(a)(9) . . . . . . . . . . . 73

TEX. CRIM. PROC. CODE art. 35.16(c)(2) . . . . . . . . . . . 68

TEX. CRIM. PROC. CODE art. 37.071§ 2(g) . . . . . . . . . . . 164

TEX. CRIM. PROC. CODE art. 38.04 . . . . . . . . . . . 81

TEX. CRIM. PROC. CODE art. 42.01 § 14 . . . . . . . . . . . 162

TEX. CRIM. PROC. CODE art. 44.29(a) . . . . . . . . . . . 74

TEX. CRIM. PROC. CODE art. 44.29(c) . . . . . . . . . . . 71

TEX. CRIM. PROC. CODE art. 46B.003(a)(1) . . . . . . . . . . . 61

TEX. CRIM. PROC. CODE art. 46B.003(b) . . . . . . . . . . . 61

TEX. HEALTH & SAFETY CODE § 591.003(1) . . . . . . . . . . . 121

TEX. HEALTH & SAFETY CODE § 591.003(7) . . . . . . . . . . . 123

TEX. HEALTH & SAFETY CODE § 591.003(13) . . . . . . . . . . . 121

TEX. PEN. CODE § 1.07(25) . . . . . . . . . . . . 89

TEX. PEN. CODE § 12.04(a)(1) . . . . . . . . . . . 162

TEX. PEN. CODE § 12.31(a) . . . . . . . . . . . 162

TEX. PEN. CODE § 19.03(a)(2) . . . . . . . . . . . 162

TEX. PEN. CODE § 20.01(2)(A) . . . . . . . . . . . 86

TEX. PEN. CODE § 20.01(2)(B) . . . . . . . . . . . 86

TEX. PEN. CODE § 20.03(b) . . . . . . . . . . . 84

TEX. PEN. CODE § 30.02(a) . . . . . . . . . . . 83

TEX. PEN. CODE § 36.06 . . . . . . . . . . . 87

TEX. PEN. CODE § 36.06(a)(1)(B) . . . . . . . . . . . 87

TEX. PEN. CODE § 36.06(a)(2)(A) . . . . . . . . . . . 87

VA. CODE ANN. § 19.2-264.3:1.1(B)(2) . . . . . . . . . . . 140

**Rules**

TEX. R. APP. P. 9.4 . . . . . . . . . . . 166

TEX. R. APP. P. 9.10(a)(3) . . . . . . . . . . . . 13

TEX. R. APP. P. 44.2(b) . . . . . . . . . . . . 60

TEX. R. APP. P. 78.1(b) . . . . . . . . . . . 163

TEX. R. EVID. 404(b) . . . . . . . . . . . . 92

TEX. R. EVID. 503(b)(2) . . . . . . . . . . . . 60

TEX. R. EVID. 503(c) . . . . . . . . . . . . 59

**DOCKETED CASE**

*Lizcano v. Texas,* No. 15-65 (U.S.) . . . . . . . . . . . 128

**Other Authorities**

American Association of Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010) . . . . . . . . . . . . 130

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) . . . . . . . . . . . . 133

Blume, John H., et al., *A Tale of Two (and Possibly Three) Atkins*, 23 Wm. & Mary Bill Rts. J. 393 (2014) . . . . . . . . . . . . 129

Blume, John H., et al., *Of Atkins and Men*, 18 Cornell J.L. & Pub. Pol'y 689 (2009) . . . . . . . . . . . . 129

George E. Dix & John M. Schmolesky, 43 Texas Practice: Criminal Practice and Procedure § 31:81, at 89–90 & n. 10 (3rd ed. 2011) . . . . . . . . . . . . . 63

Greenspan, Stephen, *The Briseño Factors*, *in The Death Penalty and Intellectual Disability* 219 (Edward A. Polloway ed., 2015) . . . . . . . . . . . . 130

Tobolowsky, Peggy M., *A Different Path Taken*, 39 Hastings Const. L.Q. 1 (2011) . . . . . . . . . . . . 139

## Statement Regarding Oral Argument

Argument is requested. The facts are voluminous and the issues on appeal are complex. It is respectfully suggested argument would assist the Court in its decisional process.

## Statement of the Case

This is an appeal from a criminal proceeding. Petetan was indicted by a McLennan County grand jury for the offense of capital murder (1 CR 44). It was alleged Petetan murdered his wife, Kimberly Petetan, by shooting her with a firearm while he was in the course of committing or attempting to commit the offenses of burglary, kidnapping, and retaliation (1 CR 44). The State gave notice of its intent to seek the death penalty (2 RR 6).

Petetan asserted he was incompetent to stand trial and sought a competency determination by a jury (2 CR 383). A competency jury was selected and sworn (10 RR 109, 110). The jury found Petetan competent to stand trial (2 CR 453, 13 RR 94).

A jury was selected and sworn for trial on the charged offense of capital murder (48 RR 108, 50 RR 192, and 51 RR 16). Petetan entered a plea of not guilty to the indicted offense (51 RR 26). At the conclusion of the guilt or

innocence phase, the jury found Petetan guilty of capital murder as charged in the indictment (4 CR 1308, 54 RR 224).

Punishment was tried to the same jury (55-60 RR). At the conclusion of the punishment phase, the jury returned answers to four special issues (4 CR 1336-1339, 60 RR 67-68). Based on the jury's answers to the special issues, punishment was assessed by the trial court at death and Petetan was sentenced in open court (60 RR 71).

A motion for new trial was filed and denied (4 CR 1377, 1382). Appeal to this Court is automatic. Nonetheless, the trial court certified Petetan's right to appeal and notice of appeal was timely filed (4 CR 1348, 1353).

## Issues Presented on Appeal

**Point of Error One**

**The trial court abused its discretion by allowing the State to invoke Petetan's attorney-client privilege as to testimony he sought to offer from his former attorney on the issue of competency to stand trial (13 RR 57).**

**Point of Error Two**

**The trial court abused its discretion by excluding evidence Petetan sought to offer concerning the legal fate of those who obtain an incompetency determination through malingering (13 RR 60).**

**Point of Error Three**

**The trial court abused its discretion by denying a defense challenge for cause to prospective juror Richard Hester who had a bias against a life sentence without possibility of parole and a bias in favor of a sentence of death (28 RR 89).**

**Point of Error Four**

**The trial court abused its discretion by denying a defense challenge for cause to prospective juror Richard Hester who believed law enforcement officers to be more credible than other witnesses (28 RR 89).**

**Point of Error Five**

**The trial court abused its discretion by denying a defense challenge for cause to prospective juror Luther Fore who had a bias against a life sentence without possibility of parole and a bias in favor of a sentence of death (30 RR 174).**

**Point of Error Six**

The evidence is insufficient to prove Petetan murdered the complainant while in the course of committing or attempting to commit the offenses of burglary, kidnapping, or retaliation.

**Point of Error Seven**

The trial court abused its discretion by admitting an extraneous offense showing that on the day of the murder, Petetan told Miller he was going to Waco to buy drugs and would give Miller drugs if he would drive Petetan to Waco (53 RR 31).

**Point of Error Eight**

The trial court abused its discretion by admitting an extraneous offense showing that on the day of the murder, Petetan told Mouton he was going to Waco to buy drugs and would give Mouton drugs if he would accompany Petetan to Waco (53 RR 31).

**Point of Error Nine**

The trial court abused its discretion by admitting evidence which undermined defense counsel before the jury and created a conflict of interest which denied Petetan his right to the effective assistance of counsel (59 RR 198).

**Point of Error Ten**

The jury's answer to the intellectual disability special issue is against the great weight and preponderance of the evidence.

**Point of Error Eleven**

Petetan's intellectual disability renders him ineligible for the death penalty.

**Point of Error Twelve**

The trial court erred by failing to define the term "militate" within the punishment charge as requested by Petetan (4 CR 1318, 4 CR 1330, and 59 RR 212).

**Point of Error Thirteen**

The trial court erred by overruling Petetan's objection to the instruction that 10 votes were required for the jury to return a "no" answer to the first special issue concerning future dangerousness (4 CR 1318, 4 CR 1330, and 59 RR 212).

**Point of Error Fourteen**

The trial court erred by overruling Petetan's objection to the "anti-sympathy" instruction insofar as the instruction would limit the scope of mitigating

evidence and or circumstances that jury may consider in returning a life sentence (4 CR 1320, 4 CR 1330, and 59 RR 212).

**Point of Error Fifteen**

The trial court erred by overruling Petetan's request that the jury be instructed on the concept of mercy and the role it can play in deliberations (4 CR 1320, 4 CR 1330, and 59 RR 212).

**Point of Error Sixteen**

The trial court erred by submitting a special issue on future dangerousness which was not found by the grand jury or alleged in the indictment returned against Petetan (1 CR 44, 4 CR 1321, 4 CR 1330, and 59 RR 212).

**Point of Error Seventeen**

The trial court erred by failing to define the term "probability" within the punishment charge as requested by Petetan (4 CR 1321, 4 CR 1330, and 59 RR 212).

**Point of Error Eighteen**

The trial court erred by failing to define the phrase "criminal acts of violence" within the punishment charge as requested by Petetan (4 CR 1322, 4 CR 1330, and 59 RR 212).

**Point of Error Nineteen**

The trial court erred by failing to define the phrase "continuing threat to society" within the punishment charge as requested by Petetan (4 CR 1323, 4 CR 1330, and 59 RR 212).

**Point of Error Twenty**

The trial court erred by failing to submit Petetan's four requested instructions relative to the jury's consideration of victim impact evidence (4 CR 1324, 4 CR 1330, and 59 RR 212).

**Point of Error Twenty-One**

The trial court erred by failing to define the phrases "personal moral culpability" and "moral blameworthiness" within the punishment charge as requested by Petetan (4 CR 1325, 4 CR 1330, and 59 RR 212).

**Point of Error Twenty-Two**

The trial court erred by overruling Petetan's objection that the charge unduly limited what factors the jury could consider as mitigating (4 CR 1325, 4 CR 1330, and 59 RR 212).

**Point of Error Twenty-Three**

The trial court erred by overruling Petetan's objection that the mitigation special issue is unconstitutional for failing to assign a burden of proof and not being susceptible to a sufficiency of the evidence review on appeal (4 CR 1326, 4 CR 1330, and 59 RR 212).

**Point of Error Twenty-Four**

The trial court erred by overruling Petetan's objection that the jury should be instructed there is a presumption in favor of a life sentence rather than a sentence of death (4 CR 1327, 4 CR 1330, and 59 RR 212).

**Point of Error Twenty-Five**

The trial court erred by overruling Petetan's objection that the jury should be instructed that if it was unable to agree on a special issue, a mistrial would be declared and life sentence imposed (4 CR 1326, 4 CR 1330, and 59 RR 212).

**Point of Error Twenty-Six**

**Imposition of the death penalty violates Petetan's Eighth Amendment and Fourteenth Amendment rights not to be subjected to cruel and unusual punishment.**

**Point of Error Twenty-Seven**

**Petetan was denied equal protection of the law and due course of law due to the absence of a unified statutory procedure for pretrial litigation of an *Atkins* assertion of intellectual disability (18 RR 12, 4 CR 1228).**

**Point of Error Twenty-Eight**

**The judgment should be modified to properly reflect Petetan was convicted of a capital felony offense rather than a first degree felony offense (4 CR 1343).**

**Point of Error Twenty-Nine**

**The judgment should be modified to properly reflect punishment was assessed by the trial court rather than the jury (4 CR 1343).**

## Statement of Facts

### A. Competency Trial

Petetan filed a motion, supported by the affidavit of an expert, alleging he was incompetent to stand trial (2 CR 383). He sought a jury determination of his competency to be tried (2 CR 383). The trial court appointed an independent expert to examine Petetan's competency to stand trial (2 CR 392). That expert opined Petetan was competent for trial (2 CR 414). In view of the conflicting opinions regarding Petetan's competency, the trial court agreed a jury trial on competency was warranted (8 RR 5). A jury to pass on the issue of competency was selected and sworn (10 RR 109, 110).

Dr. Ollie Seay is a psychologist from Austin (12 RR 32). She was employed by the defense to examine Petetan relative to his competency to stand trial (12 RR 49).

She explained that in current practice the term intellectual disability is used rather than the outdated term mental retardation (12 RR 43). She agreed both terms have the same definition and three prongs to determine existence (12 RR 43). Intellectual disability alone will not render an individual incompetent for trial (12 RR 48).

She met with Petetan on three occasions and administered various assessment tests (12 RR 51). She reviewed police reports, medical reports, school records, and other psychological records (12 RR 53). Even though she did not administer an IQ test, previous IQ testing provided to her raised some concerns for her and those concerns were confirmed by her testing of and interaction with Petetan (12 RR 63, 99). Various test results from IQ tests administered to Petetan from childhood to 2012 were consistent in their results (12 RR 165).

She administered a test designed to determine competency for those with intellectual disability (12 RR 67). Petetan scored 63% of the answers on the test correctly (12 RR 69). The score placed him within the range of those found incompetent to stand trial and below those found competent to stand trial (12 RR 70).

Based on her examination, Petetan has limited capacity to understand the criminal charges against him (12 RR 71). He does not have the ability to consult with counsel (12 RR 73). She felt he would not be capable to testify because he becomes stuck on one topic or loses attention quickly (12 RR 83). Based on all of her activity in the case, Seay did not believe Petetan was competent to stand trial because his intellectual disability was interfering with his ability to be competent (12 RR 88-89). She did not believe he was subject to having his competency

restored due to his intellectual disability (12 RR 88, 148). Petetan rested (12 RR 171).

Dr. Michael Pittman is a psychiatrist from Dallas (12 RR 172). He was appointed by the trial court to examine Petetan for competency (12 RR 174). He assessed Petetan in jail and reviewed various documents (12 RR 177). He did not administer a written examination to Petetan (12 RR 199).

Pittman did not believe Petetan to be intellectually disabled, but did believe his intellect was below average and that he was a "little low in the IQ department" (12 RR 185). After his assessment, Pittman believed Petetan competent for trial (12 RR 186, 196).

On September 23, 2012, Christopher Moutray, of the Bryan Police Department, interviewed Petetan with regard to the murder of his wife, Kimberly Petetan (12 RR 207). Petetan was given his *Miranda* warnings, which he appeared to understand (12 RR 211, 212). Petetan spoke with Moutray and another detective about the events which had transpired the day of his wife's death (12 RR 215). During the interview, Petetan repeatedly told the detectives that Adrian Miller had killed Kimberly (12 RR 217). Petetan participated in a gunshot residue test, but refused to provide a DNA sample (12 RR 220, 223). Upon his arrest, Petetan invoked his right to counsel (12 RR 226). The recorded interview of

Petetan in Bryan was played for the jury (12 RR 228, 61 RR SX C). The State rested (13 RR 15).

Seay was recalled by the defense (13 RR 16). She said that she believed Petetan was being honest with her during their three interviews (13 RR 22). After listening to the State's evidence, she still believed Petetan incompetent for trial (13 RR 25).

Both sides closed on the issue of competency (13 RR 61). No objection was voiced to the court's charge (13 RR 12). The charge was read to the jury (13 RR 62). Argument was presented (13 RR 70, 75, and 84). The jury returned a verdict finding Petetan competent to stand trial (13 RR 94).

## B. Guilt or Innocence Phase

The indictment alleges Petetan killed Kimberly Petetan on September 23, 2012, by shooting her with a firearm while in the course of committing burglary of Kimberly Petetan, retaliation of Kimberly Petetan, and kidnapping of Kimberly Petetan and her daughter, A. W.[1] (1 CR 44, 51 RR 25).

On September 23, 2012, at 6:30 pm in the evening, Waco Police Officer Rebecca Diaz responded to a report of shots fired at The Landing apartment

---

[1] "A. W." was a minor at the time of the offense and a pseudonym is used throughout this brief. See TEX. R. APP. P. 9.10(a)(3).

- 13 -

complex in Waco (51 RR 47). She and a fellow officer approached an apartment, knocked on the door, and opened the door when no one answered (51 RR 54). They saw the body of a white female on the floor as well as bloodstains near the body (51 RR 56). The victim had suffered multiple gunshot wounds (51 RR 56).

Diaz and her fellow officer searched for other victims or a suspect in the apartment and found none (51 RR 57). There were no signs of forced entry into the apartment (51 RR 58). The gunshot victim died by the time paramedics arrived (51 RR 64).

After speaking with a neighbor, Diaz learned the identity of the gunshot victim as Kimberly Petetan (51 RR 66). Diaz also learned that the victim had a young daughter and Diaz was concerned because the child was not in the apartment and her whereabouts were unknown (51 RR 67). While still at the scene, Diaz learned the child had been located in Bryan (51 RR 67).

Ashley Roy, an evidence technician with the Waco Police Department, went to the scene of shooting (51 RR 117). She saw a body with gunshot wounds (51 RR 120). Roy found three .380 shell casings at the scene (51 RR 120-123). Inside the apartment, she noticed blood stains on the four lowest stairs near the front door (51 RR 123). The bloodstains led her to believe the person was already wounded when they climbed the four stairs (51 RR 133). She found no bloodstains upstairs

(51 RR 139). There was no sign of a forced entry or struggle in the apartment (51 RR 124-125). She recovered two cigarette butts and a cigar package outside the apartment (51 RR 153).

Joyce Marek, a Waco Police Department crime scene technician, searched Petetan's 1989 Suburban vehicle which had been seized by the Bryan Police Department (51 RR 164). She took photos of the vehicle and found what she thought to be bloodstains in the vehicle (51 RR 167). The vehicle contained numerous papers belonging to Petetan (51 RR 178). She also found maps in the vehicle showing directions from Port Arthur to Waco and to McLennan County Community College (51 RR 188).

Drs. Chester Gwin and Allison Edgecombe, of the Southwestern Institute of Forensic Sciences, performed an autopsy on the body of Kimberly Petetan (51 RR 200-203). During the examination, they found evidence of two gunshot wounds (51 RR 206). The projectile from one of the wounds hit several major organs (51 RR 220). Gwin testified that Kimberly Petetan died from multiple gunshot wounds (51 RR 224).

Lanelle Waley is a firearm and tool mark examiner with the Department of Public Safety in Austin (51 RR 229). He examined the three shell casings found in apartment and determined they were .380 Winchester cartridges (51 RR 235). All

of the casings had been fired from the same firearm which may have been a Bersa Thunder Model .380 (51 RR 237-238). Waley explained that the Department will not conduct a gunshot residue tests if the suspects hands were swabbed more than four hours after a weapon was allegedly fired (51 RR 242).

Erin Casmus is a forensic scientist with the Department of Public Safety in Waco (51 RR 246). He examined evidence submitted in the case (51 RR 249). A cigarette butt at the scene of the shooting had DNA consistent with that of Kerrie Mouton (51 RR 253). A bloodstain found on the shirt Petetan was wearing at the time of his arrest contained DNA consistent with Petetan's own DNA (51 RR 261).

Kristin Warmack is the older sister of A. W.[2] and daughter of Kimberly Petetan (52 RR 7). She and her mother met Petetan's brother at a brake repair shop in Waxahachie and he suggested Kimberly write to Petetan to share her story and God's love (52 RR 17-19). Her mother corresponded with Petetan in 2009 and 2010 and eventually began to have romantic feelings toward him (52 RR 20). They were married by proxy in September of 2010 with Warmack standing in for Petetan (52 RR 23). Petetan came to live with Kimberly and A. W. in April of 2012 (52 RR 26).

---

[2] Warmack and "A. W." do not have the same last name.

In August of 2012, Kimberly was planning to move to Port Arthur to be with Petetan (52 RR 28). She then decided to stay in Waco and rented an apartment at The Landing apartment complex (52 RR 33). Kimberly eventually moved to Port Arthur in early September of 2012 to be with Petetan (52 RR 34).

On September 13, 2012, Warmack received a voice message from A. W. informing her that Petetan was threatening their mother with a knife (52 RR 36). The following day, her mother decided to leave Port Arthur and move back to Waco (52 RR 37). Her mother told her that in view of Petetan's assault in front of A. W., she was leaving Petetan and intended to divorce him (52 RR 38).

On September 23, 2012, A. W. called Warmack from a convenience store in Conroe and asked her to come pick her up (52 RR 42). On the way, Warmack received a call from her mother's apartment manager in Waco informing her that her mother had been shot and was dead (52 RR 43). Warmack called 911 to report her sister's call for help and upon investigation by the police; she was told A. W. was not at the convenience store (52 RR 44).

Later in the day on September 23, 2012, Warmack received a telephone call from Kerrie Mouton informing her that the police in Bryan had A. W. (52 RR 45). She drove to Bryan that night and picked up her younger sister, A. W. (52 RR 46). A. W. now lives with her (52 RR 7).

Warmack went to her mother's apartment in Waco a couple of days later to pick up some clothing for A. W. (52 RR 48). While at the apartment, she found her mother's purse in the dishwasher (52 RR 49).

On September 13, 2012, Ryan Kidwell, of the Port Arthur Police Department, responded to a domestic disturbance call (52 RR 83). Kimberly Petetan told Kidwell that Petetan assaulted her when she asked him to stop smoking in the apartment because her daughter has asthma (52 RR 85). She said Petetan had thrown her to the floor and held a kitchen knife close to her (52 RR 86). While holding the knife close to her, Petetan said "I could kill you, do you want to die in front of your child?" (52 RR 88).

Petetan left the apartment by the time Kidwell arrived (52 RR 87). Kimberly told the officer she wanted to file assault charges against Petetan and she knew it would be a felony since he used a knife during the assault (52 RR 90). She also told the officer she was leaving Port Arthur and moving back to Waco (52 RR 93).

On September 23, 2012, Jackie Musgrove was staying at a motel in Waco (52 RR 102). Petetan approached him and asked him to rent a room in Musgrove's name for Petetan in return for ten dollars (52 RR 104). Musgrove did as asked and was paid by Petetan (52 RR 108).

On September 23, 2012, Cornelius Jefferson was at The Landing apartment complex in Waco washing clothes (52 RR 121). He was approached by a man who asked him to knock on an apartment door (52 RR 124). Jefferson agreed to do so because he thought it was a joke or prank (52 RR 124). He knocked on the door and two women looked out the window (52 RR 125). The man who asked him to knock was crouched down behind Jefferson (52 RR 126). Eventually one of the women opened the door of the apartment and the man who had been crouched down behind Jefferson ran into the apartment (52 RR 127). Jefferson identified Petetan as the man who asked him to knock on the door and eventually ran into the apartment (52 RR 132).

Nichlos Lampkin previously lived in the same apartment complex as Kimberly and A. W. on Purvis Street in Waco (52 RR 147). Petetan later moved into the apartment and frequently argued with Kimberly (52 RR 153). Sometimes when Petetan was angry, he would tell Lampkin in reference to Kimerbly "man, I'm going to kill that bitch" (52 RR 154). Petetan and Kimberly eventually moved from the complex (52 RR 158).

Morris Evans knew Petetan and Kimberly when they lived in an apartment complex on Purvis Street in Waco (52 RR 165). Evans recalled an occasion when

Petetan accused him of sleeping with Kimberly (52 RR 168).  Evans remembered Petetan saying "I'm going to kill the bitch" (52 RR 169).

Charles Gatlin was an inmate at the McLennan County Jail with Petetan following Petetan's arrest for murder (52 RR 179).  One morning in jail, Petetan bumped into Gatlin and Gatlin said "excuse me" to which Petetan replied "I killed my wife and I will kill you" (52 RR 179).  On another occasion, Petetan asked Gatlin if the authorities could match a fingerprint from a gun based on a DNA sample (52 RR 181).  Petetan asked Gatlin to explain a ballistics report and whether it meant the police had a gun (52 RR 182).

On September 23, 2012, Officer Crystal O'Rear, of the Bryan Police Department, received a call of a possible kidnapping (53 RR 7).  Within ten minutes she saw a vehicle matching the description of that involved in the possible kidnapping (53 RR 21).  She stopped the vehicle which was occupied by four people, Petetan, A. W., Adrian Miller, and Kerrie Mouton (53 RR 8, 11).  Backup officers arrived, the occupants were separated, and O'Rear had an opportunity to speak with A. W. about what had happened to her mother in Waco (53 RR 13, 15).  While stopped on the roadway, Mouton called A. W.'s older sister in Conroe and told her A. W. was in Bryan and safe in the presence of law enforcement officers (53 RR 25).

At 9:43 pm on September 23, 2012, Officer Lance Matthews, of the Bryan Police Department, received a call that his assistance was needed in conducting some interviews (51 RR 72). Those to be interviewed had knowledge of a murder in Waco (51 RR 73). They had been stopped in a vehicle traveling through Bryan (51 RR 73). The individuals to be interviewed were A. W., Kerrie Mouton, Adrian Miller, and Petetan (51 RR 76). Matthews first obtained some information from a Waco Police Department detective before conducting the interviews (51 RR 77).

Matthews first interviewed A. W., the daughter of Kimberly Petetan (51 RR 79). She had no difficulty describing the events leading to her mother's shooting (51 RR 81).

Matthew next spoke with Miller (51 RR 82). Miller was cooperative, provided a DNA sample, and took a gunshot residue test (51 RR 84, 86). After the interview, Matthews did not believe Miller was involved in the shooting (51 RR 87).

Mouton was interviewed next (51 RR 87). He was cooperative, provided a DNA sample, and took a gunshot residue test (51 RR 88). After interviewing Mouton, Matthews did not believe him to be a suspect in the shooting (51 RR 90).

Petetan was the last person interviewed (51 RR 91). He was cooperative and took a gunshot residue test (51 RR 92). He refused to provide a DNA sample (51

RR 92).  At the conclusion of the interviews, Matthews arrested Petetan for the murder of Kimberly Petetan based on a McLennan County arrest warrant (51 RR 92).  Miller and Mouton were released and A. W. was turned over to her older sister (51 RR 93, 95).

Adrian Miller and Petetan grew up together in Port Arthur (53 RR 34).  In the early morning of September 23, 2012, Miller saw Petetan at a store in Port Arthur (53 RR 36).  Petetan told him he was going to Waco to buy some drugs and he would give Miller an ounce of crack cocaine and some money if he would drive Petetan to Waco (53 RR 37).  Kerrie Mouton agreed to come along in order to "watch Miller's back" (53 RR 40).

On the way to Waco, Petetan had a gun which he placed in the hood compartment of his Suburban (53 RR 41).  The threesome arrived in Waco about noon and went to a motel (53 RR 43).  Petetan paid a man to rent a room for them (53 RR 45).

Petetan left the motel in his Suburban without Miller or Mouton (53 RR 52).  When Petetan returned to the motel, he was driving Kimberly's truck which was also occupied by Kimberly and A. W. (53 RR 52).  Petetan told Miller and Mouton to get in the bed of the truck and they all drove to Kimberly's apartment complex (53 RR 54).  Miller noticed Petetan's vehicle was at the complex (53 RR 55).

They entered Kimberly's apartment (53 RR 56). Miller and Mouton stayed downstairs and watched television for two hours (53 RR 56). Petetan and Kimberly went upstairs and Miller never heard them arguing (53 RR 56). When Petetan and Kimberly came downstairs, Kimberly told Miller where he could find something to eat in the kitchen (53 RR 57).

As Kimberly was trying to walk out the front door, Petetan slammed the door shut and struck her with his fist (53 RR 57). Petetan then produced a pistol and shot Kimberly multiple times (53 RR 59). Miller testified that Mouton ran out of the apartment after the first shot and A. W. did so after the second shot (53 RR 59). Miller believed Petetan shot Kimberly four times and he saw her fall to the floor in the apartment (53 RR 60).

Miller and Petetan left the apartment and got in Petetan's vehicle which was already occupied in the back seat by Mouton and A. W. (53 RR 61). Miller testified he got in the vehicle to drive because he was concerned Petetan would hurt A. W. or Mouton (53 RR 62). Miller stated that no one told A. W. and Mouton to get in Petetan's Suburban, they simply did so after the shooting of Kimberly in the apartment (53 RR 90).

With Miller driving, they stopped for gas (53 RR 63). Petetan gave Miller money to purchase gasoline after Petetan had rubbed the money on his hands (53

RR 63). Petetan followed Miller into the gas station and Miller was not able to alert the clerk of the shooting in Waco (53 RR 65).

In the vehicle, A. W. asked if her mother was dead (53 RR 68). Miller told her "no," and Petetan said nothing (53 RR 68). Miller never heard Petetan apologize to A. W. for killing her mother (53 RR 68).

After stopping at a store in Bryan, Miller intentionally engaged in aggressive driving in an effort to attract the attention of a nearby police officer (53 RR 70, 72). When the officer approached the vehicle, Miller told the officer that he needed to talk to the officer in private (53 RR 72). Petetan told Miller to only talk to the officer in the presence of Petetan (53 RR 72).

When the officer took Miller to the rear of the vehicle, Miller told him what had happed in Waco (53 RR 73). Miller denied killing Kimberly or knowing of Petetan's intent to do so (53 RR 77).

In hindsight, Miller believes Petetan was trying to set him up or frame him for the murder of Kimberly (53 RR 74). He recalled that once they were on Highway 6 headed toward Bryan from Waco, Petetan had Miller pull over so he could dispose of the pistol and piece of pizza Miller had taken from Kimberly's apartment (53 RR 66). Miller believed Petetan was trying to set him up with DNA from the pizza, or the pizza wrapper at the murder scene, and connect him to the

murder weapon (53 RR 66).  Miller also recalled that a couple of weeks before shooting, Petetan offered him a rock of crack cocaine if he would call Kimberly and cuss her out on the phone (53 RR 91).  Miller agreed to do so and he believes the call was recorded for possible later use by Petetan in implicating him the murder of Kimberly (53 RR 91).

Kerrie Mouton first met Petetan in 2012 in Port Arthur (53 RR 98).  Petetan asked Mouton to come with him on trip to Waco to buy drugs (53 RR 101).  Petetan promised to give Mouton some drugs if he would come along on the trip (53 RR 101).

Miller came with them on the trip to Waco (53 RR 102).  When they arrived in Waco, they checked into a motel (53 RR 106).  Petetan left the motel in his vehicle and later returned in a truck occupied by Kimberly and A. W. (53 RR 108, 109).

Mouton and Miller got in the bed of Kimberly's truck and she drove the five of them to her apartment (53 RR 110).  Upon arriving, Kimberly opened the door and they all entered (53 RR 111, 131).  While he and Miller were downstairs, Mouton heard Kimberly upstairs say "fuck you Carnell, if you are going to kill me, kill me" (53 RR 113).

When Kimberly and Petetan came downstairs, she tried to unlock and open the front door, but Petetan pushed her away and into a wall (53 RR 117). When Kimberly pushed Petetan, he shot her multiple times with a handgun (53 RR 118).

After the shooting, Mouton and A. W. ran out the back door of the apartment and jumped into Petetan's vehicle (53 RR 121). Mouton intended to drive the two of them away, but Miller and Petetan came outside and entered the vehicle before he could do so (53 RR 121). Mouton did not force A. W. to get in the vehicle with him; she simply followed him to the vehicle after the shooting of her mother (53 RR 135).

The four of them drove away with Miller driving, Petetan in the front passenger seat, and Mouton and A. W. in the rear seat (53 RR 122). While they were traveling, Mouton was in fear for his life and A. W. was crying and asking for her older sister (53 RR 124). Eventually, they were stopped by the police in Bryan and Mouton told the police the details of the shooting in Waco (53 RR 125, 127).

A. W. was eleven years old at the time of trial in April of 2014 (53 RR 143). At one time, she and her mother lived in an apartment on Purvis Street in Waco (53 RR 145). While living on Purvis, Petetan moved in with them (53 RR 145). Petetan would yell at her mother and say bad things to her (53 RR 147). She and her mother then moved to The Landing apartment complex in Waco (53 RR 148).

After moving to The Landing, her mother told her that they were moving to Port Arthur to be with Petetan because that was where he was on parole (53 RR 150).

After moving to Port Arthur, her mother and Petetan fought and her mother would cry (53 RR 151). She recalled an argument in the apartment one night when Petetan refused her mother's request to smoke outside rather than in the apartment because she has asthma (53 RR 155). Petetan pushed her mother to the floor and she was crying (53 RR 156). Petetan retrieved a knife from the kitchen, put the knife behind her mother, and asked "if she wanted to die in front of A. W." (53 RR 158). Her mother ran to the bathroom and called the authorities concerning the assault and Petetan then cut himself on the stomach with the knife (53 RR 160). She saw Petetan call the police and then leave the apartment before the police arrived (53 RR 161). The next day, her mother told her they were leaving Port Arthur and moving back to Waco (53 RR 163).

Her mother died on a Sunday after they had attended church and talked about Heaven (53 RR 168). They were at home and heard a knock on the door (53 RR 172). Looking out the window, they could tell it was a stranger knocking (53 RR 173). When her mother opened the door, Petetan pushed his way into the apartment without her mother inviting him in (53 RR 174). Petetan pulled a gun from his pocket and waved the gun around the apartment (53 RR 175). Petetan

told her mother to get dressed and "come with me" (53 RR 176). Petetan told her mother they were going to Port Arthur and she was "going to tell the cops what happened" (53 RR 177).

The three of them got into her mother's truck and her mother was driving (53 RR 177). Petetan still had the gun in his pocket while in the truck (53 RR 178). Petetan directed her mother to drive to a motel in Waco (53 RR 179). Once they arrived at the motel, Petetan told her mother to honk the horn of the truck (53 RR 180). Two men came out of a room and got in the bed of the truck (53 RR 180). She did not know the men (53 RR 180).

They left the motel and returned to her mother's apartment (53 RR 183). Once at the apartment, everyone went inside (53 RR 184). The two men stayed downstairs and her mother and Petetan went upstairs (53 RR 184). While upstairs, she saw Petetan try to kiss her mother (53 RR 185). Petetan told A. W. to go to her own bedroom and leave them alone (53 RR 186).

Everyone went downstairs and her mother was washing dishes (53 RR 187). The men were outside on a patio smoking cigarettes (53 RR 187). When they came back into to the apartment, one of the men put a pizza in the microwave oven (53 RR 188).

When her mother tried to open the front door, Petetan ran toward the door, shut it, and pushed her mother into a wall (53 RR 190). Petetan told her mother to stand on the stairs, that it was "time for her dust away," and then he shot her three times (53 RR 191). Her mother fell to the floor and "flopped around like a fish" (53 RR 192).

The younger of two other men in the apartment grabbed her and took her out the back door of the apartment (53 RR 192). He told her that everything would be okay (53 RR 193). When they briefly went back into the apartment, she saw Petetan grabbing all of the cellphones in the apartment (53 RR 193).

All four of them then got in Petetan's white Suburban and left (53 RR 195). At one point, they stopped on the road by some trees and she saw Petetan wrap the gun used to shoot her mother in a sheet and then throw the sheet over a fence and into the woods (53 RR 198). After the Suburban was stopped by the police in Bryan, she told the police what had happened in Waco and her older sister then picked her up in Bryan and took her to Conroe (53 RR 201). The State rested (53 RR 224).

On September 23, 2012, Chasity Hamilton was working as a clerk at the Big Gas Truck Stop in Bryan (54 RR 15). Petetan came into the store and was acting

in a nervous manner (54 RR 18). She obtained a description of his vehicle as well as the license plate number and called the police after he left the store (54 RR 19).

Ricki Elliot met Petetan when he was living with Kimberly in an apartment on Purvis Street him Waco (54 RR 22). Her apartment was next door and she never heard Petetan and Kimberly arguing in their apartment (54 RR 23).

Petetan testified his relationship started with Kimberly while he was a prisoner serving a 20 year sentence at the Ellis Unit of the TDCJ-ID (54 RR 31). They corresponded with one another and she would visit him in prison with her daughter, A. W. (54 RR 35). They eventually decided to marry and were married by proxy 18 months before he was paroled from prison (54 RR 37-38).

He was in prison for five convictions, three aggravated assaults and two attempted murders (54 RR 84). He served 19 years and 8 months of a 20 year sentence before he was released on parole (54 RR 84).

After being released on parole, he lived with Kimberly and A. W. in an apartment on Purvis Street in Waco (54 RR 40). He never threatened to kill his wife while living on Purvis Street (54 RR 43). They eventually moved to an apartment at The Landing in Waco because they were having problems with the neighbors on Purvis Street (54 RR 44).

He denied assaulting Kimberly in Port Arthur (54 RR 46). Rather, after she disapproved of him going to a recording studio, she slapped him, and then cut him on the chest with a knife (54 RR 49-50). He reported her assault of him to the police (54 RR 50).

On the day of Kimberly's death, Petetan came to Waco from Port Arthur to pick up some property and return some money to Kimberly (54 RR 52). Miller and Mouton came with him because he did not know the way from Port Arthur to Waco (54 RR 52). Once they arrived, he rented a motel room for Miller and Mouton (54 RR 55).

Petetan drove to Kimberly's apartment and she let him come inside (54 RR 57). He denied crouching down behind a man and rushing into her apartment when the door was opened (54 RR 57). He denied having a gun in the apartment (54 RR 123). He, Kimberly, and A. W., drove to the motel to pick up Miller and Mouton (54 RR 60). Before they went back to Kimberly's apartment, they stopped for Kimberly to buy some marijuana (54 RR 63).

Once they returned to Kimberly's apartment, Pertetan and Kimberly went upstairs and Mouton and Miller remained downstairs (54 RR 63). Petetan did not have a gun, but Miller had brought a gun from Port Arthur for protection because this was his first trip to Waco (54 RR 63).

- 31 -

Eventually, Petetan and Kimberly went downstairs (54 RR 65). She became upset when she saw Miller eating her food (54 RR 66). Kimberly and Miller began to argue (54 RR 68). While Miller and Kimberly were near the front door, Petetan heard Miller say "fuck this bitch" and then saw Miller shoot Kimberly (54 RR 71). When Petetan tried to call 911, Miller pointed the gun at him and took his phone (54 RR 73).

The four of them left with Miller driving and A. W. pleading with Petetan not to let Miller hurt her (54 RR 73). Petetan only got into the vehicle to protect A. W. from Miller (54 RR 144). Miller wanted to throw A. W. out of the vehicle while traveling down the highway or take her to Houston and kill her (54 RR 76). When they stopped at a truck stop in Bryan, Petetan told the clerk that his daughter was in the vehicle, she had been kidnapped, and his wife had been shot in Waco (54 RR 77).

Eventually, Petetan's vehicle was stopped because of the information he gave to the clerk at the truck stop (54 RR 78). When an officer approached the vehicle, Petetan told her that Miller had kidnapped his daughter and shot his wife (54 RR 79). When he was interrogated at the police station, Petetan repeated that Miller had kidnapped his daughter and shot his wife (54 RR 80). The defense rested (54 RR 156)

In rebuttal, the State called Michael Tovar who was an inmate at the McLennan County Jail with Petetan (54 RR 158). In jail, Petetan referred to Kimberly as "that bitch" (54 RR 162). Petetan told Tovar that he shot Kimberly "boom-boom-boom" (54 RR 166). Petetan said he was willing to talk about the murder because the State would be unable to charge him due to his "mental state" (54 RR 168).

The State rested on rebuttal and both sides closed (54 RR 173). No objections were voiced to the court's charge and it was read to the jury (54 RR 174, 176). Argument was presented (54 RR 188, 197, and 215). The jury found Petetan guilty of capital murder as charged in the indictment (54 RR 224).

### C. Punishment Phase

Ramona Pitre is a public school teacher in Port Arthur (55 RR 21). In 1989, Petetan was in her in-school suspension program (55 RR 26). He was angry, resistant, and disruptive in class (55 RR 27). On May 24, 1989, Petetan threw a lunch tray full of food at her when she tried to make him sit in the correct seat (55 RR 29). She does not believe Petetan is mentally intellectually disabled (55 RR 31). She believed he cannot follow rules and misbehaves (55 RR 31). In twenty five years of teaching, she has never had a student with intellectual disability, mental problems, or mental illness in one of her classes (55 RR 32).

Edward Cockrell is with the Jefferson County Juvenile Probation Department (55 RR 36).  In 1990, Petetan was placed in intensive supervision juvenile probation for assaulting Pitre and the offense of criminal mischief against another person (55 RR 41).  Petetan did not comply with the terms of probation and was eventually committed to the Brownwood State School (55 RR 49).  Petetan returned to Port Arthur on juvenile parole and continued engaging in criminal conduct (55 RR 50).

Eventually, it was decided to pursue certification for prosecution as an adult after Petetan shot Fredrick Nico with a gun in March of 1992 (55 RR 50, 51, and 55).  Cockrell's certification analysis was admitted into evidence (55 RR 53, 62 RR SX 133).  When Petetan was 16 years of age, an IQ test administered yielded a score of 64 on a child's test and 74 on an adult test (55 RR 65, 62 RR SX 133).  A doctor described Petetan as mildly intellectually disabled  in connection with testing conducted relative to the certification proceeding (55 RR 66).  Eventually, Cockrell recommended Petetan be certified and tried as an adult for various offenses he committed while under 17 years of age (55 RR 72).  He was certified to stand trial as an adult (55 RR 82).

Records from the former Texas Youth Commission regarding Petetan were admitted into evidence (55 RR 87, 62 RR SX 128).  Those records reflect an IQ

score of 61 for Petetan when he was admitted to TYC at the age of 15 in 1991 (62 RR SX 128).

The juvenile certification proceedings related to Petetan were admitted into evidence and published to the jury (55 RR 82, 62 RR SX 130). The exhibit reflects Petetan's date of birth as February 7, 1976 (62 RR SX 130).

Leonard Cucolo testified that Petetan was received by the Brownwood State School in 1991 after his juvenile probation for burglary was revoked (55 RR 84, 87). He was at the Brownwood School for four months before returning to Port Arthur on juvenile parole (55 RR 93). While at the Brownwood School, Petetan was diagnosed as mildly intellectually disabled (55 RR 103).

Port Arthur Police Department Officer Brian Broussard responded to a shooting report on March 21, 1992 (55 RR 107-108). He spoke with the victim, Fredrick Nico, who told him that Petetan had shot him with a gun (55 RR 110). Petetan shot Nico twice, and then tried to shoot him in the head, but the gun misfired (55 RR 111-112). Nico related the shooting was unprovoked (55 RR 112).

Petetan was arrested for the shooting of Nico (55 RR 113). When he was 16 years of age, Petetan was certified to stand trial as an adult and received a 20 year sentence for the attempted murder of Nico (55 RR 115).

On March 21, 1992, Fredrick Nico, was at Petetan's house in Port Arthur drinking beer in the backyard (55 RR 124). Nico was carrying a pistol for protection (55 RR 122). When Nico put the pistol on a table, Petetan grabbed it and ran to an alley (55 RR 126). When Petetan returned from the alley, he pointed the pistol at Nico and shot him twice (55 RR 128). Nico denied that Petetan tried to shoot him a third time in the head (55 RR 129).

Nico later learned that Petetan was prosecuted for his attempted murder (55 RR 131). Nico has known Petetan for 25 years and does not consider him to be intellectually disabled (55 RR 134).

Judge Vi McGinnis previously served as a Justice of the Peace in Jefferson County (55 RR 150). His duties included giving warnings to arrested juveniles and reviewing any written statements given by juveniles to police before they were signed by the juvenile (55 RR 153). Following his arrest for the attempted murder of Nico, McGinnis gave Petetan his statutory warnings (55 RR 156). McGinnis also reviewed the statement Petetan provided to the police concerning the shooting of Nico (55 RR 157). The statement reflected Petetan shot Nico because Nico had previously beat him, Nico had laughed at Petetan's mother, and Nico laughed when he learned that Petetan's friend "Pee Wee" had been killed (55 RR 159).

Officer Tony Barker, of the Beaumont Police Department, responded to a call from the Jefferson County Juvenile Detention Center in April of 1992 (55 RR 165). He spoke with a teacher at the Center who reported that Petetan had physically assaulted her (55 RR 166). Barker arrested Petetan for assaulting the teacher (55 RR 168).

Raffiel Dugas testified that when he was 15 or 16 year old, he fought with Petetan inside a club in Port Arthur (55 RR 173, 177). Petetan hit Dugas with a chair rendering Dugas unconscious (55 RR 179). Petetan then proceeded to beat Dugas with the chair while he was unconscious on the floor (55 RR 180). Dugas sustained multiple injuries and was in the hospital for a week (55 RR 180-182). He later learned that Petetan went to prison for assaulting him with a chair (55 RR 180).

Max Wolgast, of the Port Arthur Police Department, responded to a shooting on January 14, 1993 (55 RR 186). Victor Loeb was shot in a drive-by shooting while walking in his neighborhood (55 RR 187). He sustained three gunshot wounds (55 RR 188). Petetan was arrested for the shooting three days later and the handgun used in the shooting was found in his mother's home (55 RR 189). Petetan was sent to prison for shooting Loeb (55 RR 190).

Kari Biddix previously lived in Port Arthur (55 RR 192). She recalled an incident when she heard gunshots outside her home and saw an older man limping and grabbing his side on the sidewalk (55 RR 193). She approached the man and he said "I've been shot" (55 RR 196). After learning the man's name, she and her sister drove to Loeb's house and told his wife that her husband had been shot (55 RR 197).

On June 28, 1992, Corey Mendoza was a detention officer in the Jefferson County Jail (55 RR 202). He responded to a fire set in a cell occupied by Petetan and another inmate (55 RR 203). After Mendoza extinguished the fire, Petetan said he would start another fire if he was not moved to a different cell (55 RR 204). Mendoza later received a report that Petetan was throwing water on other inmates as they walked by his cell (55 RR 206). Jail records reflect Petetan's date of birth as February 7, 1976 (55 RR 203).

On February 9, 1993, while working as a jailer in the Jefferson County Jail, Mark Beadle responded to an inmate who had been burned when Petetan threw hot water on him (55 RR 210-211). His records reflect Petetan assaulted another inmate in jail on May 28, 1993 (55 RR 213).

The pen packets from Petetan's five prior felony convictions were admitted into evidence (55 RR 217, 62 RR SX 131). The packets reflect that on July 7,

1993, he pleded guilty to five felony offenses committed while he was a 16 year old juvenile (62 RR SX 131). Those offenses were two attempted murders and three aggravated assaults (62 RR SX 131). Pursuant to a plea bargain, he received two 20 year sentences and three 10 year sentences to be served concurrently (62 RR SX 131). He was received at the Department of Corrections when he was 17 years of age on August 27, 1993 (62 RR SX 131). Prison records reflected his IQ testing was scored at 69 with a notation he was expelled following the eighth grade (62 RR SX 130).

Joseph Blanton was previously employed as a prison guard at the Ferguson Unit of TDCJ (55 RR 230). On December 5, 1993, Petetan was involved in a fracas in the dayroom with several other offenders (55 RR 233). He was eventually found guilty in an administrative hearing of assaulting four other inmates (55 RR 240).

Darrel Musgrove was previously employed as a prison guard at the Ferguson Unit of TDCJ (55 RR 248). On February 24, 1994, Petetan assaulted him by striking him in the chest with his elbow (55 RR 250).

Gilbert Mercado is a former prison guard from the McConnell Unit of TDCJ (55 RR 256). On April 5, 1995, Mercado saw Petetan in a fight with another inmate and repeatedly strike the other inmate with his fist (55 RR 259).

Billy Jordan previously worked at the Ferguson Unit of TDCJ as a prison guard (56 RR 6). On July 24, 1994, he responded to screams from a cell occupied by Petetan and Christopher Robinson (56 RR 7). Robinson was covered in blood and had injuries to his face and head (56 RR 9). Robinson was holding a sock which contained a padlock (56 RR 9). Petetan had no injuries (56 RR 9). Petetan was administratively charged with attacking another inmate with a weapon (56 RR 11).

James Simmons previously worked as a prison guard at the Clements Unit of TDCJ (56 RR 19). On June 3, 1995, Petetan approached Simmons and asked to be his boyfriend (56 RR 19). Petetan told Simmons that he loved him and wanted to live with him when he was released from prison (56 RR 20). Petetan was administratively charged with soliciting an officer (56 RR 20).

Kellie Dossett previously worked as a prison guard at the McConnell Unit of TDCJ (56 RR 26). On August 25, 1995, Petetan yelled at Dossett and threw a liquid on him because Petetan was not allowed to participate in recreation (56 RR 27, 30). Petetan was administratively charged with assaulting an officer (56 RR 30).

On February 25, 1996, prison guard Jody Munn searched Petetan's cell at the Coffield Unit for contraband (56 RR 34-35). When Petetan returned to his cell,

he found Munn inside his cell and he threated to "kick her ass" (56 RR 37). Petetan was administratively charged with threatening an officer (56 RR 38).

Morris Lee was Petetan's principal in elementary school (56 RR 44). Petetan was frequently sent to Lee's office because he did not follow school rules (56 RR 45). According to Lee, Petetan had no mental disabilities other than being hard headed (56 RR 51).

Speedy Bryant has served a sentence for aggravated robbery since 1993 (56 RR 63). On February 28, 1994, he and Petetan were cellmates at the Ferguson Unit of TDCJ (56 RR 64). Petetan sexually assaulted him in their cell after they had been cellmates for a week (56 RR 65). When Bryant reported the sexual assault to a guard, Petetan and his friends jumped on Bryant and beat him (56 RR 67).

In January of 2004, Concepcion Rosas and Petetan were cellmates at the Ellis Unit of TDCJ (56 RR 74). One afternoon after they had been cellmates for two weeks, Petetan sexually assaulted Rosas in their cell (56 RR 77).

Daniel Gunter was incarcerated at the McConnell Unit of TDCJ in 1995 (56 RR 83). Gunter overheard Petetan tell his cellmate that he wanted a sexual relationship with Gunter (56 RR 87). One afternoon, Gunter was knocked unconscious in his cell (56 RR 92). When he regained consciousness, he was in

Petetan's cell with his pants pulled down and Petetan sexually assaulting him while holding a shank to Gunter's throat (56 RR 92-94). Gunter reported the incident to a guard (56 RR 96). The State rested on punishment (56 RR 99).

Ophelia Ortiz is Petetan's mother (56 RR 107). He is the youngest of her children (56 RR 109). Petetan's father was both intellectually disabled and crazy (56 RR 109). While a child, Petetan was physically abused by his father (56 RR 129).

As an infant, Petetan would constantly cry and pitch a fit (56 RR 112-113). He would break his baby bottles (56 RR 112). His temper tantrums started as a baby and have never subsided (56 RR 121).

Petetan has wet the bed since childhood and still does so (56 RR 114). He was slow as a child and his mother had to repeatedly tell him to bathe (56 RR 115). He was unable to take care of himself as a child and unable to tie his shoes (56 RR 116). As a child, he was unable to dress himself or brush his teeth (56 RR 116). He did not follow her directions (56 RR 118).

She had to walk with him to school because if he went by himself, he would get lost or go the wrong way (56 RR 117). He did not do his school homework (56 RR 118). She could never send him to the store because he could not remember

what he was to purchase (56 RR 171).  He never learned to make change when purchasing an item (56 RR 171).

After his best childhood friend, "Pee Wee," died, his nervousness and depression increased (56 RR 120).  Petetan had no interest in television or games as a child (56 RR 122).  He would simply sit on the floor or go walking by himself without first telling his mother where he was going (56 RR 122).  He was committed to a psychiatric hospital at age 15 before he went to the Brownwood State School (56 RR 128).

Petetan was never able to get a driver license because he was unable to pass the written portion of the test (56 RR 123).  After he left prison, he could not take care of himself (56 RR 124).  Her daughter would clean and wash his clothes because he could not operate a washing machine (56 RR 124).  He was unable to figure out how to operate a cell phone (56 RR 125).  He never learned to wash dishes (56 RR 127).

Sabrina Mouton, Petetan's older sister, testified that up to age two, Petetan would cry constantly, wet himself, and not pay attention (56 RR 182).  He didn't walk until three years old or talk until four or five years old (56 RR 184).

Growing up, Petetan would not play outside with his sister (56 RR 185).  He wandered around the neighborhood aimlessly by himself (56 RR 185).  He never

watched television or played games (56 RR 186). He was overweight as a child and teased by others (56 RR 187). He never learned to ride a bicycle (56 RR 188).

When Petetan came home from prison, she tried to teach him how to use a cell phone and he could not learn (56 RR 193). He never learned to count money (56 RR 198). His handwriting is poor (56 RR 201). At the apartment he obtained while on parole, Petetan did not know how to cook for himself or clean up after himself (56 RR 197).

Cathy Gauthier, Petetan's aunt from Lake Charles, testified that Petetan lived with her for a year when he was 13 or 14 years old (56 RR 241, 244). He was real quiet and slower than her children (56 RR 245-246). Petetan did not attend school for the year he spent with Gauthier (56 RR 251).

Petetan's cousin, Caston Gauthier, visited Petetan while he was in prison (56 RR 26). When Petetan told Gauthier that he wanted to be a bondsman or rapper when released from prison, Gauthier thought Petetan did not have the intellectual ability to engage in such professions (56 RR 263-264). He never thought Petetan was intellectually disabled (56 RR 265).

Kimberly Jackson is Petetan's cousin and the daughter of Cathy Gauthier (56 RR 272). She and Petetan are the same age (56 RR 272). She remembered

that when Petetan was living with her family, he was not on her level "mind-wise" and intellectually slower than her (56 RR 272, 274).

Thomas Kemper is Petetan's uncle (56 RR 276). Petetan has been intellectually slow since birth (56 RR 279). He was in special education classes in school (56 RR 280). As a child, Petetan refused to bathe or groom himself (56 RR 281).

Dr. Ray Coxe is a psychologist from Beaumont (56 RR 313). In 1992, he was performing psychological examinations for the court system in Jefferson County in connection with whether juveniles should be certified as adults for purposes of prosecution (56 RR 315). He examined Petetan at the request of the juvenile probation department in connection with a pending attempted murder charge and whether Petetan should be certified as an adult (56 RR 316-317). Petetan was 16 years of age at the time of the examination (56 RR 316).

In view of his age, Coxe administered IQ tests for both children and adults to Petetan (56 RR 318). He explained the child test goes up to age 17 while the adult test goes down to age 16 (56 RR 318). Petetan's full scale IQ on the child version was 64 which places him in the lower three percent (56 RR 322). Petetan's full scale IQ on the adult test was 74 which places him in the lower four percent (56

RR 323). Due to testing differences between the two tests, it is not unusual for the adult test to be 10 points higher than the child test (56 RR 323).

Coxe also administered achievement tests to Petetan (56 RR 354). The tests are scored like an IQ test (56 RR 354). Petetan scored 70 on reading, 61 on spelling, and 46 on mathematics (56 RR 354). Based on testing and evaluation in 1992, Coxe believed Petetan to be mildly intellectually disabled (56 RR 357).

Dr. Harold Scott, a psychiatrist, was previously a consultant for the Texas Youth Commission at the Brownwood State School (57 RR 40. 43). He examined Petetan at the school in 1991 when Petetan was 15 years old (57 RR 45). Scott diagnosed Petetan with a conduct disorder and mild mental disability (57 RR 53). Scott explained that mild mental disability meant an IQ score between 55 and 69 (57 RR 55). The diagnosis was based in part on previous IQ testing of Petetan (57 RR 56).

Edmond Stewart is a former professional boxer (57 RR 92). For the last five years, he has been a pastor at a jail ministry in the McLennan County Jail (57 RR 95). Stewart met with Petetan in jail and found it hard to have a conversation with him because his mind tends to "wander off" (57 RR 98).

Ellis Craig is a psychologist with 47 years of experience working in the area of adaptive behavior assessments (58 RR 7). He performed an adaptive behavior

assessment of Petetan by administering a test, reviewing records, and speaking with Petetan's relatives (58 RR 18, 34, and 38). When speaking with Petetan's relatives, Craig sought to determine adaptive behavior before the time Petetan went to prison at 17 years of age (58 RR 67). Most of the answers provided to his questions were examples of adaptive deficits from the time Petetan was a youth of 14 or 15 years old and had not yet gone to prison (58 RR 68). Craig believed Petetan was forthcoming with him during the assessment and did not intentionally attempt to underestimate his abilities (58 RR 39).

The information gathered from Petetan's relatives was graded for adaptive disabilities (58 RR 40). The information from Petetan's mother placed Petetan so low that Craig did not consider it reliable (58 RR 40). Petetan's brother and sister ranked his social skills at the best, conceptual skills second, and practical skills at the lowest (58 RR 41).

The scoring of adaptive assessment is similar to scoring on an IQ test with the norm in the 85 to 115 range (58 RR 42). The results of the assessment done by Craig were based on input from Petetan and his relatives and the scores were as follows: brother 53; uncle and sister 47; Petetan 42; and Petetan's mother 40.

Craig concluded Petetan's adaptive limitations far outweigh his limited skills (58 RR 47). Craig had to rely on retrospective assessments because there was no

measure from when Petetan was a child other than one report noting his adaptive limitations without concurrent testing (58 RR 48). Based on his adaptive behavior deficits and the IQ scores he has seen, Craig considers Petetan to be moderately intellectually disabled which is more severe than mildly intellectually disabled (58 RR 48).

Dr. Kevin Correia, a psychologist, examined Petetan on August 8, 2012, in connection with an application for Social Security disability benefits (58 RR 104, 63 RR DX 5). Correia administered an IQ test resulting in a full scale score of 55 (58 RR 104, 63 RR DX 5). Correia diagnosed Petetan as mildly intellectually disabled in view of his IQ score and adaptive behavior deficits (58 RR 104, 63 RR DX 5).

Joan Mayfield is a neuropsychologist (58 RR 105). While Petetan was in the McLennan County Jail awaiting trial, she administered 16 different tests to him (58 RR 124). The tests covered areas such as IQ, intellectual ability, attention, executive functioning, academic achievement, memory, learning, language, visual spatial, and motor coordination (58 RR 117). She did not perform any adaptive behavior assessment testing and relied on the testing by Dr. Craig (58 RR 231).

Mayfield explained that one of the components of intellectual disability is sub-average intellectual functioning as shown by a full scale IQ score of 70 or

below, namely, two standard deviations below the mean (58 RR 129).  She also considered and looked for evidence of an onset of the condition before the age of 18 (58 RR 132).

Mayfield was provided access to various records including Petetan's school records and previous psychological testing (58 RR 133).  She noted Petetan was required to repeat both the third and sixth grades in school (58 RR 133).  He was socially promoted to the fourth grade rather than being required to repeat the third grade three times (58 RR 133).  He ultimately dropped out of school in the ninth grade (58 RR 220).

Her testing of Petetan revealed global delays in intellectual ability, academic, executive functioning, problem solving, memory, language, motor skills, and visual perception (58 RR 185).  He suffers from sub-average intellectual functioning with an onset before the age of 18 (58 RR 185-186).  Her testing revealed a full scale IQ score of 52 (58 RR 190).  The IQ testing results were consistent with other IQ testing results of Petetan she was provided (58 RR 244).

She explained that at the time Coxe administered the child and adult versions of an IQ test to Petetan, there was a problem in correlating the results and those scoring on the lower end of child's IQ test typically scored 10 to 15 points better on the adult version (58 RR 228).  When the tests were revised, the norms

for the tests were adjusted and there is now good reliability between the two tests so that the scores are now similar (58 RR 228).  She believed Coxe found the child's score of 64 to be more reliable than the adult score of 74 and that is the reason he diagnosed Petetan as mildly intellectually disabled  (58 RR 228).  The defense rested on punishment (58 RR 248).

In rebuttal, the State called Meshia Hicks (59 RR 34).  Hicks was a clerk at the C & E Motel in Waco on September 23, 2012 (59 RR 37).  Petetan saw her at the motel and asked for a ride to The Landing apartment complex (59 RR 40).  With Petetan in her car, they drove around the parking lot of the complex (59 RR 41).  Petetan told her he was looking for a drug dealer driving a black car (59 RR 41).  No such car was observed and they returned to the motel (59 RR 42).

Dorothy Stamps is a retired public school teacher from Port Arthur (59 RR 45).  Petetan was in her first grade class (59 RR 50).  She did not believe him to be intellectually disabled (59 RR 50).  Rather, he was a coward and tended to run away from trouble (59 RR 53).

Eddie Fowler was the principal of the middle school attended by Petetan (59 RR 59).  He recalled that he caught Petetan smoking in the bathroom and that Petetan shot another student off campus (59 RR 62).  Petetan was placed in special

education classes because he was a discipline problem (59 RR 63).  Otherwise, he was an average student and not intellectually disabled (59 RR 63-64).

Petetan's school records were admitted into evidence (59 RR 69, 63 RR DX 10).  Those records reflect he failed two grades and was socially promoted in another grade (59 RR 66).  He withdrew from school in the eighth grade (63 RR DX 10).

Mattie Howe was Petetan's parole officer in Beaumont from May to September of 2012 (59 RR 70-71).  He was required to participate in anger management classes as part of his parole (59 RR 74).  Howe does not believe Petetan is intellectually disabled (59 RR 75).

Travis Turner works for the Classification Department of TDCJ (59 RR 80).  When Petetan was initially received at TDCJ in 1993, he scored at 69 on an IQ test (59 RR 85).  He took an adaptive behavior screening test, but was never assigned to a prison unit for intellectually disabled offenders (59 RR 85-86).

Turner described the classification system for inmates and security measures in place for each group of inmates (59 RR 103).  He explained that the Crips and Bloods are not part of Security Threat Groups which are automatically housed in administrative segregation (59 RR 104).

While Warren Kroll was working as a prison guard at the Ferguson Unit of TDCJ in 1994, he searched Petetan's cell (59 RR 80. 111). He found a sharpened piece of steel and a padlock inside a sock (59 RR 111). Petetan was administratively charged with possessing a weapon (59 RR 114).

While Robert Blanks was working as a prison guard at the Estelle Unit of TDCJ in 1998, he saw Petetan and another inmate stab two other inmates while in the dining hall (59 RR 124). Petetan was administratively charged with assaulting another inmate with a weapon (59 RR 126).

Azikiw Daniels previously served a prison sentence at the Estelle Unit of TDCJ (59 RR 131). When he heard that Petetan wanted to fight him, Daniels struck Petetan on the head with a pipe two or three times (59 RR 138). Two days later, Petetan stabbed Daniels while he was working in the serving line of the kitchen (59 RR 143). Daniels knew that Petetan was a member of the Crips street gang (59 RR 144).

Jay Hart is in charge of the TDCJ Security Threat Groups Office (59 RR 152). He explained TDCJ recognizes eight different security threat groups including the Crips (59 RR 154). Unlike some other threat groups, Crips are not automatically housed in administrative segregation and may have jobs in the general inmate population (59 RR 159).

Hart observed various tattoos on Petetan and said they were indicative of membership in the Crips (59 RR 161, 165). Petetan identified himself as a Crips member to prison authorities in 1999 (59 RR 172). Hart had no record of Petetan ever attempting to disassociate from the Crips or renounce his membership in the organization (59 RR 182).

Mubarak Ali was in the McLennan County Jail on a drug charge while Petetan was awaiting his capital murder trial in March of 2014 (59 RR 199). Petetan told Ali that if he acted like he was mentally sick, he would not receive the death penalty (59 RR 203). When Ali asked Petetan to make a telephone call for him, Petetan declined by explaining his calls were recorded and he was telling the court he was mentally sick (59 RR 205). Ali admitted he told the State of his conversations with Petetan at the urging of his lawyer (59 RR 208). Ali's drug charge remained pending at the time of Petetan's trial (59 RR 200). The State rested on rebuttal and both sides closed (59 RR 209).

The trial court sustained one of Petetan's objections to the charge and the remaining objections were overruled (59 RR 212, 4 CR 1313). The charge was read to the jury (60 RR 5). Argument was presented (60 RR 15, 24, and 50). The jury returned answers to the four special issues submitted (60 RR 67-68, 4 CR

1336-1339).  Based on the jury's answers to the special issues, punishment was assessed by the trial court at death (60 RR 71).

## Summary of the Argument

Twenty-nine points of error are presented on direct appeal.  The first two complain of the exclusion of evidence offered by Petetan during the competency trial.  The trial court refused to allow former counsel to testify relative to Petetan's competency to stand trial upon erroneously allowing the State to invoke Petetan's attorney-client privilege to the admissibility of the evidence.  In the second instance, after the State suggested Petetan was malingering in an effort to secure a finding of incompetency, the trial court refused to admit testimony as to the fate of those who secure an incompetency determination through malingering.

Three points of error are presented urging the trial court erred by denying defense challenges for cause to prospective jurors during voir dire examination relative to the trial on the merits.  One venireman had a bias in favor of the death penalty and a bias in favor of the credibility of law enforcement officers.  The second venireman had a bias in favor of the death penalty.  Petetan used peremptory strikes on both, was denied additional strikes, and identified an objectionable juror he would have stricken if afforded additional strikes.

Petetan challenges the sufficiency of the evidence to prove the underlying felonies which elevate the murder to the offense of capital murder. Even viewed in the light most favorable to the verdict, no rational juror could have found the murder occurred in the course of committing or attempting to commit burglary, kidnapping, or retaliation.

Two points of error assert the trial court erred by admitting extraneous offenses during the guilt or innocence phase of trial. Those extraneous offenses were not relevant to the charged capital murder. The offenses improperly portrayed Petetan before the jury as a violent drug dealer.

A point complains the trial court undermined Petetan's right to conflict free counsel by admitting evidence from a former client of defense counsel during the punishment phase of trial. Trial counsel was placed in an impossible position of effectively representing Petetan while not revealing attorney-client confidences in cross-examination of his former client.

Petetan complains the jury's rejection of his claim of intellectual disability is manifestly unjust and against the great weight and preponderance of the evidence. Consequently he is not eligible for the death penalty. Overwhelming evidence of intellectual disability was presented to the jury. Petetan seeks for this Court to reconsider its flawed *Briseno* approach and adopt a clinical standards approach to

the issue as embraced by the Supreme Court in *Atkins* and *Hall*.  However, under either standard, he has shown himself not to be eligible for a sentence of death.

In fourteen points of error, Petetan maintains the trial court abused its discretion by denying his objections to the punishment phase jury charge.  Petetan acknowledges the challenges have been previously rejected by this Court.  They are presented for preservation of the errors and to avoid waiver.

A point of error complains the death penalty violates the Eighth Amendment prohibition on cruel and unusual punishment.  The point is based on Justice Breyer's recent dissenting opinion in *Glossip v. Gross*.

Petetan argues he was denied equal protection of the law and due course of law due to the absence of a unified statutory procedure for pretrial litigation of an *Atkins* assertion of intellectual disability.  The point is based on this Court's recent opinion in *In re Allen* recognizing disparity through the state in obtaining such a pretrial determination from a trial court.

The final two points of error seek modification of erroneous recitations within the judgment.  Those errors concern the degree of the offense and assessment of punishment by the jury.  The Court has the necessary information and authority to reform the judgment.

Petetan prays this Court will reverse the judgment of conviction and reform to an acquittal, remand for a new trial, remand for a new punishment hearing, reform the sentence to a life sentence, remand for a new competency hearing, modify the judgment, or enter any other relief appropriate under the law and the facts.

### Point of Error One

**The trial court abused its discretion by allowing the State to invoke Petetan's attorney-client privilege as to testimony he sought to offer from his former attorney on the issue of competency to stand trial (13 RR 57).**

During the competency trial, Petetan called his former attorney, Stan Schwieger (13 RR 43). Schwieger was initially appointed to represent Petetan when he was charged with the offense of murdering Kimberly (13 RR 45). He met with Petetan shortly after his appointment (13 RR 45). He met with Petetan a second time when the charge was upgraded to capital murder (13 RR 45). At that second meeting, he explained to Petetan that new counsel would be appointed because Schwieger was not on the list of counsel eligible for appointment on capital murder cases (13 RR 47).

The State objected to any effort to present privileged information from Schwieger and the objection was sustained (13 RR 47). Petetan clarified that he

was simply attempting to determine whether Schwieger was able to communicate with Petetan (13 RR 47).  The State's objection was once again sustained (13 RR 48).  Outside the jury, Petetan explained he was not seeking to offer confidential communications, he was simply attempting to show that Schwieger had difficulty communicating with Petetan (13 RR 50).  The State again asserted such testimony, even going to a difficulty in communication, would violate the attorney-client privilege (13 RR 50).

Outside the presence of the jury, Schwieger testified that Petetan could not understand the reason he was required to withdraw from representation (13 RR 52).  When the State again objected, Petetan asserted the State had no standing to assert an objection based on the privilege and the testimony sought to be offered was not privileged (13 RR 53).  The State responded that even if it had no right to assert the privilege, it "had a duty to protect it" (13 RR 53).  Petetan claimed the evidence concerning difficulty in communicating with counsel went to the "heart of the reason" they were having a competency trial (13 RR 56).  The trial court sustained the State's objection and excluded the evidence Petetan sought to offer (13 RR 57).  When the jury returned, the trial court instructed it to disregard the entirety of Schwieger's testimony (13 RR 61).

A trial court's exclusion of evidence is reviewed for an abuse of discretion. *Osbourn v. State,* 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). In determining whether the trial court abused its discretion, an appellate court should consider whether the court acted without reference to guiding rules and principles—that is, whether the court acted arbitrarily or unreasonably. *Montgomery v. State,* 810 S.W.2d 372, 380 (Tex. Crim. App. 1991). A trial court's ruling must be upheld so long as it is "within the zone of reasonable disagreement." *Wheeler v. State,* 67 S.W.3d 879, 888 (Tex. Crim. App. 2002).

The State has no authority to seek the exclusion of evidence on the basis its admission would violate a defendant's attorney-client privilege. *See* TEX. R. EVID. 503(c) (specifying who may claim the privilege).[3] Exclusion of evidence upon the State wrongly claiming it violates the attorney client privilege is error. *Smith v. State*, 770 S.W.2d 70, 71 (Tex. App. – Texarkana 1989, no pet.).

Besides the lack of standing to voice an objection, the State's objection was misguided. The attorney client-privilege is not violated when former counsel

---

[3] (c) Who May Claim. The privilege may be claimed by:
  (1) the client;
  (2) the client's guardian or conservator;
  (3) a deceased client's personal representative; or
  (4) the successor, trustee, or similar representative of a corporation, association, or other organization or entity--whether or not in existence.

testifies relative to competency without revealing the substance of client communication. *Manning v. State*, 766 S.W.2d 551, 557 (Tex. App. – Dallas 1989, *aff'd,* 773 S.W.2d 568 (Tex. Crim. App. 1989). Nor is such testimony excludable under TEX. R. EVID. 503(b)(2) on the basis it is a fact which came to the knowledge of counsel by reason of the attorney-client relationship.[4] *Manning,* 766 S.W.2d 558.

Here, the trial court erroneously allowed the State to invoke Petetan's attorney-client privilege upon excluding the evidence sought to be presented by former counsel. Moreover, Petetan did not seek to offer confidential communication, only observations by former counsel concerning Petetan's difficulty in communicating with counsel. The evidence was admissible and the trial court abused its discretion by excluding it.

Harm in the exclusion of evidence is reviewed as non-constitutional error. *Ray v. State,* 178 S.W.3d 833, 836 (Tex. Crim. App. 2005). For non-constitutional errors, an appellate court may disregard errors that do not affect the defendant's substantial rights. TEX. R. APP. P. 44.2(b); *Robinson v. State,* 236 S.W.3d 260, 269 (Tex. App. -Houston [1st Dist.] 2007, pet. ref d). An error affects a substantial

---

[4] **(2) Special Rule in a Criminal Case.** In a criminal case, a client has a privilege to prevent a lawyer or lawyer's representative from disclosing any other fact that came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship.

right only when the error had a substantial and injurious effect or influence on the jury's verdict. *Robinson,* 236 S.W.3d at 269 (citing *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). In contrast, if the appellate court is fairly assured that the error did not influence the jury or had but a slight effect, it will conclude the error was harmless. *Ray,* 178 S.W.3d at 836.

In the instant cause, Petetan had the substantial right to present all available admissible evidence in support of his claim of incompetency to stand trial. Recent former counsel occupied a unique position with regard to Petetan's competency to stand trial in the instant case. Counsel was prevented from testifying to Petetan's difficulty in communicating with his lawyer. As stated by trial counsel, such testimony goes to the heart of the competency inquiry. See TEX. CRIM. PROC. CODE art. 46B.003(a)(1) (sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding). Former counsel's firsthand knowledge of Petetan's difficulty in communicating with counsel is qualitatively different than the opinions expressed by the experts at the competency trial. It is likewise not comparable to the evidence at the competency trial showing Petetan is willing to lie to a police officer. The burden of proof in a competency proceeding is on the defendant to show by a preponderance of the evidence that he is incompetent. TEX. CRIM. PROC. CODE art. 46B.003(b). After considering the

relatively low burden of proof Petetan was prevented from successfully showing to the jury, this Court should find the exclusion of the evidence harmful.

A retrospective competency determination may be conducted consistent with the requirements of due process in most cases. *See Barber v. State,* 737 S.W.2d 824, 828 (Tex. Crim. App. 1987) (recognizing a retrospective determination of the competency of an accused "can be made within the limits of due process depending upon the quality and quantity of the evidence available"). However, there are many difficulties inherent in making a retrospective determination of a defendant's competency to stand trial, including: (1) the passage of time; (2) the present recollection of expert witnesses who testified at the original hearing; and (3) the ability of the judge and jury to observe the subject of their inquiry. *Id.; Caballero v. State,* 587 S.W.2d 741, 743 (Tex. Crim. App. 1979). Petetan's fluctuating mental condition, combined with the mounting passage of time, suggests that a retrospective competency inquiry is simply not feasible in this case and a new trial should be ordered. *See Greene v. State*, 264 S.W.3d 271, 272-73 (Tex. App.—San Antonio 2008, pet. ref'd) (finding remedy of new trial is appropriate remedy when retrospective competency determination is not feasible).

In the alternative, Petetan seeks a remand to the trial court for a determination as to whether a retrospective competency hearing is feasible. *See*

*Turner v. State*, 422 S.W.3d 676, 697 (Tex. Crim. App. 2013): George E. Dix &

John M. Schmolesky, 43 Texas Practice: Criminal Practice and Procedure § 31:81,

at 89–90 & n. 10 (3rd ed.2011) (citing, *e.g., Torres v. State,* 593 S.W.2d 717, 719

(Tex. Crim. App. 1980) (remanding to trial court to decide, *inter alia,* whether "a

nunc pro tunc determination of appellant's competency is not possible"); *Ex parte*

*McKenzie,* 582 S.W.2d 153, 155 (Tex. Crim. App. 1979) (remanding case to the

trial court to "determine if it is possible to conduct a nunc pro tunc competency

hearing and, if it is, to hold such a hearing" under the then-extant competency-to-

stand-trial statute); *Ex parte Winfrey,* 581 S.W.2d 698, 699 (Tex. Crim. App. 1979)

(holding that the original competency hearing suffered from a flawed jury

instruction, and cause remanded to the trial court for a determination whether, *inter*

*alia,* a retrospective competency hearing was feasible).

**Point of Error Two**

**The trial court abused its discretion by excluding evidence Petetan sought to**

**offer concerning the legal fate of those who obtain an incompetency**

**determination through malingering (13 RR 60).**

During cross-examination of Dr. Seay, the State sought to develop evidence

Petetan was malingering when interacting with Seay. The State asserted a

defendant facing a sentence of death would have a strong motive to lie or

exaggerate during a competency examination (12 RR 103). The State questioned whether Seay had the ability to determine whether Petetan lied to her during the examination (12 RR 104). It was noted he had already visited with counsel on several occasions before Seay saw him (12 RR 104). She relied on Petetan to be truthful and honest with her (12 RR 105). Seay acknowledged that if Petetan gave her incorrect or incomplete information, it would impact her opinion of his competency (12 RR 106). If a defendant was motivated to delay or avoid trial, Seay acknowledged he might give false information to the examiner (12 RR 111).

The State's malingering defense to Petetan's assertion of incompetency continued with its examination of Dr. Pittman. The State initially stressed that Pittman was the court's independent expert and had not been hired by the State (12 RR 174).[5] Pittman felt Petetan was not reliable during his assessment and was not "giving it his best shot" (12 RR 181, 184). He was especially suspicious when Petetan was unable to name the Dallas Cowboys as the professional football team from Dallas (12 RR 181).

On rebuttal, Petetan called his former attorney, Stan Schwieger, a criminal defense attorney from Waco (13 RR 43). Outside the presence of the jury, Petetan asked Schwieger whether he was familiar with the procedures in place at Vernon

---

[5] The record reflects Pittman was appointed after being recommended by the State (7 RR 5).

State Hospital for those found incompetent to stand trial through malingering (13 RR 58). In response to the State's relevancy objection, Petetan urged the testimony was admissible in response to the State's claim he was malingering in an effort to be found incompetent (13 RR 59). Schwieger explained that those found to have been malingering before a determination of incompetency are deemed competent by the hospital staff and returned to the originating county for a competency finding and trial (13 RR 59-60). The trial court sustained the State's objection and refused to allow Schwieger to testify as proffered (13 RR 60).

In argument, the State claimed Petetan devised a plan to avoid both trial and the death penalty by claiming he was incompetent (13 RR 77). The State suggested Petetan manipulated Seay during her assessment (13 RR 80). The State claimed that Petetan lied to Pittman and faked his alleged incompetence (13 RR 82, 84). The prosecutor implored the jurors not to be fooled by Petetan's game because a finding of incompetency means "he ain't going to get tried" (13 RR 82, 84). That, of course, is not factually or legally true.

Petetan relies on the same standard of review and harm standard as set forth in the preceding point of error complaining of the exclusion of admissible and relevant evidence. Here, Petetan had the substantial right to present all available admissible evidence in support of his claim of incompetence. The State urged its

defense of malingering during cross-examination of Seay, direct examination of Pittman, and during argument. In response to that defense, Petetan sought to demonstrate that a finding of incompetency based on malingering would be short-lived at best and would not mean "he ain't going to get tried."

The burden of proof in a competency proceeding is on the defendant to show by a preponderance of the evidence that he is incompetent. TEX. CRIM. PROC. CODE art. 46B.003(b). After considering the relatively low burden of proof Petetan was prevented from successfully showing to the jury, this Court should find the exclusion of the evidence harmful. Petetan's fluctuating mental condition, combined with the mounting passage of time, suggests that a retrospective competency inquiry is simply not feasible in this case and a new trial should be ordered.

## Point of Error Three

**The trial court abused its discretion by denying a defense challenge for cause to prospective juror Richard Hester who had a bias against a life sentence without possibility of parole and a bias in favor of a sentence of death (28 RR 89).**

Richard Hester was called as a prospective juror (28 RR 21). In his questionnaire, Hester indicated he was opposed to a life sentence without parole

because he saw no reason to keep someone in prison for their entire life (28 RR 62). He did not believe a life sentence without parole would be sufficient punishment for one convicted of capital murder (28 RR 63). When asked by the trial court if he could ever assess a punishment of life without parole, Hester responded that he believed he could, but it would go against his "grain" (28 RR 64).

Defense counsel sought to explore Hester's "grain" (28 RR 69). Under questioning by defense counsel, Hester agreed with the sentiment that one convicted of capital murder should be executed rather than have the taxpayers pay for incarceration for the rest of his life (28 RR 69). Hester said that despite his bias against a life sentence, he would try to answer the special issues truthfully based on what he believed the answer to be (28 RR 71). Hester made it clear he is in favor of the death penalty and did not believe enough sentences of death are assessed by juries (28 RR 81). Hester reiterated that he was opposed to a life sentence without parole and acknowledged he indicated on his questionnaire that life without parole is not an adequate punishment for capital murder and he saw no reason to keep a person in prison for his entire life following a conviction for capital murder (28 RR 83).

Petetan sought to challenge Hester based on his bias against a life sentence without parole (28 RR 88). The challenge was denied and Petetan used his seventh peremptory strike to remove Hester (28 RR 89).

Petetan ultimately exhausted his peremptory strikes (47 RR 145). His request for an additional peremptory strike was denied (48 RR 109). Upon denying the request for an additional strike, Petetan identified prospective juror Ronald Brown as objectionable because of his work with law enforcement and previous employment as a prison guard (48 RR 109). Had Petetan been afforded an additional strike, he would have used it on Brown (48 RR 109). Brown was selected as the twelfth juror (48 RR 110).

A defendant may properly challenge any prospective juror who has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor. TEX. CRIM. PROC. CODE art. 35.16(c)(2). When reviewing a trial court's decision to grant or deny a challenge for cause, the entire record is to be considered to determine if there is sufficient evidence to support the trial court's ruling. *Feldman v. State,* 71 S.W.3d 728, at 743–45 (Tex. Crim. App. 2002); *Patrick v. State,* 906 S.W.2d 481, 488 (Tex. Crim. App. 1995). The test is whether the bias

or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Feldman,* 71 S.W.3d at 743–45. Before a prospective juror may be excused for cause on this basis, however, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Id.* Finally, the proponent of a challenge for cause has the burden of establishing that his challenge is proper. *Id.* at 747. The proponent does not meet his burden until he has shown that the veniremember understood the requirements of the law and could not overcome his or her prejudice well enough to follow it. *Id.* When the record reflects that a venireperson vacillated or equivocated on his or her ability to follow the law, the reviewing court must defer to the trial court. *Moore v. State,* 999 S.W.2d 385, 400 (Tex. Crim. App.1999); *Brown v. State,* 913 S.W.2d 577, 580, (Tex. Crim. App. 1996).

Petetan maintains Hester was subject to a defense challenge for cause due to his opposition against a life sentence and preference for a sentence of death. Hester made it clear through the voir dire examination that: he was opposed to a life sentence without parole because he saw no reason to keep someone in prison for their entire life; he did not believe a life sentence without parole would be sufficient punishment; he agreed with the sentiment that one convicted of capital murder should be executed rather than have the taxpayers pay for incarceration for the rest of his life; he is in favor of the death penalty; he did not believe enough

sentences of death are assessed; he reiterated that he was opposed to a life sentence without parole; and finally, he acknowledged that he indicated on his questionnaire that life without parole is not an adequate punishment for capital murder and he saw no reason to keep a person in prison for his entire life. The record does not support the trial court's determination Hester was not subject to a challenge for cause by the defense. The trial court abused its discretion by denying Petetan's challenge.

To preserve error on denied challenges for cause, the appellant must demonstrate on the record that: 1) he asserted a clear and specific challenge for cause; 2) he used a peremptory challenge on the complained-of venireperson; 3) all his peremptory challenges were exhausted; 4) his request for additional strikes was denied; and 5) an objectionable juror sat on the jury. *Feldman,* 71 S.W.3d at 743–45; *Green v. State,* 934 S.W.2d 92, 105 (Tex. Crim. App. 1996). When the trial court errs in overruling a challenge for cause against a venireperson, the defendant is harmed if he uses a peremptory strike to remove the venireperson and thereafter suffers a detriment from the loss of the strike. *Feldman,* 71 S.W.3d at 743–45; *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex.Crim.App.1986).

Here, Petetan properly preserved the issue. He ultimately exhausted his peremptory strikes (47 RR 145). His request for additional peremptory strike was

denied (48 RR 109). Upon denying the request for an additional strike, Petetan identified prospective juror Ronald Brown as objectionable because of his work with law enforcement and previous employment as a prison guard (48 RR 109). Had Petetan been afforded an additional strike, he would have used it on Brown to prevent him from serving on the jury (48 RR 109). Brown was selected as the twelfth juror (48 RR 110).

Petetan was harmed by the erroneous denial of his challenge for cause through the detrimental loss of a strike. The loss of that strike resulted in a juror Petetan found objectionable being seated on the jury.

The error only impacts the punishment phase of trial and consequently Petetan seeks a new punishment hearing. *See* TEX. CRIM. PROC. CODE art. 44.29(c) (providing for new punishment hearing in the case of a capital murder conviction when error affects punishment only); *Ransom v. State*, 920 S.W.2d 288, 298 (Tex. Crim. App. 1994) (holding that voir dire error in a capital murder case on an issue the jury would only consider at punishment constitutes error affecting punishment and thus calling for a new punishment hearing).

**Point of Error Four**

**The trial court abused its discretion by denying a defense challenge for cause to prospective juror Richard Hester who believed law enforcement officers to be more credible than other witnesses (28 RR 89).**

Richard Hester was called as a prospective juror (28 RR 21). Hester's brother is a police officer (28 RR 85). He felt police officers were more believable as witnesses as compared to others who are not law enforcement officers (28 RR 86). He felt that way with regard to any testimony as to training or expertise by a police officer (28 RR 86). As to general questions and personalities, he would not give preferential treatment to the testimony of a police office (28 RR 86).

Petetan sought to challenge Hester based on his bias in favor of the believability of police officers (28 RR 88). The challenge was denied and Petetan used his seventh peremptory strike to remove Hester (28 RR 89).

Petetan ultimately exhausted his peremptory strikes (47 RR 145). His request for additional peremptory strike was denied (48 RR 109). Upon denying the request for an additional strike, Petetan identified prospective juror Ronald Brown as objectionable because of his work with law enforcement and previous employment as a prison guard (48 RR 109). Had Petetan been afforded an

additional strike, he would have used it on Brown (48 RR 109). Brown was selected as the twelfth juror (48 RR 110).

Petetan maintain Hester was subject to a challenge for cause. *See* TEX. CRIM. PROC. CODE art. 35.16(a)(9) (providing for challenge for cause for any juror who has a bias or prejudice in favor of or against the defendant). In this case, there is no doubt that venireman Hester's attitude toward police officers constituted a bias against Petetan. His voir dire examination revealed he believed a police officer would be more believable than other witnesses as to matters of training and expertise. When considering the fact that eight of the nineteen State's witnesses were police officers, these responses become especially important. Those eight police officers testified to matters unique to their expertise and training as law enforcement officers; the very matters to which Hester indicated he would view with greater credibility and believability.

A defendant is entitled to a juror who will impartially judge the credibility of the witnesses. *Shaver v. State*, 280 S.W.2d 740, 742 (Tex. Crim. App. 1955). Venireman Hester's testimony revealed that his predisposition to believe police officers would have prevented him from impartially judging the credibility of those witnesses. Such responses effectively demonstrated bias against Petetan. Under the circumstances, Petetan's challenge for cause was improperly denied. *See*

- 73 -

*Hernandez v. State*, 563 S.W.2d 947, 950 (Tex. Crim. App. 1978) (finding defense challenge improperly denied as to prospective juror based on her attitude toward the credibility of police officers constituted a bias against the defendant).

Petetan properly preserved the issue. He ultimately exhausted his peremptory strikes (47 RR 145). His request for an additional peremptory strike was denied (48 RR 109). Upon denying the request for an additional strike, Petetan identified prospective juror Ronald Brown as objectionable because of his work with law enforcement and previous employment as a prison guard (48 RR 109). Had Petetan been afforded an additional strike, he would have used it on Brown (48 RR 109). Brown was selected as the twelfth juror (48 RR 110).

Petetan was harmed by the erroneous denial of his challenge for cause through the detrimental loss of a strike. The loss of that strike resulted in a juror Petetan found objectionable being seated on the jury.

The error impacts both phases of trial and Petetan should be awarded a new trial. *See* TEX. CRIM. PROC. CODE art. 44.29(a) (providing for new trial when an error affects either the guilt or innocence phase or both phases of trial). Petetan should be awarded a new trial.

**Point of Error Five**

**The trial court abused its discretion by denying a defense challenge for cause to prospective juror Luther Fore who had a bias against a life sentence without possibility of parole and a bias in favor of a sentence of death (30 RR 174).**

Luther Fore was called as a prospective juror (30 RR 90). In response to questions from the prosecutor in voir dire, Fore stated he is "not a big fan" of life without parole for one convicted of capital murder (30 RR 131, 164). If the death penalty is available, he does not, as a taxpayer, want to pay for someone to live in prison for the rest of his life (30 RR 131, 164). He agreed that while not a fan of life without parole, he would hold the State to its burden of proof with regard to the punishment phase special issues (30 RR 132). On his juror questionnaire, Fore indicated a sentence of life without parole would never be a sufficient punishment for the offense of capital murder because "they should pay the same price" (30 RR 133). Fore would expect the defense to prove the answer to the first special issue regarding future dangerousness should be "no" (30 RR 167). If he was serving as a juror and reached the final special issue on mitigation, he feels a sentence of death would be appropriate in view of his answers to the previous special issues (30 RR 168).

The defense voiced a challenge for cause to Fore based on his bias against a life sentence without the possibility of parole and bias in favor of a sentence of death (30 RR 174). The challenge for cause was denied by the trial court (30 RR 174). Petetan used his eighth peremptory strike on Fore (30 RR 174).

Petetan ultimately exhausted his peremptory strikes (47 RR 145). His request for an additional peremptory strike was denied (48 RR 109). Upon denying the request for an additional strike, Petetan identified prospective juror Ronald Brown as objectionable because of his work with law enforcement and previous employment as a prison guard (48 RR 109). Had Petetan been afforded an additional strike, he would have used it on Brown (48 RR 109). Brown was selected as the twelfth juror (48 RR 110).

A defendant may properly challenge any prospective juror who has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor. TEX. CRIM. PROC. CODE art. 35.16(c)(2). When reviewing a trial court's decision to grant or deny a challenge for cause, the entire record is to be considered to determine if there is sufficient evidence to support the trial court's ruling. *Feldman,* 71 S.W.3d at 743–45; *Patrick,* 906 S.W.2d at 488. The test is whether

the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Feldman,* 71 S.W.3d at 743–45. Before a prospective juror may be excused for cause on this basis, however, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Id.* Finally, the proponent of a challenge for cause has the burden of establishing that his challenge is proper. *Id.* at 747. The proponent does not meet his burden until he has shown that the veniremember understood the requirements of the law and could not overcome his or her prejudice well enough to follow it. *Id.* When the record reflects that a venireperson vacillated or equivocated on his or her ability to follow the law, the reviewing court must defer to the trial court. *Moore,* 999 S.W.2d at 400; *Brown,* 913 S.W.2d at 580.

Petetan maintains Fore was subject to a defense challenge for cause due to his opposition against a life sentence and preference for a sentence of death. Fore made it clear through the voir dire examination that: he is "not a big fan" of life without parole for one convicted of capital murder; if the death penalty is available, he does not, as a taxpayer, want to pay for someone to live in prison for the rest of his life; in his juror questionnaire, Fore indicated a sentence of life without parole would never be a sufficient punishment for the offense of capital murder because "they should pay the same price;" Fore would expect the defense

to prove the answer to the first special issue regarding future dangerousness should be "no;" and if he was serving as a juror and reached the final special issue on mitigation, he feels a sentence of death would be appropriate in view of his answers to the previous special issues. The record does not support the trial court's determination Fore was not subject to a challenge for cause by the defense. The trial court abused its discretion by denying Petetan's challenge to prospective juror Fore.

To preserve error on denied challenges for cause, the appellant must demonstrate on the record that: 1) he asserted a clear and specific challenge for cause; 2) he used a peremptory challenge on the complained-of venireperson; 3) all his peremptory challenges were exhausted; 4) his request for additional strikes was denied; and 5) an objectionable juror sat on the jury. *Feldman,* 71 S.W.3d at 743–45; *Green,* 934 S.W.2d at 105. When the trial court errs in overruling a challenge for cause against a venireperson, the defendant is harmed if he uses a peremptory strike to remove the venireperson and thereafter suffers a detriment from the loss of the strike. *Feldman,* 71 S.W.3d at 743–45; *Demouchette,* 731 S.W.2d at 83.

Here, Petetan properly preserved the issue. He ultimately exhausted his peremptory strikes (47 RR 145). His request for additional peremptory strike was denied (48 RR 109). Upon denying the request for an additional strike, Petetan

identified prospective juror Ronald Brown as objectionable because of his work with law enforcement and previous employment as a prison guard (48 RR 109). Had Petetan been afforded an additional strike, he would have used it on Brown (48 RR 109). Brown was selected as the twelfth juror (48 RR 110).

Petetan was harmed by the erroneous denial of his challenge for cause through the detrimental loss of a strike. The loss of that strike resulted in a juror Petetan found objectionable being seated on the jury.

The error only impacts the punishment phase of trial and consequently Petetan seeks a new punishment hearing. *See* TEX. CRIM. PROC. CODE art. 44.29(c) (providing for new punishment hearing in the case of a capital murder conviction when error affects punishment only); *Ransom*, 920 S.W.2d at 298 (holding that voir dire error in a capital murder case on an issue the jury would only consider at punishment constitutes error affecting punishment and thus calling for a new punishment hearing).

**Point of Error Six**

**The evidence is insufficient to prove Petetan murdered the complainant while in the course of committing or attempting to commit the offenses of burglary, kidnapping, or retaliation.**

- 79 -

The grand jury returned an indictment charging Petetan with the offense of capital murder (1 CR 44). Specifically, it was alleged he murdered Kimberly Petetan while in the course of committing or attempting to commit the offense of burglary of Kimberly Petetan's habitation, the kidnapping of Kimberly Petetan or A. W., and retaliation against Kimberly Petetan (1 CR 44). *See* TEX. PEN. CODE § 19.03(a)(2). At the conclusion of the guilt or innocence phase of trial, the court charged the jury (4 CR 1300). The jury was instructed it could convict if it found beyond a reasonable doubt that Petetan murdered Kimberly while in the course of committing or attempting to commit the offenses of burglary, kidnapping, or retaliation (4 CR 1300). The jury was instructed it did not have to unanimously agree on a particular underlying felony, just that the murder occurred during one or more of the underlying and alleged felonies (4 CR 1300). The jury found Petetan guilty of capital murder as charged in the indictment (4 CR 1308).

This point of error challenges the sufficiency of the evidence to prove Petetan murdered while in the course of committing or attempting to commit one of the underlying felonies alleged in the indictment. The state of the evidence is such that no rational juror could have found beyond a reasonable doubt that Petetan committed one of the underlying felonies. Petetan seeks to have the judgment

- 80 -

reformed to a conviction for the offense of murder and the cause remanded for a new punishment hearing.[6]

In a due-process review of the sufficiency of the evidence to support a conviction, the reviewing court is to view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Dobbs v. State,* 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson,* 443 U.S. at 319; *Dobbs,* 434 S.W.3d at 170.

The trier of fact is the sole judge of the weight and credibility of the evidence. See TEX. CRIM. PROC. CODE art. 38.04; *Dobbs,* 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, a reviewing court may not re-evaluate the weight and credibility of the evidence and substitute its judgment for that of the factfinder. *Isassi v. State,* 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, the reviewing court must determine whether the necessary inferences are reasonable based upon the cumulative force of the

---

[6] The jury was charged on the lesser included offense of murder (4 CR 1300).

evidence when viewed in the light most favorable to the verdict. *Sorrells v. State,* 343 S.W.3d 152, 155 (Tex .Crim. App. 2011); *Temple v. State,* 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). It is presumed that the factfinder resolved any conflicting inferences in favor of the verdict and the reviewing court must defer to that resolution. *Jackson,* 443 U.S. at 326; *Dobbs,* 434 S.W.3d at 170.

This Court has held "in the course of committing" an offense listed in § 19.03(a)(2), means conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense. *Wooldridge v. State,* 653 S.W.2d 811, 816 (Tex. Crim. App. 1983); *Riles v. State,* 595 S.W.2d 858, 862 (Tex. Crim. App. 1980). Moreover, the State must prove a nexus between the murder and the aggravating offense; that is, the State must show that, during the commission of the offense or while in immediate flight, the defendant killed the victim to facilitate the underlying felony offense. *Ibanez v. State,* 749 S.W.2d 804, 807 (Tex. Crim. App. 1986); *Whitaker* v. State, 977 S.W.2d 869, 873 (Tex. App.—Beaumont 1998, pet. ref'd); *Hernandez v. State,* 969 S.W.2d 440, 444 (Tex. App.—San Antonio 1998, pet. ref'd).

At the outset, Petetan maintains the evidence does not show a burglary of Kimberly's apartment. Evidence at trial showed Petetan told Miller and Mouton to get in the bed of the truck and they all drove to Kimberly's apartment complex and

they entered the apartment when Kimberly opened the door (53 RR 54, 56). Mouton testified that he and Miller got in the bed of Kimberly's truck and she drove the five of them to her apartment and they all entered the apartment when Kimberly opened the door to the apartment (53 RR 110, 111, and 131). A. W. stated that the five of them left the motel, returned to her mother's apartment, and everyone went inside (53 RR 183, 184). Kimberly was shot two hours after they arrived at the apartment (53 RR 56).

The evidence fails to support the allegation of a burglary of Kimberly's apartment. The undisputed evidence shows that before the shooting, Kimberly opened her apartment for Petetan, Miller, Mouton, and her daughter to enter. In view of that evidence, the State failed to show Petetan entered the apartment without the effective consent of Kimberly. *See* TEX. PEN. CODE § 30.02(a) (providing for the offense of burglary if one enters a habitation without the effective consent of the owner); *Villanueva v. State*, 711 S.W.2d 739, 740 (Tex. App.—San Antonio 1986) *pet. ref'd* 725 S.W.2d 244 (Tex. Crim. App. 1987); *Eppinger v. State*, 800 S.W.2d 652, 653 (Tex. App.—Austin 1990, pet. ref'd) (finding evidence insufficient in burglary prosecution after owner expressly assented to defendant entering his apartment).

Petetan concedes the evidence shows that hours before the shooting, he pushed his way into the apartment without Kimberly inviting him in, pulled a gun from his pocket, and waved the gun around the apartment (53 RR 174, 175). While that conduct constituted a burglary, it was so removed in time as to not have a nexus to the later shooting of Kimberly sufficient to support the conviction for capital murder. The evidence clearly shows the complainant was not killed during Petetan's initial burglarious conduct. She was only killed after having left her apartment and then later consented to Petetan's entry before her shooting. The evidence does not show the complainant was killed while Petetan was in the course of committing or attempting to commit burglary of a habitation.

The evidence also fails to demonstrate Petetan restrained either Kimberly or A. W. with intent to prevent their liberation in the course of the capital murder. *See* TEX. PEN. CODE §§ 20.01(2) and 20.03(b). Absent such evidence, the evidence will only support a conviction for the offense of murder.

Miller testified that as Kimberly was trying to walk out the front door, Petetan slammed the door shut, struck her with his fist, and then shot her multiple times (53 RR 57, 59). Miller stated that no one told A. W. and Mouton to get in Petetan's Suburban, they simply did so after the shooting (53 RR 90).

Mouton testified that when Kimberly and Petetan came downstairs in her apartment, she tried to unlock and open the front door, but Petetan pushed her away and into a wall (53 RR 117). When Kimberly pushed Petetan back, he shot her multiple times with a handgun (53 RR 118). After the shooting, Mouton and A. W. ran out the back door of the apartment and jumped into Petetan's vehicle (53 RR 121). Mouton intended to drive the two of them away, but Miller and Petetan came outside and entered the vehicle before he could do so (53 RR 121). Mouton did not force A. W. to get in the vehicle with him; she simply followed him out of the apartment after the shooting of her mother (53 RR 135).

A. W. testified that when her mother tried to open the front door, Petetan ran toward the door, shut it, and pushed her mother into a wall (53 RR 190). Petetan told her mother to stand on the stairs, that it was "time for her dust away," and then he shot her three times (53 RR 191). Her mother fell to the ground and "flopped around like a fish" (53 RR 192).

The younger of two other men in the apartment, Mouton, grabbed her and took her out the back door of the apartment (53 RR 192). He told her that everything would be okay (53 RR 193). All four of them then got in Petetan's white Suburban and left (53 RR 195).

Even viewing the evidence in the light most favorable to the verdict, Petetan maintains the evidence is insufficient to prove he committed or attempted to commit the offense of kidnapping against either Kimberly or A. W. Neither was secreted or held in a place where they were not likely to be found. See TEX. PEN. CODE § 20.01(2)(A). Neither was restrained by the use of or threat to use deadly force. See TEX. PEN. CODE § 20.01(2)(B).

Petetan concedes the evidence shows that hours before the shooting, he pushed his way into the apartment without Kimberly inviting him in, pulled a gun from his pocket, and started waving it around the apartment (53 RR 174, 175). Petetan told Kimberly to get dressed and "come with me" (53 RR 176). The three of them got into Kimberly's truck and Kimberly was driving (53 RR 177). Petetan still had the gun in his pocket while in the truck (53 RR 178). Petetan directed Kimberly to drive to a motel in Waco (53 RR 179). Once they arrived at the motel, Petetan told Kimberly to honk the horn of the truck (53 RR 180). Two men came out of a room and got in the bed of the truck (53 RR 180). All five individuals left the motel and returned to her mother's apartment (53 RR 183). While that conduct constituted a kidnapping of both Kimberly and A. W., it was so removed in time as to not have a nexus to the later shooting of Kimberly sufficient to support the conviction for capital murder. The evidence clearly shows the complainant was not killed during Petetan's initial kidnapping. She was only killed after having left

- 86 -

her apartment and then later returning to her own apartment before the shooting. Petetan was not shown to have restrained Kimberly or A. W. in the apartment upon returning and before the shooting. Finally, A. W. was shown to have voluntarily left with Mouton following the shooting of her mother. The evidence does not show the complainant was killed while Petetan was in the course of committing or attempting to commit the offenses of kidnapping against either Kimberly or A. W.

Finally, the evidence fails to demonstrate Petetan murdered Kimberly while in the course of attempting or committing the offense of retaliation. *See* TEX. PEN. CODE § 36.06. The evidence fails to show he threatened to harm Kimberly in retaliation for her reporting his assault of her in Port Arthur. § 36.06(a)(1)(B). Likewise, there is insufficient evidence to show Petetan harmed or threatened to harm Kimberly to prevent or delay her service as a witness or a person who had reported a crime. § 36.06(a)(2)(A) &(B). Absent such evidence, the evidence will only support a conviction for the offense of murder rather than capital murder.

On September 13, 2012, Ryan Kidwell, of the Port Arthur Police Department, responded to a domestic disturbance call (52 RR 83). Kimberly Petetan told Kidwell that Petetan assaulted her when she asked him to stop smoking in the apartment because her daughter has asthma (52 RR 85). She said

Petetan had thrown her to the floor and held a kitchen knife close to her (52 RR 86). While holding the knife close to her, Petetan said "I could kill you, do you want to die in front of your child?" (52 RR 88).

Petetan had left the apartment by the time Kidwell arrived (52 RR 87). Kimberly told the officer she wanted to file assault charges against Petetan and she knew it would be a felony since he used a knife during the assault (52 RR 90). She also told the officer she was leaving Port Arthur and moving back to Waco (52 RR 93).

A. W. testified that when her mother opened the door in Waco 10 days after her assault in Port Arthur, Petetan pushed his way into the apartment without her mother inviting him in (53 RR 174). Petetan pulled a gun from his pocket and started waving it around the apartment (53 RR 175). Petetan told her mother to get dressed and "come with me" (53 RR 176). Petetan told her mother they were going to Port Arthur and she was "going to tell the cops what happened" (53 RR 177). Rather than go to Port Arthur, they traveled to a motel in Waco in picked up Miller and Mouton (53 RR 180). The five of them left the motel and returned to Kimberly's apartment (53 RR 183).

For purposes of the retaliation statute, the State must prove harm or a threat to harm in retaliation or to prevent service. *Meyer v. State*, 366 S.W.3d 728, 731

(Tex. App.—Texarkana 2012, no pet.).  "Harm" is defined as "anything reasonably regarded as loss, disadvantage, or injury...." TEX. PEN. CODE § 1.07(25).

Here, the evidence fails to show Petetan harmed or threatened to harm Kimberly in retaliation for reporting his assault of her.  Likewise, there is insufficient evidence to show Petetan harmed or threated to harm Kimberly to prevent or delay her service as a witness or a person who had reported a crime.  At most, the evidence simply shows Petetan intended to take Kimberly to Port Arthur and she was "going to tell the cops what happened" (53 RR 177).  Such a stated intention does not constitute harm or a threat of harm.  On the contrary, taken at face value, the stated intent is to safely transport her to Port Arthur to provide information to the authorities on the previously reported assault.  Absent evidence of harm or threaten to harm in relation to the prior assault, the evidence does not support a conviction for capital murder.

Petetan has demonstrated that none of the underlying aggravating elements find evidentiary support in the record.  This Court should reform the judgment to the offense of murder and remand the cause to the trial court for a new punishment proceeding.

## Point of Error Seven

**The trial court abused its discretion by admitting an extraneous offense showing that on the day of the murder, Petetan told Miller he was going to Waco to buy drugs and would give Miller drugs if he would drive Petetan to Waco (53 RR 31).**

## Point of Error Eight

**The trial court abused its discretion by admitting an extraneous offense showing that on the day of the murder, Petetan told Mouton he was going to Waco to buy drugs and will give Mouton drugs if he would accompany Petetan to Waco (53 RR 31).**

The State proffered evidence it sought to present showing Petetan told Miller he was coming to Waco on the day of the murder to buy drugs and would give Miller drugs in return for driving him to Waco (53 RR 28). The State claimed such evidence was admissible to show Miller's motive for coming to Waco on the day of the murder and to rebut the defense assertion in opening that Miller murdered Kimberly (53 RR 28). The defense objected that such evidence was an inadmissible extraneous offense (53 RR 29). The trial court overruled Petetan's objection and granted him a running objection to the evidence the State sought to offer (53 RR 31-32).

In the presence of the jury, Miller testified he and Petetan have known each other since they grew up in Port Arthur (53 RR 34). Early in the morning of September 23, 2012, Miller saw Petetan at a convenience store in Port Arthur (53 RR 36). Petetan told Miller he was going to Waco to buy some drugs and needed Miller to drive him to Waco (53 RR 36-37). Petetan offered to give Miller an ounce of crack cocaine and some money if he would drive him to Waco (53 RR 37). Miller did not know Petetan was married or his wife's name (53 RR 39, 53). He met Kimberly and A. W. for the first time when they picked him up at the motel in Waco with Petetan (53 RR 52). He did not kill Kimberly, never had any intention to kill her, and did not know her before they met in Waco on the day of her death (53 RR 75, 78).

Mouton testified that Petetan asked him to accompany him to Waco on the day of the murder (53 RR 100). Petetan said he was going to Waco to buy five ounces of drugs and would give Mouton two of the five ounces if he would come with him to Waco (53 RR 101). They went to a convenience store, picked up Miller, and started driving toward Waco (53 RR 102). Mouton did not know Petetan was married or had a wife in Waco (53 RR 103).

An extraneous offense is any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers and shown to have

been committed by the accused. *Rankin v. State*, 953 S.W.2d 740, 741 (Tex. Crim. App. 1996). A trial court should be diligent and forever mindful of the devastating impact of extraneous offense evidence on the jury's rational disposition towards other evidence because of the jury's natural inclination to infer guilt to the charged offense from the extraneous offenses. *Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994). In fact, to ensure that a defendant is tried only for the crime with which he is charged and not for criminal propensity, evidence of extraneous offenses is normally inadmissible. *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003).

The general rule of law is that evidence of extraneous offenses or prior wrongful acts is inadmissible as evidence of a person's character—and rightly so—because of the inherent prejudice that such evidence could unsuspectingly have on jurors. *Johnston v. State*, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004). Generally, an accused may only be tried for the offense with which he is charged and not for being a criminal generally. *Lockhart v. State*, 847 S.W.2d 568, 570 (Tex. Crim. App. 1992*).* TEX. R. EVID. 404(b) seeks to protect the defendant from the inherent dangers presented by the admission of extraneous offenses.

A trial court has broad discretion in determining the admissibility of evidence, and its decision will not be disturbed absent a showing that discretion

was abused. *Mozon v. State*, 991 S.W.2d 841 (Tex. Crim. App. 1999). Extraneous-offense evidence is admissible if that evidence satisfies a two-pronged test: (1) whether the extraneous-offense evidence is relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character; and (2) whether the probative value of the evidence is not substantially outweighed by unfair prejudice. *Mann v. State,* 718 S.W.2d 741, 743 (Tex. Crim. App. 1986). To be admissible, extraneous offense evidence must be relevant apart from its proof of character conformity. *Alba v. State*, 905 S.W.2d 581, 585 (Tex. Crim. App. 1995).

Petetan maintains the evidence of other crimes, wrongs, and acts of which he now complains was erroneously admitted contrary to TEX. R. EVID. 404(b) as character conformity evidence. The extraneous offenses and bad acts had no relevance to the capital murder charge pending against Petetan.

The State claimed such evidence was admissible to show Miller's motive for coming to Waco on the day of the murder and to rebut the defense assertion in Petetan's opening statement that Miller murdered Kimberly (53 RR 28). Neither of the reasons supports admission of the extraneous offenses involving Miller and Mouton. Their motive for coming to Waco on the day of the murder was irrelevant to the charged offense. A review of the defense opening statement does not

support the State's claim that Petetan suggested Miller was responsible for the murder (51 RR 40-44).

The trial court agreed the extraneous offences were admissible to show motive, intent, and preparation (53 RR 32). Petetan disagrees.

The extraneous conduct was not necessary to prove intent in the instant prosecution. Petetan's intent to cause serious bodily injury or death could be inferred from the use of a deadly weapon, a firearm. See *Arnold v. State,* 234 S.W.3d 664, 672 (Tex. App.-Houston [14th Dist.] 2007, no pet.); *Darkins v. State*, 430 S.W.3d 559, 565 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). The State was erroneously permitted to portray Petetan as a drug dealer and a criminal in general.

Likewise, the complained of evidence was inadmissible to prove motive to kill Kimberly. Though motive is not an element of capital murder, the prosecution may offer evidence to show motive for the commission of the offense because it is relevant as a circumstance to prove the commission of the offense. *See Crane v. State,* 786 S.W.2d 338, 349–50 (Tex. Crim. App. 1990). Once the opponent of extraneous-acts evidence raises an appropriate character-evidence objection, the proponent of the evidence must satisfy the trial court that the evidence has relevance apart from proving character conformity. *Johnston,* 145 S.W.3d at 220;

*Lopez v. State,* 200 S.W.3d 246, 252 (Tex.App.-Houston [14th Dist.] 2006, pet.

ref'd.); *Montgomery v. State,* 810 S.W.2d 372, 387 (Tex.Crim.App.1991).

Petetan's extraneous bad acts involving Miller and Mouton have no logical

relevance to the shooting of Kimberly. The State was erroneously permitted to

portray Petetan as a dope-dealing criminal in general.

Finally, Petetan argues the extraneous offenses were not admissible on the

issue of preparation. The extraneous offenses did not prove the existence of a

larger plan of which the capital murder was a part. The evidence was not shown to

have furthered the capital murder of Kimberly or in contemplation of the offense.

The evidence was erroneously admitted and portrayed Petetan as a dope-dealing

criminal in general.

Petetan has demonstrated an abuse of discretion in the admission of the

complained of evidence. The evidence was erroneously admitted and painted him

as a criminal in general.

Error under the rules of evidence in the admission of evidence constitutes

nonconstitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App.

1998). A reviewing court is to disregard nonconstitutional error that does not

affect the substantial rights of the defendant. TEX. R. APP. P. 44.2(b). A

substantial right is affected when the error had a substantial and injurious effect or

influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In *Kotteakos*, the United States Supreme Court explained:

> "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U.S. at 765.

The Supreme Court has defined "grave doubts" to mean "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Webb v. State*, 36 S.W.3d 164, 182 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). If the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, that is, as having a substantial and injurious effect or influence in determining the jury's verdict. *Id.*

The defendant is not required to prove harm from an error. *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). Indeed, there ordinarily is no way to prove "actual" harm. *Id.* It is instead the duty of the reviewing court to assess harm from the context of the error. *Id.* Thus, the proper inquiry is whether the trial court's error in allowing the State to introduce evidence of other crimes,

wrongs, and acts by Petetan substantially swayed or influenced the jury's verdict, or whether this Court is left in grave doubt as to whether this extraneous offense evidence substantially swayed or influenced the jury's verdict. *See Kotteakos*, 328 U.S. at 765; *Johnson*, 43 S.W.3d at 4. In making that determination, this Court should consider the trial court's erroneous admission of the extraneous offense evidence in the context of the entire record and not just whether there was sufficient or overwhelming evidence of Petetan's guilt. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Extraneous offense evidence can have a devastating impact on the jury's rational disposition towards other evidence because of the jury's natural inclination to infer guilt to the charged offense from the extraneous offenses. *Abdnor,* 871 S.W.2d at 738. Here, the erroneous admission of the other crimes, wrongs, and acts, was of such a magnitude that in all probability it disrupted the jury's orderly evaluation of the evidence and had a devastating impact on the jury's rational disposition towards other evidence. The natural inclination of the jury was to infer Petetan's guilt of capital murder because he was portrayed as a criminal in general due to his other criminal activity.

After reviewing the entire record, this Court will be unable to find with fair assurance that the erroneous admission of other crimes, wrongs, and acts did not

have a substantial and injurious effect or influence on the jury's verdict. This Court cannot say, with fair assurance, after considering the entire record without stripping it of the erroneous admission of the extraneous matters, that the judgment was not substantially swayed by the errors. The errors were harmful under TEX. R. APP. P. 44.2(b). Petetan should be awarded a new trial free of such errors.

**Point of Error Nine**

**The trial court abused its discretion by admitting evidence which undermined defense counsel before the jury and created a conflict of interest which denied Petetan his right to the effective assistance of counsel (59 RR 198).**

Outside the presence of the jury, Petetan's lead counsel, Russ Hunt, told the court he had recently represented Mubarak Ali, a witness the State might call at the punishment phase of trial (52 RR 188). The trial court told second chair defense counsel, Skip Reaves, to conduct the cross-examination of Ali if he was called as a witness by the State (52 RR 190).

A hearing was held outside the presence of the jury on Petetan's objection to the State calling Mubarak Ali as a rebuttal witness at the punishment phase of trial (59 RR 6). Lead counsel for Petetan, Russ Hunt, stated he represented Ali for three or four weeks on a synthetic marijuana charge while also representing Petetan on his pending capital murder charge (59 RR 7). It was urged that

permitting Ali's testimony before the jury would create an actual conflict of interest for Hunt by having a former client testify against a current client (59 RR 8).

Specifically, it was urged that information Hunt learned from Ali could not be used by Hunt or shared with fellow counsel in order to effectively cross-examine Ali (59 RR 9).  Hunt represented that he learned facts about Petetan from Ali while he was representing Ali (59 RR 9).  Allowing Ali to testify would place Hunt in the position of being called as a rebuttal witness to Ali's testimony (59 RR 11).

Still outside the presence of the jury, Ali testified Petetan talked to him in jail and told him that Hunt was his lawyer (59 RR 16).  Petetan told Ali that he was charged with murdering his wife and that Hunt had told him to act like he was mentally sick so he would not get the death penalty (59 RR 17).  Petetan also told Ali that Hunt had told Petetan not to use the jail phone and to act like he was mentally sick (59 RR 18, 19).  Ali hired Hunt on his drug case when he was released from jail on bond (59 RR 19).  He initially hired Hunt because Petetan had said he was a good lawyer (59 RR 22).  He did not otherwise provide any information to Hunt concerning Petetan (59 RR 21-22).

He met with Hunt once and then hired another lawyer (59 RR 19). He was dissatisfied with Hunt because Hunt was never in the office and did not return Ali's calls (59 RR 26). Hunt ultimately returned Ali's retainer (59 RR 26). After hiring new counsel and at the urging of his new lawyer, Ali went to the District Attorney's Office to reveal Petetan's statements to him in jail (59 RR 24).

Petetan continued to express a concern that Hunt had a conflict of interest because he was a potential rebuttal witness to Ali's assertion Petetan said that Hunt told him to feign mental illness (59 RR 26). Hunt was further hampered because he could not reveal any confidential information learned from Ali while representing him on the drug charge (59 RR 26). Petetan further complained the testimony from Ali would undermine Hunt's credibility before the jury with respect to the intellectual disability defense put forth at punishment (59 RR 27-28). Hunt said that at the time he was representing Ali, Ali did not know that Petetan was charged with murdering his wife (59 RR 29).

The State offered to limit Ali's testimony by not revealing that Petetan said counsel told him to act mentally ill to avoid the death penalty (59 RR 31). Petetan continued to object that even with such a limitation, the jury would be left to speculate as to who had told Petetan to feign mental illness and that defense counsel would be a prime target of that speculation (59 RR 32). Hunt complained

that Ali did not know Petetan had been charged with murder at the time he allegedly made the statements to Ali in the jail (59 RR 33-34).

Overruling all of Petetan's previous objections, the trial court permitted Ali to testify in the presence of the jury (59 RR 198). Ali testified he was in the McLennan County Jail with Petetan in March of 2014 (59 RR 199). He knew Petetan by his nickname "Big Boy" (59 RR 202). Petetan told Ali that if he acted like he was mentally sick, he would not receive the death penalty (59 RR 203). Petetan told Ali that he had a relative in Louisiana who was a bondsman and would help Ali get out of jail (59 RR 204). When Ali asked Petetan to call the bondsman for him, Petetan declined by explaining his calls were recorded and he was telling the court he was mentally sick (59 RR 205). Upon the urging of Ali, Petetan called his mother concerning Ali's need for a bond (59 RR 205).

Ali testified he was familiar with Petetan's lawyer, Russ Hunt, through Petetan (59 RR 207-208). Ali admitted he told the State of his conversations with Petetan at the urging of the lawyer representing him on a pending drug charge (59 RR 208). Those revelations came about 10 days before Ali's testimony at Petetan's trial (59 RR 208). Ali's drug charge remained pending at the time of Petetan's trial (59 RR 200). Ali was the State's only rebuttal witness and final witness in the punishment phase of trial (59 RR 209).

Ordinarily, to prevail on a claim of ineffective assistance of counsel, a defendant must show by a preponderance of the evidence that counsel's performance (1) was so deficient that it fell below an objective standard of reasonableness and (2) prejudiced the defense, meaning there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  However, when an applicant claims that ineffective assistance resulted from a conflict of interest, the *Strickland* test does not apply.  *Acosta v. State*, 233 S.W.3d 349, 356 (Tex. Crim. App. 2007).  Instead, the defendant must show that (1) counsel had an actual, not merely potential, conflict of interest and (2) that conflict adversely affected counsel's performance.  *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980).

An actual conflict exists when "counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests ... to the detriment of his client's interest." *Acosta,* 233 S.W.3d at 355.  A showing of a potential conflict of interest is not sufficient to constitute an actual conflict of interest.  *Cuyler*, 446 U.S. at 350; *Ex Parte McFarland,* 163 S.W.3d 743, 759 n.52 (Tex. Crim. App. 2005). "The petitioner must specifically identify instances in the record that reflect that his counsel made a choice between possible alternative courses of action such as eliciting (or failing to elicit) evidence helpful to one client but harmful to another." *Perillo v. Johnson,* 79 F.3d 441, 447 (5th Cir.1996)

(quoting *United States v. Fox,* 613 F.2d 99, 102 (5th Cir.1980)); *Gaston v. State,* 136 S.W.3d 315, 318 (Tex.App.-Houston [1st Dist.] 2004, pet. struck).

Petetan maintains the facts presented demonstrate he was denied the effective assistance of counsel due to Hunt's representation of both Petetan and Ali as well as Hunt's efforts to defend against the accusation he was sponsoring false testimony concerning Petetan's intellectual disability. Hunt was precluded from cross-examining Ali with confidential information he acquired while representing Ali. The jury was left with the clear impression that someone, probably counsel, had coached Petetan on feigning mental illness in an effort to avoid the death penalty. Such occurrence placed Hunt in the untenable position of attempting to save Petetan's life with an intellectual disability defense while at the same time defending himself from implications he was sponsoring false testimony. An actual conflict of interest is shown which adversely affected Hunt's performance during the punishment phase of trial. A sentence of death under such circumstances cannot stand under the Sixth Amendment right to the effective assistance of counsel. Petetan is entitled to a new punishment hearing with conflict free counsel.

**Point of Error Ten**

**The jury's answer to the intellectual disability special issue is against the great weight and preponderance of the evidence.**

**A. The evidence relevant to Petetan's intellectual disability.**

Ramona Pitre is a public school teacher in Port Arthur (55 RR 21). In 1989, Petetan was in her in-school suspension program (55 RR 26). She does not believe Petetan is intellectually disabled;[7] he just cannot follow rules and misbehaves (55 RR 31). In twenty five years of teaching, she has never had a student with intellectual disability, mental problems, or mental illness in one of her classes (55 RR 32).

Edward Cockrell is with the Jefferson County Juvenile Probation Department (55 RR 36). It was decided to pursue certification for prosecution as an adult after Petetan shot Fredrick Nico with a gun in March of 1992 (55 RR 50, 51, and 55). Cockrell's certification analysis was admitted into evidence (55 RR 53, 62 RR SX 133). When Petetan was 16 years of age, an IQ test administered yielded a score of 64 on a child's test and 74 on an adult test (55 RR 65, 62 RR SX 133). The doctor administering the test described Petetan as mildly intellectually disabled (55 RR 66).

Records from the former Texas Youth Commission regarding Petetan were admitted into evidence (55 RR 87, 62 RR SX 128). The records state Petetan's

---

[7] Pitre was not provided with a definition of "intellectual disability" or shown to be competent to render such an opinion. No objection was voiced to the question, her qualification to answer, or her answer.

date of birth as February 7, 1976 (62 RR 128). Those records reflect a previous IQ score of 61 for Petetan from the Port Arthur Independent School District when he was admitted to TYC at the age of 15 in 1991 (62 RR SX 128). The records further note that on November 7, 1991, Dr. Antonio Bartonico made reference to a previous diagnosis of possible mild intellectual disability (62 SX 128). While at the Brownwood State School, Petetan was diagnosed with mild intellectual disability (62 RR SX 128).

The juvenile certification proceedings related to Petetan were admitted into evidence and published to the jury (55 RR 82, 62 RR SX 130). The exhibit reflects Petetan's date of birth as February 7, 1976 (62 RR SX 130).

Leonard Cucolo testified that Petetan was received by the Brownwood State School in 1991 after his juvenile probation for burglary was revoked (55 RR 84, 87). He was at the Brownwood School for four months before returning to Port Arthur on juvenile parole (55 RR 93). While housed at the Brownwood School, Petetan was diagnosed as mildly intellectually disabled (55 RR 103, 62 SX 128).

On March 21, 1992, Fredrick Nico was at Petetan's house in Port Arthur drinking beer in the backyard (55 RR 124). While at Petetan's house, Petetan

pointed a pistol at Nico and shot him twice (55 RR 128). Nico has known Petetan for 25 years and does not consider him to be intellectually disabled (55 RR 134).[8]

The pen packets from Petetan's five prior felony convictions were admitted into evidence (55 RR 217, 62 RR SX 131). He was received at the Department of Corrections when he was 17 years of age on August 27, 1993 (62 RR SX 131). Prison records reflected his IQ testing was scored at 69 with a notation he was expelled following the eighth grade (62 RR SX 130).

Morris Lee was Petetan's principal in elementary school (56 RR 44). Petetan was frequently sent to Lee's office because he did not follow school rules (56 RR 45). According to Lee, Petetan had no mental disabilities other than being hard-headed (56 RR 51).[9]

Ophelia Ortiz is Petetan's mother (56 RR 107). As an infant, Petetan would constantly cry and pitch a fit (56 RR 112-113). While upset, he would break his baby bottles (56 RR 112). His temper tantrums started as a baby and have never subsided (56 RR 121).

---

[8] Nico was not provided with a definition of "intellectual disability" or shown to be competent to render such an opinion. No objection was voiced to the question, his qualification to answer, or his answer.

[9] Lee was not provided with a definition of "mental disabilities" or shown to be competent to render such an opinion. No objection was voiced to the question, his qualification to answer, or his answer.

Petetan has wet the bed since childhood and still does so (56 RR 114). He was slow as a child and his mother had to repeatedly tell him to bathe (56 RR 115). He was unable to take care of himself as a child and unable to tie his shoes (56 RR 116). As a child, he was unable to dress himself or brush his teeth (56 RR 116). He did not follow her directions (56 RR 118).

She had to walk with him to school because if he went by himself, he would get lost or go the wrong way (56 RR 117). He did not do his school homework (56 RR 118). She could never send him to the store because he could not remember what he was to purchase (56 RR 171). He never learned to make change when purchasing an item (56 RR 171).

After his best childhood friend, "Pee Wee," died, his nervousness and depression increased (56 RR 120). Petetan had no interest in television or games as a child (56 RR 122). He would simply sit on the floor or go walking without first telling his mother where he was going (56 RR 122). He was committed to a psychiatric hospital at age 15 before he went to the Brownwood State School (56 RR 128).

Petetan was never able to get a driver's license because he was unable to pass the written portion of the test (56 RR 123). After he left prison, he could not take care of himself (56 RR 124). Her daughter, Petetan's sister, would clean and

wash his clothes because he could not operate a washing machine (56 RR 124).

He was unable to figure out how to operate a cell phone (56 RR 125). He never

learned to wash dishes (56 RR 127).

Sabrina Mouton, Petetan's older sister, testified that up to age two, Petetan

would cry constantly, wet himself, and not pay attention (56 RR 182). He didn't

walk until three years old or talk until four or five years old (56 RR 184).

Growing up, Petetan would not play outside with his sister; he just wandered

around the neighborhood aimlessly by himself (56 RR 185). He never watched

television or played games (56 RR 186). He was fat as a child and teased by others

(56 RR 187). He never learned to ride a bicycle (56 RR 188).

When Petetan came home from prison, she tried to teach him how to use a

cell phone and he could not learn (56 RR 193). He never learned to count money

(56 RR 198). His handwriting is poor (56 RR 201). At the apartment he obtained

while on parole, Petetan did not know how to cook for himself or clean up after

himself (56 RR 197).

Cathy Gauthier, Petetan's aunt from Lake Charles, testified that Petetan

lived with her for a year when he was 13 or 14 years old (56 RR 241, 244). He

was real quiet and slower than her children (56 RR 245-246). Petetan did not

attend school for the year he spent with Gauthier (56 RR 251).

- 108 -

Petetan's cousin, Caston Gauthier, visited Petetan while he was in prison (56 RR 26). When Petetan told Gauthier that he wanted to be a bondsman or rapper upon release from prison, Gauthier thought Petetan did not have the intellectual ability to engage in such professions (56 RR 263-264). He never thought Petetan was intellectually disabled (56 RR 265).[10]

Kimberly Jackson is Petetan's cousin and the daughter of Cathy Gauthier (56 RR 272). She and Petetan are the same age (56 RR 272). She remembered that when Petetan was living with her family, he was not on her level "mind-wise" and intellectually slower than her (56 RR 272, 274).

Thomas Kemper is Petetan's uncle (56 RR 276). Petetan has been intellectually slow since birth (56 RR 279). He was in special education classes in school (56 RR 280). As a child, Petetan refused to bathe or groom himself (56 RR 281).

Dr. Ray Coxe is a psychologist from Beaumont (56 RR 313). In 1992, he was performing psychological examinations for the court system in Jefferson County in connection with whether juveniles should be certified as adults for purposes of prosecution (56 RR 315). He examined Petetan at the request of the

_____

[10] Gauthier was not provided with a definition of "intellectual disability" or shown to be competent to render such an opinion. No objection was voiced to the question, his qualification to answer, or his answer.

juvenile probation department in connection with a pending attempted murder charge in an effort to determine whether Petetan should be certified as an adult (56 RR 316-317). Petetan was 16 years of age at the time of the examination (56 RR 316).

In view of his age, Coxe administered IQ tests for both children and adults to Petetan (56 RR 318). He explained the child test goes up to age 17 while the adult test goes down to age 16 (56 RR 318). Petetan's full scale IQ on the child version was 64 which places him in the lower three percentile (56 RR 322). Petetan's full scale IQ on the adult test was 74 which places him in the lower four percent (56 RR 323). Due to testing differences between the two tests, it is not unusual for the adult test to be 10 points higher than the child test (56 RR 323).

Coxe also administered achievement tests to Petetan (56 RR 354). The tests are scored like an IQ test (56 RR 354). Petetan scored 70 on reading, 61 on spelling, and 46 on mathematics (56 RR 354). Based on testing and evaluation in 1992, Coxe believed Petetan to be mildly intellectually disabled (56 RR 357).

Dr. Harold Scott, a psychiatrist, was previously a consultant for the Texas Youth Commission at the Brownwood State School (57 RR 40. 43). He examined Petetan at the school in 1991 when Petetan was 15 years old (57 RR 45). Scott diagnosed Petetan with a conduct disorder and mild intellectual disability (57 RR

53). Scott explained that mild intellectual disability meant an IQ score between 55 and 69 (57 RR 55). The diagnosis was based in part on previous IQ testing of Petetan (57 RR 56).

Edmond Stewart is a former professional boxer (57 RR 92). For the last five years, he has been a pastor at a jail ministry in the McLennan County Jail (57 RR 95). Stewart met with Petetan in jail and found it hard to have a conversation with him because his mind tends to "wander off" (57 RR 98).

Ellis Craig is a psychologist with 47 years of experience working in the area of adaptive behavior assessments (58 RR 7). He performed an adaptive behavior assessment of Petetan by administering a test, reviewing records, and speaking with Petetan's relatives (58 RR 18, 34, and 38).

Craig explained that adaptive behavior involves the ability to "get along" in everyday life and the ability to do things everyone else is able to do (58 RR 19). When conducting an assessment, he measures social skills, conceptual skills, and practical skills (58 RR 19-20). Conceptual skills include language, numbers, and time (58 RR 20). Social skills involve interpersonal relationships, social responsibility, gullibility, and naiveté (58 RR 22). Practical skills involve daily living, hygiene, feeding, use of money, and the ability to follow schedules and routines (58 RR 23). Fighting, arguing, and a lack of cooperation are more

common among those with intellectual disability than the general population (58 RR 24). The testing is conducted in such a way that the score of 100 is average and a score of 70 or below would indicate significant limitations in adaptive behavior (58 RR 21).

Craig used the ABAS-II assessment test when seeking to determine retrospectively whether Petetan had adaptive behavior deficits in his developmental period (58 RR 33-34). The test measures adaptive behavior in a number of areas including: communication; community use; functional academics; home living; health; safety; leisure; self-care; self-direction; and social (58 RR 35).

When speaking with Petetan's relatives, Craig sought to determine adaptive behavior before the time Petetan went to prison at 17 years of age (58 RR 67). Most of the answers provided to his questions were examples of adaptive deficits from the time Petetan was a youth of 14 or 15 years old and had not yet gone to prison (58 RR 68). Craig believed Petetan was forthcoming with him during the assessment and did not intentionally attempt to underestimate his abilities (58 RR 39).

The information gathered from Petetan's relatives was graded for adaptive disabilities (58 RR 40). The information from Petetan's mother placed Petetan so low that Craig did not consider it reliable (58 RR 40). Petetan's brother and sister

ranked his social skills as the best, conceptual skills the second best, and practical skills at the lowest level (58 RR 41).

The scoring of adaptive assessment is similar to scoring on an IQ test with the norm in the 85 to 115 range (58 RR 42). The results of the assessment done by Craig were based on input from Petetan and his relatives and the scores were as follows: brother 53; uncle and sister 47; Petetan 42; and Petetan's mother 40 (58 RR 40).

Craig summarized some of the adaptive behavior limitations he found during testing and information supplied by informant relatives in the following manner:

> [H]e was easily led by other people, that the basic social skills of being polite and offering to help people, he simply doesn't do it. He doesn't say thank you. He doesn't give gifts. He doesn't offer assistance to people. And this was a uniform finding too.
>
> He didn't engage in games. The only games we ever heard that he played were with a cousin who played Hide and Seek with him, and this was when he was older, too. But he simply didn't understand any kind of simple kind of games that, you know, kids play.
>
> He showed no interest in most -- what a lot of people use for leisure, which is TV. I mean, he has consistently over the years never shown the least bit of interest in TV.
>
> [He has] very limited conversational skills. It's really hard to engage in a conversation with him. He just won't follow the conversation. You can't get a response to what you're saying.
>
> In terms of getting along in the world, it was routinely noted that he was unable to read menus. I mean, he would have to order things -- if

he went out to, you know, a fast food restaurant or something, he would have to order by the picture, just saying what he knew it was.

He could not calculate the correct change. And you really couldn't depend on him time-wise. He was irresponsible regarding time commitments.

Again, in his neighborhood he could get along just fine. I mean, he knew how to find places. He couldn't necessarily tell you street names, but he knew where things were geographically. He could make simple meals for himself, and this was kind of like a little idiosyncratic thing about him.

He never learned to use a fork. I mean, he would sometimes use a spoon, but every bit of food that you gave him, he would wrap up in bread. That's how he ate. I mean, he made a sandwich out of everything. So in terms of the typical or just lack of ability, he didn't do. It's fairly common for people, even with mild mental retardation, to have difficulties cutting their food into bite-size portions. Somebody may have to do that for them. I'm not sure if that was the case with him, because he didn't use a knife. He just used a spoon.

He was able to take medications. He was able to swallow them. He didn't resist that. And he could dress himself. He didn't necessarily dress himself well, but he could do the physical act.

Even though he could get around the community, he was unable to use a map. He relied on the ability to -- either people tell him familiar locations or whatever, and he got lost fairly easily.

He did not do housekeeping. He was described as a terrible housekeeper and never made his own bed, was unable to learn how to operate most common appliances, broke microwaves because he didn't know how to use them, put the wrong things in them, had no conception about how to use a washer or a dryer.

And even in the area of first aid, I mean, when asked what he would do if he cut his finger, he said he would sop it up. "Sop the blood up," that was his response. So he didn't -- he just wasn't worried that way

where he would know to put a Band-Aid and some Bactine or something on it (58 RR 43-47).

He doesn't understand jokes. I mean, it's too complex. You know, I asked him, you know, "Do people tell you things that make you laugh," and he said, "No."

Adaptive behavior strengths as found by Craig included:

He got along well with family members. He could navigate his community pretty well. He could present himself in a reasonably good -- I mean, you know, although his personal hygiene was not particularly good, he dressed and he could blend in with the neighborhood. It may be that in that environment he was not really that atypical in terms of how he dressed and his personal hygiene. I don't really know.

He had good social skills in general. I mean, he could make friends and he could hang out with a group that he felt comfortable with (58 RR 97).

Based on the test results he obtained, Craig concluded Petetan's adaptive limitations far outweigh his limited skills (58 RR 47). Craig had to rely on retrospective assessments because there was no measure from when Petetan was a child other than one report noting his adaptive limitations without concurrent testing (58 RR 48). Based on his adaptive behavior deficits and the IQ scores he has seen, Craig considers Petetan to be moderately intellectually disabled which is more severe than mildly intellectually disabled (58 RR 48).

Dr. Kevin Correia, a psychologist, examined Petetan on August 8, 2012, in connection with an application for Social Security disability benefits (58 RR 104, 63 RR DX 5). Correia administered an IQ test resulting in a full scale score of 55 (58 RR 104, 63 RR DX 5). Correia diagnosed Petetan as mildly intellectually disabled in view of his IQ score and adaptive behavior deficits (58 RR 104, 63 RR DX 5).

Joan Mayfield is a neuropsychologist (58 RR 105). While Petetan was in the McLennan County Jail awaiting trial, she administered 16 different tests to him (58 RR 124). Multiple tests, rather than simply an IQ test, were administered to determine how Petetan's whole brain was functioning across a number of different areas (58 RR 170). The tests covered areas such as IQ, intellectual ability, attention, executive functioning, academic achievement, memory, learning, language, visual spatial, and motor coordination (58 RR 117). She did not perform any adaptive behavior assessment testing and relied on the testing by Dr. Craig (58 RR 231). She thought Petetan gave his best effort during the testing she administered (58 RR 186).

Mayfield explained that one of the components of intellectual disability is sub-average intellectual functioning as shown by a full scale IQ score of 70 or below, namely, two standard deviations below the mean (58 RR 129). She also

considered and looked for evidence of an onset of the condition before the age of 18 (58 RR 132).

Mayfield was provided access to various records including Petetan's school records and previous psychological testing (58 RR 133). She noted Petetan was required to repeat both the third and sixth grades in school (58 RR 133). He was socially promoted to the fourth grade rather than being required to repeat the third grade for the second time (58 RR 133). He ultimately dropped out of school in the ninth grade (58 RR 220).

Her testing of Petetan revealed global delays in intellectual ability, academic, executive functioning, problem solving, memory, language, motor skills, and visual perception (58 RR 185). He suffers from sub-average intellectual functioning with an onset before the age of 18 (58 RR 185-186). Her testing revealed a full scale IQ score of 52 (58 RR 135). The IQ testing results were consistent with previous IQ testing results of Petetan she was provided (58 RR 186, 244). Mayfield explained that different scores may be obtained on different versions of the same test (58 RR 243).

She explained that at the time Coxe administered the child and adult versions of an IQ test to Petetan, there was a problem in correlating the results and those scoring on the lower end of child's IQ test typically scored 10 to 15 points

higher on the adult version (58 RR 228).  When the tests were revised, the norms for the tests were adjusted and there is now greater reliability between the two tests so that the scores are now similar (58 RR 228).  She believed Coxe found the child's score of 64 to be more reliable than the adult score of 74 and that is the reason he diagnosed Petetan as mildly intellectually disabled  (58 RR 228).

Although she did not perform any adaptive behavior limitations assessment, on cross-examination, Mayfield was asked questions concerning adaptive behavior limitations in relation to the *Briseno* factors created by this Court in relation to adaptive behavior  (58 RR 232).  She noted that her role was not that of assessing adaption functioning because Dr. Craig had taken on that role (58 RR 233, 236).  Nevertheless, she assumed that facts within a hypothetical posed by the prosecutor concerning the instant cause would show an ability to hide facts and material evidence (58 RR 236).  She assumed an ability to lie about a companion would show an ability to lie in anticipation of being arrested (58 RR 236).  Although not present for Petetan's trial testimony, based on the prosecutor's representations of that testimony, she assumed the ability to respond coherently to questions (58 RR 237).  Based on Petetan's criminal history, as represented by the prosecutor, he has the ability to act alone in criminal conduct (58 RR 238).  Based on the facts of the instant offense as represented by the prosecutor, Petetan was not working under the

directions of others at the time of the offense (58 RR 238). The defense rested on punishment (58 RR 248).

Dorothy Stamps is a retired public school teacher from Port Arthur (59 RR 45). Petetan was in her first grade class (59 RR 50). She did not believe him to be intellectually disabled (59 RR 50).[11]

Eddie Fowler was the principal of the middle school attended by Petetan (59 RR 59). Petetan was placed in special education classes because he was a discipline problem (59 RR 63). Otherwise, he was an average student and not intellectually disabled (59 RR 63-64).[12]

Petetan's school records were admitted into evidence (59 RR 69, 63 RR DX 10). Those records reflect he failed two grades and was socially promoted in another grade (59 RR 66). He withdrew from school in the eighth grade (63 RR DX 10).

---

[11] Stamps was not provided with a definition of "intellectual disability" or shown to be competent to render such an opinion. No objection was voiced to the question, her qualification to answer, or her answer.

[12] Fowler was not provided with a definition of "intellectual disability" or shown to be competent to render such an opinion. No objection was voiced to the question, his qualification to answer, or his answer.

Mattie Howe was Petetan's parole officer in Beaumont from May to September of 2012 (59 RR 70-71). Howe does not believe Petetan is intellectually disabled (59 RR 75).[13]

Travis Turner works for the Classification Department of TDCJ (59 RR 80). When Petetan was initially received at TDCJ in 1993, he scored a 69 on an IQ test (59 RR 85). He took an adaptive behavior screening test, but was never assigned to a prison unit for intellectually disabled offenders (59 RR 85-86).

**B. The trial court's charge on intellectual disability**.

At the close of the punishment phase, the trial court presented a charge to the jury (60 RR 5, 4 CR 1330). With respect to the issue of intellectual disability, the court charged the jury as follows:

> "You are instructed that in answering Special Issue Number 3, you shall answer yes or no.
>
> "The Defendant has the burden of proving by a preponderance of the evidence that Special Issue Number 3 should be answered yes.
>
> "By the term 'preponderance of the evidence' is meant the greater weight of the credible evidence.

---

[13] Howe was not provided with a definition of "intellectual disability" or shown to be competent to render such an opinion. No objection was voiced to the question, her qualification to answer, or her answer.

"You may not answer Special Issue Number 3 unless you agree -- you may not answer Special Issue Number 3 yes unless you agree unanimously.

"You may not answer Special Issue Number 3 no unless you agree unanimously.

"In deliberating on Special Issue Number 3, you shall consider all evidence admitted at the guilt/innocence stage and the punishment stage of this trial.

"Mental retardation[14] is a disability characterized by:
"1. Significant subaverage general intellectual functioning;[15]

"2. Accompanied by related limitations in adaptive functioning;[16]

"3. The onset of which occurs prior to the age of 18.

---

[14] The trial court sustained the State's objection to the use of the term "intellectual disability" rather than "mental retardation" during trial (57 RR 109-110). *See Hall v. Florida,* ___ U.S. ___, ___, 134 S.Ct. 1986, 1991, 188 L.Ed.2d 1007 (2014) ("Previous opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe the identical phenomenon."). The term "mentally retarded" has been changed to "intellectually disabled," as mental health advocates decided that the former term had pejorative connotations. *Ex parte Cathey*, 451 S.W.3d 1, 5 n.4 (Tex. Crim. App. 2014). See TEX. HEALTH & SAFETY CODE§ 591.003(13) (providing mental retardation means intellectual disability).

[15] No objection was voiced by counsel to the trial court's failure to include the instruction that significant subaverage intellectual functioning is generally evidenced by an IQ of 70 or below. Likewise, counsel did not request an instruction or object to the lack of a definition of "significant subaverage general intellectual functioning" (4 CR 1313).

[16] No objection was voiced by counsel to the trial court's use of the term "adaptive functioning" rather than "adaptive behavior." Counsel also failed to object to the absence of a definition for the term "adaptive behavior" or request a definition of the term (4 CR 1313). See TEX. HEALTH & SAFETY CODE § 591.003(1).

"You are instructed that if you return a negative finding, that is, a no answer, to Special Issue Number 2, then and only then --" that should be "Special Issue Number 3," ladies and gentlemen. I'm going to correct the copy here, if you want to correct yours.

"You are instructed that if you return a negative finding, that is a no answer, to Special Issue Number 3, then and only then are you to answer Special Issue Number 4 (60 RR 7-9).

"Special Issue Number 3: Do you find, taking into consideration all of the evidence, that the Defendant is a person with mental retardation?"

If the answer is unanimous, and it has to be unanimous for a yes or a no answer, it should be signed by the Presiding Juror (60 RR 14). Ultimately, the jury returned a "no" answer to the third special issue (60 RR 68, 4 CR 1338). Based on the jury's answers to the special issues, Petetan was sentenced to death in open court (60 RR 71).

## C.  The standard of review and burden of proof.

In *Atkins v. Virginia,* 536 U.S. 304, 321 (2002), the United States Supreme Court decided that it violates the United States Constitution for a state to execute a mentally retarded murderer.  The Court simultaneously left to the individual states the substantive and procedural mechanisms to implement the *Atkins* decision. *Atkins*, 536 U.S. at 317.

In view in the absence of legislation and the *Atkins* decision, this Court adopted the American Association on Mental Retardation (AAMR) definition of

- 122 -

mental retardation for *Atkins* claims presented in Texas death-penalty cases. *See Ex parte Briseno,* 135 S.W.3d 1, 7–8 (Tex. Crim. App. 2004). The AAMR defines mental retardation as a disability characterized by: (1) "significantly subaverage" general intellectual functioning, which is usually evidenced by an IQ "of about 70" or below,[17] (2) accompanied by "related" limitations in adaptive functioning,[18] (3) the onset of which occurs prior to the age of 18. *See id;.[19] see also Ex parte Tennard,* 960 S.W.2d 57, 61 (Tex.Cr.App.1997) (third part of AAMR definition

---

[17] *See Briseno,* 135 S.W.3d at 7 n.24.

[18] *See Briseno,* 135 S.W.3d at 7 n. 25 ("Impairments in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales.") (internal quotes omitted).

[19] In *Briseno,* 135 S.W.3d at 7–8, we also adopted the definition of mental retardation contained in the Texas Health and Safety Code, which, similar to the AAMR definition, defines mental retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." *See* TEX. HEALTH & SAFETY CODE § 591.003(13).

The most recent amendment to the Texas Health and Safety Code definition of "mental retardation" defines it as "intellectual disability," and it defines "intellectual disability" as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE §§ 591.003(13) & (7–a). *See In re Allen*, 462 S.W.3d 47, 56 (Tex. Crim. App. 2015) (Yeary, J., concurring).

requires a person to exhibit parts one and two of the AAMR definition during the developmental period).

This Court used *Briseno* to "define [from its own perspective] that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty." *Id.* at 6. The Court recognized that, the term "mental retardation" as defined in the DSM–IV included those categorized as mildly, moderately, severely, and profoundly mentally retarded, and that "some 85% of those officially categorized as mentally retarded fall into" the mildly mentally retarded range. *Id.* at 5. The Court observed that "mental retardation is not necessarily a lifelong disorder." *Id.* at 6. And it noted that "those in the mental health profession" might understandably "define mental retardation broadly to provide an adequate safety net for those who are at the margin" and who "might well become mentally-unimpaired citizens if given additional social services support." *Id.* The Court questioned whether "a consensus of Texas citizens" would agree "that all persons who might legitimately qualify for assistance under the social services definition of mental retardation" should be "exempt from an otherwise constitutional penalty." *Id.* But in the absence of legislative guidance, it adopted the definitions of "mental retardation" then

- 124 -

promulgated by the American Association on Mental Retardation (AAMR)[20] and

section 591.003(13) of the Texas Health and Safety Code. *Id*. Those definitions

were very similar.

In *Briseno*, the Court stated the adaptive behavior criteria are exceedingly

subjective, and undoubtedly experts will be found to offer opinions on both sides

of the issue in most cases. *Briseno*, 135 S.W.3d at 8. Seemingly from whole cloth

and without scientific, clinical, or other authority, the Court declared there are

other evidentiary factors which factfinders in the criminal trial context might also

focus upon in weighing evidence as indicative of mental retardation or of a

personality disorder:

> Did those who knew the person best during the developmental stage—
> his family, friends, teachers, employers, authorities—think he was

---

[20] The Supreme Court referred to the AAMR definition of mental retardation in *Atkins*. 536 U.S. at 308 n.3 & 317 n.22. That organization has now changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD). The Supreme Court also referred to the American Psychiatric Association (APA) definition of mental retardation as it was then described in the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM IV–TR): "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders p. 41 (4th ed. 2000). *See In re Allen*, 462 S.W.3d 47, 56 (Tex. Crim. App. 2015) (Yeary, J., concurring).

mentally retarded at that time, and, if so, act in accordance with that determination?

Has the person formulated plans and carried them through or is his conduct impulsive?

Does his conduct show leadership or does it show that he is led around by others?

Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

Can the person hide facts or lie effectively in his own or others' interests?

Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose? *See Briseno,* 135 S.W.3d at 8.

This Court has decided that a defendant, presenting an *Atkins* intellectual disability claim at trial, has the burden to prove by a preponderance of the evidence that he is intellectually disabled. *See Williams v. State*, 270 S.W.3d 112, 114 (Tex. Crim. App. 2008); *Gallo v. State,* 239 S.W.3d 757, 769–70 (Tex. Crim. App. 2007). When reviewing a defendant's assertion the jury's rejection of an issue is against the great weight and preponderance of the evidence, an appellate court views the entirety of the evidence in a neutral light, and may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the

weight and credibility of the witnesses' testimony. *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). A finding rejecting a defendant's issue upon which he had the burden of proof by a preponderance of the evidence cannot be overruled unless, after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). Thus, in reviewing a jury's finding that a defendant is not intellectually disabled, it is appropriate to consider all of the evidence relevant to the intellectual disability issue and determine, with "great deference" to the jury's finding, whether this finding is "so against the great weight and preponderance of the evidence so as to be manifestly unjust." *See Neal v. State,* 256 S.W.3d 264, 273 (Tex. Crim. App. 2008) (noting appellate court affords "great deference" to jury's finding that defendant is not intellectually disabled because jury is in the best position to assess witness credibility and to resolve conflicts in the evidence); *Williams*, 270 S.W.3d at 114; *Gallo,* 239 S.W.3d at 769–70.

**D. This Court's flawed practice when reviewing sufficiency of the evidence claims relative to showing intellectual disability by a preponderance of the evidence.[21]**

This Court routinely applies the *Briseno* factors instead of clinical diagnostic criteria to evaluate intellectual disability. As *Hall* v. *Florida* confirmed, however, clinical standards "were a fundamental premise of *Atkins*." 134 S. Ct. 1986, 1999 (2014). Like Florida, Texas departs from those standards in several respects, including by disregarding a defendant's adaptive deficits if the defendant also exhibits adaptive strengths and by giving effect to lay stereotypes of how intellectually disabled persons ought to appear or behave. Even after *Hall*, this Court has relied on that nonclinical approach to uphold death sentences when defendants concededly meet the clinical definition of intellectual disability.

In contrast to this Court, the vast majority of death penalty States have made clear that clinical standards should govern the determination of the second prong of the definition of intellectual disability; just as *Hall* confirmed they should apply at the first prong. In cases presenting facts very similar to this one, courts in those States have held that the Eighth Amendment forecloses the death penalty.

---

[21] These arguments are largely taken from a petition for writ of certiorari currently pending before the Supreme Court in *Lizcano v. Texas*, No. 15-65.

This Court's outlier status continues to defy the Supreme Court's holding in *Hall* that "persons who meet the 'clinical definitions' of intellectual disability 'by definition'" are ineligible for the death penalty. 134 S. Ct. at 1999. This Court invented the *Briseno* factors because it deemed the clinical diagnostic criteria too "subjective." *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). *Briseno* cited no authority for these factors—scientific or otherwise— and offered no guidance on how they should be weighed. *Id.* at 8-9. No clinical authority supports them. Yet *Briseno's* standard governs all *Atkins* claims in Texas, even after *Hall*. *E.g.*, *In re Allen*, 462 S.W.3d 47, 51-52 (Tex. Crim. App. 2015). Applying that standard, this Court has sustained death sentences even where defendants meet clinical definitions of intellectual disability.

The *Briseno* factors do not merely "flesh out the AAMR definition" of intellectual disability. *Chester* v. *Thaler*, 666 F.3d 340, 346 (5th Cir. 2011). They supplant it. Texas's approach presents "an array of divergences from the clinical definitions." Blume et al., *Of Atkins and Men*, 18 Cornell J.L. & Pub. Pol'y 689, 712 (2009). It is concededly "non-diagnostic." *Ex parte Van Alstyne*, 239 S.W.3d 815, 820 (Tex. Crim. App. 2007) (per curiam). It "bear[s] no resemblance to the AAMR or APA adaptive functioning criteria." *Chester*, 666 F.3d at 361 (Dennis, J., dissenting). And it invites "factfinders in Texas to adjust the clinical criteria … to conform to their own normative judgments with respect to

- 129 -

which mentally retarded offenders are deserving of the death penalty and which are not." *Lizcano v. State*, 2010 WL 1817772, at \*35 (Tex. Crim. App. 2010) (Price, J., concurring and dissenting).

*Strengths and weaknesses.* Clinicians recognize that "adaptive skill limitations often coexist with strengths." *AAIDD Manual* 45. Observed limitations in one area therefore cannot be "outweighed" by potential strengths in others. *Id.* at 47. Under clinical standards, meeting minimum thresholds for deficits yields a diagnosis of intellectual disability, regardless whether a defendant is "competent in other adaptive domains." Greenspan, *The Briseño Factors*, *in The Death Penalty and Intellectual Disability* 219, 221 (Polloway ed., 2015).[22] There are no "prong two deficits that 'make or break' an [intellectual-disability] diagnosis." *Id.*; *see also Brumfield* v. *Cain*, 135 S. Ct. 2269, 2281 (2015)

---

[22] Strengths in an area in which the defendant claims to have limitations are clinically relevant. *Clark* v. *Quarterman*, 457 F.3d 441, 447 (5th Cir. 2006). But "[b]ecause limitations define mental retardation, adaptive strengths are relevant only insofar as they offset particular adaptive weaknesses." Blume, 18 Cornell J.L. & Pub. Pol'y at 707. "Unless a defendant's evidence of particular limitations is specifically contradicted by evidence that he does not have those limitations, then the defendant's burden is met no matter what evidence the State might offer that he has no deficits in other skill areas." *Lambert* v. *State*, 126 P.3d 646, 651 (Okla. Crim. App. 2005).

(acknowledging clinical guidance explaining that "intellectually disabled persons may have 'strengths in … some adaptive skill areas'").[23]

Texas courts, in contrast, have dismissed serious deficits in adaptive skills as "insignificant" when weighed against evidence of skills in unrelated areas, such as renting an apartment, purchasing a car, or washing clothing. *Williams* v. *Quarterman*, 293 F. App'x 298, 312-314 (5th Cir. 2008) (per curiam) (describing these as "substantial adaptive strengths"); *see also Wilson* v. *Thaler*, 450 F. App'x 369, 376 (5th Cir. 2011) (per curiam); *Ex parte Cathey*, 451 S.W.3d 1, 27 (Tex. Crim. App. 2014); (Price, J., concurring and dissenting). Under Texas law, if a factfinder "concludes that the [defendant] met one of the *Briseno* factors even in a limited period of time or situation, the factfinder may then overlook the [defendant's] limitations and conclude that the [defendant] is not mentally retarded." *Chester*, 666 F.3d at 367 (Dennis, J., dissenting).

*Lay stereotypes.* Contrary to objective clinical criteria, Texas both allows and encourages the factfinder to treat lay stereotypes as dispositive of intellectual

---

[23] In *Brumfield*, the Court held that the state court had reached an unreasonable determination of the facts in light of "substantial grounds" in the record to "question [the petitioner's] adaptive functioning," and that the petitioner was entitled to an evidentiary hearing on the issue in federal court. 135 S. Ct. at 2281-2282. The Court "assume[d]" without deciding the adequacy of Louisiana's adaptive-functioning standard. *Id.* at 2279; *see also id.* at 2277 n.3.

disability. The first *Briseno* factor, for instance, asks whether family or friends who knew the defendant during his developmental stage "th[ought]" he was "mentally retarded." 135 S.W.3d at 8. *Atkins* cases in Texas consequently often turn on testimony from individuals with no clinical training about whether they personally considered the defendant "retarded." *E.g.*, *Hunter* v. *State*, 243 S.W.3d 664, 668, 671 (Tex. Crim. App. 2007) (defendant's "former neighbor … did not think there was anything wrong with [him] mentally"); *Williams*, 293 F. App'x at 309 (lay witnesses "did not believe that [defendant] was mentally retarded"); *Wilson*, 450 F. App'x at 376 (defendant's family and acquaintances "at most" "considered him slow").

Other *Briseno* factors also permit factfinders to reject an *Atkins* claim based on "stereotypes of what persons with intellectual disability can (and cannot) do," Blume et al., *A Tale of Two (and Possibly Three)* Atkins, 23 Wm. & Mary Bill Rts. J. 393, 405 (2014), particularly "lay stereotype[s] of … *moderate* or *severe*" intellectual disability, Greenspan 219. Whether a defendant has "formulated plans," "respond[s] coherently" to questions, or can "hide facts or lie effectively," *Briseno*, 135 S.W.3d at 8, are not factors considered in any known clinical assessments. But in Texas, this Court can simply "identify [intellectual disability] when it sees it." *Ex parte Henderson*, 2006 WL 167836, at *4 (Tex. Crim. App. Jan. 25, 2006) (Cochran, J., concurring).

*Typical performance.* "Adaptive behavior … is the collection of conceptual, social, and practical skills that have been learned and are performed by people *in their everyday lives*." *AAIDD Manual* 45 (emphasis added); *see also DSM-5*, at 33. The clinical diagnosis of deficits in adaptive functioning therefore "focuses on the individual's typical performance," often assessed using a standardized diagnostic test, rather than the individual's "best or assumed ability or maximum performance." *AAIDD Manual* 47.

This Court, in contrast, both encourages and allows the factfinder to focus on a particular event—the commission of the offense—regardless of whether it exemplifies behavior that is typical of the individual's functioning in everyday life. *See, e.g., Gallo* v. *State*, 239 S.W.3d 757, 777 (Tex. Crim. App. 2007) ("[M]any of the *Briseno* factors pertain to the facts of the offense and the defendant's behavior before and after the commission of the offense."); *Ex parte Taylor*, 2006 WL 234854, at *3-6 (Tex. Crim. App. 2006) (Johnson, J., concurring) (focusing on the facts of the crime to deny *Atkins* claim); *Hines* v. *Thaler*, 456 F. App'x 357, 372 (5th Cir. 2011) (similar).

*Personality disorders.* This Court's approach also invites a clinically unfounded distinction between intellectual disability and personality disorders. The Court treats the *Briseno* factors as "indicative of mental retardation *or* of a

- 133 -

personality disorder." 135 S.W. 3d at 8 (emphasis added). Some courts have applied them to conclude that adaptive deficits merely reflect personality disorder "as opposed to" intellectual disability. *Ladd* v. *Thaler*, 2013 WL 593927, at \*8 (E.D. Tex. Feb. 15, 2013), *aff'd*, 748 F.3d 637 (5th Cir. 2014). Yet clinical guidance indicates that a person can have both. "Co-occurring mental … conditions are frequent in intellectual disability[.]" *DSM-5*, at 40; *see also Brumfield*, 135 S. Ct. at 2280.

Relying on *Briseno*, this Court has rejected *Atkins* claims even where—as here—the defendant appears to satisfy the clinical criteria for a diagnosis of intellectual disability. In *Ex parte Sosa*, this Court relied on a single *Briseno* factor to reverse a finding of intellectual disability. 364 S.W.3d 889, 895-896 (Tex. Crim. App. 2012). An expert clinician had testified in state habeas proceedings that the petitioner's "adaptive functioning was within the lowest 1% of individuals." *Id.* at 892. The trial court credited and adopted that testimony. *Id.* at 893. This Court declined to grant habeas relief, relying solely on the expert's failure to consider one *Briseno* factor: the facts of the underlying offense. *Sosa*, 364 S.W.3d at 894-895; *see also id.* at 896 (remanding with instructions to consider that factor). In the Court's view, a defendant who satisfies clinical standards for deficits in adaptive functioning nonetheless might not be "less morally culpable, less responsive to deterrence, and less capable of assisting in his own defense, such that it would

- 134 -

violate the Eighth Amendment to execute him." *Id.* at 892. The Court explained that the *Briseno* factors address this "concern" by ensuring that, in Texas, clinical standards will not be dispositive. *Id.*

In *Ex parte Chester*, this Court denied *Atkins* relief based solely on *Briseno*. 2007 WL 602607, at *4 (Tex. Crim. App. 2007). The Court acknowledged that the petitioner had "demonstrat[ed] significant limitations in intellectual functioning." *Id.* at *3. Both parties' experts agreed that he "would be correctly diagnosed as mildly mentally retarded" based on the results of a recognized test of adaptive functioning, the Vineland Adaptive Behavior Survey. *Id.* Despite this clinical assessment, the Court denied relief based on the "seven evidentiary factors listed in *Briseno*." *Id.* at *4. The court emphasized the facts of the crime, the defendant's ability to converse coherently, and the defendant's classification during his school years as merely "learning disabled." *Id.* at *4-9; *see also Chester*, 666 F.3d at 365 (Dennis, J., dissenting) (*Atkins* claim denied where "the seventh *Briseno* factor, and nothing else" was found to be "sufficient by itself to uphold a denial of relief"). This Court and federal courts have similarly denied *Atkins* relief based in

part on the *Briseno* factors in numerous other cases despite clinical evidence of intellectual disability.[24]

This Court has refused to reconsider *Briseno* in light of *Hall*. In *Hall*, the Supreme Court confronted a Florida law that "define[d] intellectual disability to require an IQ test score of 70 or less," without regard to the measurement error inherent in such scores. 134 S. Ct. at 1990, 1995-1996. Florida argued that *Atkins* gave the States "leeway" to enact "substantive definitions of mental retardation" that did not conform to clinical definitions.

*Hall* thus addressed not simply how to interpret IQ scores, but rather "how intellectual disability must be defined in order to implement … the holding of *Atkins*." 134 S. Ct. at 1993. Observing that "*Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection," *id.* at

---

[24] *See, e.g.*, *Ex parte Clark*, 2004 WL 885583, at *3 (Tex. Crim. App. 2004) (per curiam); *Taylor*, 2006 WL 234854, at *4-5 (Johnson, J., concurring); *Gallo*, 239 S.W.3d at 774; *Williams* v. *State*, 270 S.W.3d 112, 114-132 (Tex. Crim. App. 2008); *Ex parte Woods*, 296 S.W.3d 587, 610-613 (Tex. Crim. App. 2009); *Ex parte Butler*, 416 S.W.3d 863, 875-876 (Tex. Crim. App. 2012) (Cochran, J., concurring); *Ex parte Weathers*, 2014 WL 1758977, at *8-10 (Tex. Crim. App. 2014) (Alcala, J., concurring); *Cathey*, 451 S.W.3d at 26-28. Federal courts in Texas have denied collateral relief on similar grounds. *See, e.g.*, *Wilson*, 450 F. App'x at 376-377; *Rodriguez* v. *Quarterman*, 2006 WL 1900630, at *13-14 (W.D. Tex. 2006); *Matamoros* v. *Thaler*, 2010 WL 1404368, at *10-15 (S.D. Tex. 2010), *modified*, 2012 WL 394597 (S.D. Tex. 2012), *aff'd*, 783 F.3d 212 (5th Cir. 2015); *Hernandez* v. *Thaler*, 2011 WL 4437091, at *20, *22-24 (W.D. Tex. 2011), *aff'd*, 537 F. App'x 531 (5th Cir. 2013) (per curiam).

1998, the Court held that Florida's unscientific rule "create[d] an unacceptable risk that persons with intellectual disability will be executed, and thus [was] unconstitutional," *id.* at 1990; *see also, e.g., Van Tran* v. *Colson*, 764 F.3d 594, 612 (6th Cir. 2014) ("In *Hall*, the Court reasoned that the Constitution requires the courts and legislatures to follow clinical practices in defining intellectual disability.").

Former Judge Price of this Court predicted soon after *Hall* that "the writing is on the wall for the future viability of Ex parte Briseno." *Cathey*, 451 S.W.3d at 28 (concurring). Despite that prediction, the Court ignored Lizcano's repeated pleas to reconsider *Briseno* in light of *Hall*'s renewed emphasis on the importance of clinical norms. *See Ex parte Lizcano*, 2015 WL 2085190 (Tex. Crim. App. 2015). Likewise, the Court refused to reconsider Briseno in light of *Hall* in *Cathey* as well. 451 S.W.3d at 19-20, 26-27.[25]

The Fifth Circuit has also refused to reconsider the continued validity of this Court's approach in light of *Hall*, declaring that *Hall* "in no way affects …

_____

[25] The Supreme Court denied certiorari in *Cathey,* 83 U.S.L.W. 3912 (U.S. June 22, 2015), but that case did not squarely present the question whether *Hall* forecloses continued use of the *Briseno* factors because the petitioner had also failed to meet the first prong of the definition of intellectual disability, 451 S.W.3d at 19. Moreover, according to the State, the Court of Criminal Appeals "relied on and credited [expert] testimony—not the *Briseno* factors" to deny relief. Cases decided by the Fifth Circuit after *Hall* similarly provide poor vehicles for this Court to address the continued rejection of clinical criteria because they raise the issue only through AEDPA's deferential lens. *E.g., Mays* v. *Stephens*, 757 F.3d 211, 217-218 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 951 (2015).

application of *Briseno*." *Mays* v. *Stephens*, 757 F.3d 211, 218 (5th Cir. 2014).[26] The court reasoned that *Hall* "does not implicate Texas" because "the word 'Texas' nowhere appears in the opinion" and because "no reasonable jurist could theorize that the reasoning animating *Hall* could possibly be extended to *Briseno*." *Id.* at 218; *see also Guevera* v. *Stephens*, 577 F. App'x 364, 372-373 (5th Cir. 2014) (per curiam) (following *Mays*); *Matamoros* v. *Stephens*, 783 F.3d 212, 218-219 (5th Cir. 2015) (applying *Mays* to "reject[] the argument that *Hall* renders *Briseno* unconstitutional"); *Henderson* v. *Stephens*, 2015 WL 3965828, at *16 (5th Cir. 2015) (*Hall* "does not call into question the constitutionality of the *Briseno* standard").

This Court continues to apply factors that have no basis in clinical practice to allow the execution of defendants whom mental health and medical professionals would diagnose with intellectual disability. And it continues to demonstrate a reluctance to conform to the holding in *Hall*. This Court stands virtually alone in this approach.

---

[26] The Fifth Circuit had endorsed *Briseno* against Eighth Amendment challenge on several occasions before *Hall*. *See, e.g.*, *Chester*, 666 F.3d at 346-347 ("on their face, nothing about [the *Briseno* factors] contradicts *Atkins*"); *Woods* v. *Quarterman*, 493 F.3d 580, 587 n.6 (5th Cir. 2007) ("nothing in *Briseno*" is "inconsistent with *Atkins*").

This Court "has clearly taken a path that differs from the other states" on this issue. Tobolowsky, *A Different Path Taken*, 39 Hastings Const. L.Q. 1, 142 (2011). No other state legislature or court has devised its own nonclinical evidentiary factors to govern the evaluation of adaptive functioning for *Atkins* purposes. Only two States' courts have even suggested approval of this Court's *Briseno* approach.[27]

Many States have enacted statutory definitions of intellectual disability that incorporate established clinical definitions, including the adaptive-functioning prong. *See, e.g.*, Idaho Code Ann. § 19-2515A(1)(a); Mo. Rev. Stat. § 565.030(6); N.C. Gen. Stat. § 15A-2005(a)(1)(b), (2); Okla. Stat. tit. 21, § 701.10b(A)(2); *Ybarra* v. *State*, 247 P.3d 269, 273-275 & n.6 (Nev. 2011) (discussing Nev. Rev. Stat. § 174.098(7)); *Bowling* v. *Commonwealth*, 163 S.W.3d 361, 369-370 & n.8 (Ky. 2005) (discussing Ky. Rev. Stat. Ann. § 532.130(2)). Other States have adopted clinical standards by judicial decision. *See, e.g.*, *Chase* v. *State*, 2015 WL 1848126, at *2-3 (Miss. 2015); *State* v. *White*, 885 N.E.2d 905, 907-908 (Ohio 2008). Virginia requires not only a clinical definition, but also—where feasible—the

---

[27] An intermediate appellate court in Tennessee has cited *Briseno* approvingly, *Van Tran* v. *State*, 2006 WL 3327828, at *23-24 (Tenn. Crim. App. 2006), but Tennessee's highest court has not, *see Coleman* v. *State*, 341 S.W.3d 221, 248 (Tenn. 2011). The Pennsylvania Supreme Court has "adopted the clinical definitions of mental retardation," but has also "approve[d] the[] use" of the *Briseno* factors at the factfinder's discretion. *Commonwealth* v. *DeJesus*, 58 A.3d 62, 82, 86 (Pa. 2012); *see also Commonwealth* v. *Bracey*, 2015 WL 3751733, at *15-16 (Pa. 2015).

use of a standardized clinical assessment to evaluate adaptive functioning. Va. Code Ann. § 19.2-264.3:1.1(B)(2).

State and federal courts outside of Texas have stressed the importance of adhering to clinical guidance on adaptive functioning to reach accurate conclusions. For example, contrary to this Court's approach, courts have recognized that a defendant's possession of some adaptive skills is "in no way inconsistent with" a diagnosis of intellectual disability, *White*, 885 N.E.2d at 914, because adaptive deficits often coexist with strengths, *see supra* pp. 20-21. These courts have explained that the factfinder "'must therefore look at [the defendant's] weaknesses instead of at his strengths.'" *Van Tran*, 764 F.3d at 609; *see also, e.g.*, *Sasser* v. *Hobbs*, 735 F.3d 833, 845 (8th Cir. 2013) ("Consistent with nationally accepted clinical definitions of mental retardation, the Arkansas standard does not ask whether an individual has adaptive strengths to offset the individual's adaptive limitations."); *Holladay* v. *Allen*, 555 F.3d 1346, 1363 (11th Cir. 2009) ("Individuals with mental retardation have strengths and weaknesses …. Indeed, the criteria for diagnosis recognizes this by requiring a showing of deficits in only two of ten identified areas of adaptive functioning."); *White*, 885 N.E.2d at 914 ("The mentally retarded are not necessarily devoid of all adaptive skills. Indeed, 'they may look relatively normal in some areas and have certain significant limitations in other areas.'"); *Lambert* v. *State*, 126 P.3d 646, 651 (Okla. Crim. App. 2005) ("[T]he State

- 140 -

need not present any evidence that a capital defendant can function in areas other than those in which a deficit is claimed.").

Courts outside of Texas have also rejected reliance on the lay stereotypes that this Court both allows and encourages factfinders to consider. In *Thomas* v. *Allen*, 607 F.3d 749, 759 (11th Cir. 2010), the Eleventh Circuit rejected the State's argument that an *Atkins* claimant's ability to "drive cars and hold menial jobs" weighed against a finding of intellectual disability. And courts have emphasized the importance of expert clinical judgment in evaluating an *Atkins* claim. *See, e.g.*, *Van Tran*, 764 F.3d at 605 ("The reliable and professionally vetted methods presented by … experts, from which the legal standards draw their substance, must guide the court's inquiry."); *id.* at 612 ("Tennessee law does not permit the state trial court to use its independent judgment to disregard uncontroverted expert analyses, consider factors that the experts have testified are unreliable, or declare to be dispositive a factor irrelevant to the clinical definitions employed by the experts."). Factfinders in these States "may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a mentally retarded person would behave." *White*, 885 N.E.2d at 915.

The distinction between Texas's approach and that of most other death-penalty States can make the difference between life and death in factually similar cases.  In particular, defendants situated similarly to Petetan have succeeded on *Atkins* claims in other States.  In *White*, the Supreme Court of Ohio held that the trial court abused its discretion when it denied White's *Atkins* claim on the basis of lay testimony and perceived strengths.  885 N.E.2d at 915-916. Both experts at trial concluded that White met all three prongs of the clinical definition of intellectual disability. *Id.* At 909-910.  To rebut evidence of adaptive deficits, the State cited testimony from White's ex-girlfriend that he "possessed … adaptive skills inconsistent with retardation" and "was not perceived by those who knew him as having significant adaptive disorders."  *Id*. at 911.  White had bought a truck, could drive, held a job, and dated; he also had other "skills" including playing games involving coordination and lying to his landlord. *Id*. at 910, 914. On that basis, the trial court concluded that White did not satisfy the adaptive-functioning prong.

Applying clinical standards, the state Supreme Court of Ohio reversed.  885 N.E.2d at 908, 915-916. The court admonished that "rejecting the uncontradicted testimony of two qualified expert witnesses in the field of psychology" based on lay perceptions of intellectual disability is "arbitrary [and] unreasonable." *Id.* at 915-916.  Because "[t]he mentally retarded are not necessarily devoid of all adaptive skills," "one must focus on those adaptive skills the person lacks, not on

- 142 -

those he possesses." *Id.* at 914. The court cautioned that "laymen cannot easily recognize" intellectual disability. *Id.* at 915.

In *State* v. *Lombardi*, the Supreme Court of Missouri prohibited the execution of an *Atkins* claimant after holding that he met the adaptive-functioning prong based on evidence of adaptive deficits, without considering his strengths. 303 S.W.3d 523, 526-527 (Mo. 2010) (per curiam). The defendant presented evidence that he had trouble communicating and was quiet and withdrawn. *Id.* And school records indicated that the defendant had repeated tenth grade for three consecutive years. *Id.* at 527. Missouri's statutory definition of adaptive behavior mirrors the previous APA standard and requires a claimant to demonstrate deficits in at least two of ten skill areas. *Id.* At 526; *see also Goodwin* v. *State*, 191 S.W.3d 20, 30-32 (Mo. 2006). Applying this standard to the defendant's case, the court concluded that the evidence of "deficits and limitations in two or more adaptive behaviors"— communications and functional academics—sufficed to demonstrate the defendant's intellectual disability regardless of any strengths in adaptive functioning. 303 S.W.3d at 527.

No two *Atkins* claimants are identical. But this Court systematically departs from the clinical norms that govern *Atkins* claims in the vast majority of other States by giving dispositive weight to factors that have no scientific grounding. Had

*White* or *Lombardi* arisen in Texas, their outcomes would almost certainly have been different. This Court should cease its defiance of the Supreme Court's endorsement of the clinical standards approach to intellectual disability approved by the Supreme Court in *Atkins* and *Hall.*

**E. Petetan proved by a preponderance of the evidence that he is intellectually disabled under both the flawed *Briseno* approach and a clinical standards approach as approved by the Supreme Court in *Atkins* and *Hall.***

There should be no dispute Petetan has "'significantly sub average general intellectual functioning'" and meets the first clinical prong of intellectual disability. His IQ scores have consistently fallen within the range of intellectual disability. When he was 15 years of age, he scored a 61 on a school administered IQ test. When he was 16 years of age, he scored a 64 on a child's version of an IQ test and 74 on an adult version.[28] When he arrived at prison at the age of 17 he scored 69 on a prison administered test. Following his release from prison in 2012, he scored 55 on an IQ test administered in connection with an application for disability benefits. Finally, before trial, he scored 52 on an IQ test administered by Dr. Mayfield.

---

[28] The variance in those scores with regard to a child taking the adult version and problems with norming the child and versions of the test were explained by Drs. Coxe and Mayfield (56 RR 357 and 58 RR 228). In any case, after administering both tests, Coxe diagnosed Petetan as mildly intellectually disabled (56 RR 357).

The evidence of Petetan's significant deficits in adaptive behavior is overwhelming. Achievement tests administered by Dr. Coxe in 1992 revealed deficits. Dr. Craig's testing sought to determine, retrospectively, whether Petetan suffered from adaptive behavior deficits at the ages of 14 and 15 before he went to prison at the age of 17. His testing revealed significant adaptive behavior limitations far outweighing any adaptive behavior strengths. Craig was provided with a report from Petetan's childhood noting limitations in adaptive behavior.

A multitude of mental health and medical professions have diagnosed Petetan as intellectually disabled. They include Dr. Antonio Bartonico at the Brownwood School in 1991; Dr. Harold Scott at the Brownwood State School in 1991; Dr. Ray Coxe in connection with juvenile certification proceedings in 1992; Dr Kevin Correia in connection with an application for Social Security Disability Benefits in 2012; Dr. Ellis Craig in connection with testing performed in anticipation of the instant prosecution; and Dr. Joan Mayfield in connection with testing performed in anticipation of the instant prosecution.[29]

Lay witnesses confirmed the experts' diagnosis. Family members recalled Petetan's adaptive behavior limitations from his childhood including poor hygiene;

---

[29] Petetan further notes that in the pretrial competency proceeding, Dr. Ollie Seay diagnosed Petetan as suffering from intellectual disability (12 RR 62, 88). Petetan concedes that evidence was not before the jury which answered the special issue concerning intellectual disability.

poor school attendance and performance; inability to dress himself; inability to tie his shoes; inability to get himself to school; inability to make purchases or count change; a lack of interest in television or games as a child; wandering the neighborhood alone aimlessly; delayed ability to walk or talk as a child; and never learning to ride a bicycle.

Tellingly, State did not call a single expert during the punishment phase to rebut Petetan's clinical evidence of intellectual disability. Rather, it called and cross-examined a series of lay witnesses and asked them if Petetan was "mentally retarded." None of those lay witnesses were provided with a definition of "mental retardation" or shown to be competent to render such an opinion. No objections were voiced to the questions, their qualification to answer, or their answers.

On the basis of the arguments set out above, Petetan urges this Court to reject the intellectual disability approach of *Briseno* and adopt the clinical standards approach of intellectual disability as embraced by the Supreme Court in *Atkins* and *Hall*. Under a clinical standards approach as advocated, Petetan would unquestionable prevail on this point of error.

Even if the Court is not willing to reconsider the *Briseno* approach, Petetan nevertheless argues he should prevail on this claim. Viewing the entirety of the evidence relative to intellectual disability in a neutral light, the jury's rejection of

the special issue is against the great weight and preponderance of the evidence and manifestly unjust. The Court should reform the sentence to a life sentence.

## Point of Error Eleven

**Petetan's intellectual disability renders him ineligible for the death penalty.**

As demonstrated in the preceding point of error, Petetan proved by a preponderance of the evidence at trial that he is intellectually disabled. The jury's rejection of his assertion of intellectual disability is against the great weight and preponderance of the evidence.

In *Atkins v. Virginia,* decided in 2002, the United States Supreme Court discerned a national consensus against the execution of "mentally retarded" offenders and declared that such offenders are categorically immune from the death penalty. 536 U.S. 304 (2002). *Hall v. Florida* further addressed not simply how to interpret IQ scores, but rather "how intellectual disability must be defined in order to implement … the holding of *Atkins*." 134 S. Ct. at 1993. The record shows Petetan is intellectually disabled either under the flawed *Briseno* approach or a clinical standards approach as approved by the Supreme Court in *Atkins* and *Hall*. Accordingly, Petetan is not eligible for the death penalty under the Eighth and Fourteenth Amendments to the United States Constitution. The Court should reform his death sentence to a life sentence.

## Point of Error Twelve

**The trial court erred by failing to define the term "militate" within the punishment charge as requested by Petetan (4 CR 1318, 4 CR 1330, and 59 RR 212).**

Petetan objected to the trial court's failure to define the term "militate" within the punishment charge. He proposed a definition which would prevent the jury from return a sentence of death for unconstitutional reasons. The request was denied by the trial court. Petetan maintains the denial of his objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996) (rejecting similar claim). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

## Point of Error Thirteen

**The trial court erred by overruling Petetan's objection to the instruction that 10 votes were required for the jury to return a "no" answer to the first special issue concerning future dangerousness (4 CR 1318, 4 CR 1330, and 59 RR 212).**

Petetan objected to the trial court's instruction that 10 votes were required from the jurors to return a "no" answer to the first special issue. The number is artificial and hides the fact a single "no" answer will result in a sentence of life rather than death. The objection was denied by the trial court. Petetan maintains the denial of his objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Brown v. State*, 554 S.W.2d 677, 678 (Tex. Crim. App. 1977) (rejecting similar claim). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

## Point of Error Fourteen

**The trial court erred by overruling Petetan's objection to the "anti-sympathy" instruction insofar as the instruction would limit the scope of mitigating evidence and or circumstances that jury may consider in returning a life sentence (4 CR 1320, 4 CR 1330, and 59 RR 212).**

Petetan objected to the trial court's "anti-sympathy" instruction to the extent that it limited the jury's consideration of the mitigation special issue. The objection was denied by the trial court. Petetan maintains the denial of his objection was error resulting in a due process violation under the Fourteenth

- 149 -

Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Tong v. State*, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000) (rejecting similar claim). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

## Point of Error Fifteen

**The trial court erred by overruling Petetan's request that the jury be instructed on the concept of mercy and the role it can play in deliberations (4 CR 1320, 4 CR 1330, and 59 RR 212).**

Petetan sought to have the jury instructed that it may consider, as a mitigating circumstance, any personal moral judgment it may have to grant mercy to Petetan. The request was denied by the trial court. Petetan maintains the denial of his objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Thuesen v. State*, AP-76,375, 2014 WL 792038, at *49 (Tex. Crim. App. 2014) (rejecting similar claim). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

## Point of Error Sixteen

**The trial court erred by submitting a special issue on future dangerousness which was not found by the grand jury or alleged in the indictment returned against Petetan (1 CR 44, 4 CR 1321, 4 CR 1330, and 59 RR 212).**

Citing *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Petetan sought to prevent submission of the future dangerousness special issue because it was not alleged in the indictment. The request was denied. Petetan maintains the denial of the objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Williams v. State*, 273 S.W.3d 200, 214 (Tex. Crim. App. 2008) (rejecting similar claim). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

## Point of Error Seventeen

**The trial court erred by failing to define the term "probability" within the punishment charge as requested by Petetan (4 CR 1321, 4 CR 1330, and 59 RR 212).**

Petetan objected to the trial court's failure to define the term "probability" within the punishment charge. He proposed a number of possible definitions. All were denied by the trial court. Petetan maintains the denial of his objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Barefoot v. State*, 596 S.W.2d 875, 887 (Tex. Crim. App. 1980) (rejecting similar claim). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

### Point of Error Eighteen

**The trial court erred by failing to define the phrase "criminal acts of violence" within the punishment charge as requested by Petetan (4 CR 1322, 4 CR 1330, and 59 RR 212).**

Petetan objected to the trial court's failure to define the phrase "criminal acts of violence" within the punishment charge. He proposed a number of possible definitions. All were denied by the trial court. Petetan maintains the denial of the objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of

error.  *See Camacho v. State*, 864 S.W.2d 524, 536 (Tex. Crim. App. 1993) (rejecting similar point).   The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

## Point of Error Nineteen

**The trial court erred by failing to define the phrase "continuing threat to society" within the punishment charge as requested by Petetan (4 CR 1323, 4 CR 1330, and 59 RR 212).**

Petetan objected to the trial court's failure to define the phrase "continuing threat to society" within the punishment charge.  He proposed a number of possible definitions.  All were denied by the trial court.  Petetan maintains the denial of the objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt.  Petetan acknowledges there is authority against this point of error.  *See Russeau v. State*, 291 S.W.3d 426, 435 (Tex. Crim. App. 2009) (rejecting similar point).  The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

**Point of Error Twenty**

**The trial court erred by failing to submit Petetan's four requested instructions relative to the jury's consideration of victim impact evidence (4 CR 1324, 4 CR 1330, and 59 RR 212).**

Petetan objected to the trial court's failure to submit his four requested instructions relative to the jury's consideration of victim impact evidence. The instructions would have charged the jury thusly: (1) "That its consideration of victim impact evidence should not be conducted in connection with the future dangerousness issue"; (2) "That its consideration of victim impact evidence did not relieve the state of its burden to prove the 'future dangerousness' special issue beyond a reasonable doubt"; (3) "To disregard victim impact evidence that was not shown to be within the knowledge or reasonable expectation of the defendant"; (4) "Not to make a comparative worth analysis of the value of the victims to their families and community compared to the defendant or other members of society." All of the requested instructions were denied by the trial court. Petetan maintains the denial of the victim impact evidence instructions was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Mays v. State*, 318 S.W.3d 368,

391 (Tex. Crim. App. 2010) (rejecting similar point).  The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

### Point of Error Twenty-One

**The trial court erred by failing to define the phrases "personal moral culpability" and "moral blameworthiness" within the punishment charge as requested by Petetan (4 CR 1325, 4 CR 1330, and 59 RR 212).**

Petetan objected to the trial court's failure to define the phrases "personal moral culpability" and "moral blameworthiness" within the punishment charge. Petetan maintains the denial of the objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt.  Petetan acknowledges there is authority against this point of error.  *See Luna v. State*, 268 S.W.3d 594, 609 (Tex. Crim. App. 2008) (rejecting similar point).  The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

**Point of Error Twenty-Two**

**The trial court erred by overruling Petetan's objection that the charge unduly limited what factors the jury could consider as mitigating (4 CR 1325, 4 CR 1330, and 59 RR 212).**

Petetan complained the charge unduly limited the jury's consideration of mitigating evidence to evidence which would reduce moral blameworthiness. He sought a charge instructing the jury it could consider any circumstance thought to be appropriate by the jury could be mitigating and justify a life sentence. Petetan maintains the denial of the objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Cantu v. State*, 939 S.W.2d 627, 640 (Tex. Crim. App. 1997) (rejecting similar point). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

**Point of Error Twenty-Three**

**The trial court erred by overruling Petetan's objection that the mitigation special issue is unconstitutional for failing to assign a burden of proof and not being susceptible to a sufficiency of the evidence review on appeal (4 CR 1326, 4 CR 1330, and 59 RR 212).**

- 156 -

Petetan complained at trial that the mitigating special issue was unconstitutional because it does not provide for a burden of proof and does not allow for a sufficiency of the evidence review on appeal. The objections were overruled. Petetan maintains the denial of the objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009) and *Shannon v. State*, 942 S.W.2d 591, 599 (Tex. Crim. App. 1996) (rejecting similar complaints). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

## Point of Error Twenty-Four

**The trial court erred by overruling Petetan's objection that the jury should be instructed there is a presumption in favor of a life sentence rather than a sentence of death (4 CR 1327, 4 CR 1330, and 59 RR 212).**

Petetan complained at trial of the trial court's refusal to instruct the jury that there is a presumption of a life sentence rather than a sentence of death. The objection was overruled. Petetan maintains the denial of the objection was error resulting in a due process violation under the Fourteenth Amendment to the United

States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Gardner v. State*, 306 S.W.3d 274, 303 (Tex. Crim. App. 2009) (rejecting similar complaint). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

**Point of Error Twenty-Five**

**The trial court erred by overruling Petetan's objection that the jury should be instructed that if it was unable to agree on a special issue, a mistrial would be declared and life sentence imposed (4 CR 1326, 4 CR 1330, and 59 RR 212).**

Petetan complained at trial of the trial court's refusal to instruct the jury that a mistrial would be declared and life sentence imposed if the jury was unable to agree on a special issue. The objection was overruled. Petetan maintains the denial of the objection was error resulting in a due process violation under the Fourteenth Amendment to the United States Constitution and not harmless beyond a reasonable doubt. Petetan acknowledges there is authority against this point of error. *See Raby v. State*, 970 S.W.2d 1, 7 (Tex. Crim. App. 1998) (rejecting similar complaint). The point of error is presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

- 158 -

**Point of Error Twenty-Six**

**Imposition of the death penalty violates Petetan's Eighth Amendment and Fourteenth Amendment right not to be subjected to cruel and unusual punishment.**

Petetan maintains imposition of the death penalty violates his Eighth Amendment and Fourteenth Amendment right to be free from cruel and unusual punishment. In support of the claim, Petetan relies on Justice Breyer's recent dissenting opinion in *Glossip v. Gross*, 576 U.S. ___, ___ (2015); 2015 WL 2473454. at *27 (2015). There, it was recognized it is highly likely the death penalty violates the Eighth Amendment prohibition on cruel and unusual punishment. Specifically, Justice Breyer, joined by Justice Ginsburg, observed that today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability; (2) arbitrariness in application; (3) unconscionably long delays that undermine the death penalty's penological purpose; and perhaps as a result of those defects, most places within the United States have abandoned its use. *Id*.

Petetan acknowledges there is authority against this point of error. *See Gregg v. Georgia,* 428 U.S. 153, 187 (1976); *Proffitt v. Florida,* 428 U.S. 242, 247 (1976); and *Jurek v. Texas,* 428 U.S. 262, 268 (1976). The point of error is

presented to avoid waiving the claim on appeal and for exhaustion of the claim before this Court.

**Point of Error Twenty-Seven**

**Petetan was denied equal protection of the law due to the absence of a unified statutory procedure for pretrial litigation of an *Atkins* assertion of intellectual disability (18 RR 12, 4 CR 1228).**

Petetan filed a motion for a pretrial *Atkins* determination (4 CR 1228). The trial court considered the request by Petetan for a pretrial determination by the court of whether Petetan suffers from intellectual disability (18 RR 4). Counsel noted the absence of legislation in Texas addressing the issue and conflicting case law on the subject in Texas (18 RR 5). As noted in the motion, most states which have enacted legislation in response to *Atkins* allow for a pretrial determination of intellectual disability (18 RR 5, 4 CR 1228). Noting the procedural difficulty of the request, the lack of a clear statute, and that he could go either way, the trial court denied Petetan's request for a pretrial intellectual disability determination by the court (18 RR 7-8, 12).

This Court recently considered a complaint by the State regarding a trial court's intent to determine an *Atkins* assertion pretrial in a hearing before the trial court. *See In re Allen*, 462 S.W.3d 47 (Tex. Crim. App. 2015). Finding no clear

- 160 -

violation of a ministerial duty in conducting such a proceeding, mandamus relief

was denied to the State. *Id*. at 51.

Lamenting the absence of a statutory scheme addressing the procedure

challenged in *Allen*, the Court noted:

> While we withhold normative judgment, the need for a statutory
> scheme on this score is readily apparent, and its continued absence
> portends serious consequences for our criminal-justice system.
> **Without a unified procedure, intellectual-disability
> determinations may vary from county to county, court to court,
> and case to case.** As the present cases and authorities cited in this
> opinion illustrate, some judges may prefer to address the issues
> pretrial, others by submission of a special issue to the jury. **The
> gravity of defendants' intellectual-disability claims are too
> weighty to be subject to such disparity**. . . . We now make explicit
> what we before expressed only tacitly: Legislation is required. *Id.* at
> 54. (Emphasis added).

The disparity recognized by a majority of this Court in *Allen* is the basis for

Petetan's assertion of a denial of equal protection of the law.  He should not have

been denied a pretrial *Atkins* determination by the trial court simply because his

case was prosecuted in McLennan County rather than Dallas County.  There is a no

rational relationship between the disparity of treatment between equally situated

defendants asserting a pretrial intellectual disability claims and some legitimate

governmental purpose.  The disparity in treatment denied Petetan equal treatment

under the law and due process of law.  The conviction should be reversed and

- 161 -

remanded to the trial court for a pretrial intellectual disability determination before the court.

## Point of Error Twenty-Eight

**The judgment should be modified to properly reflect Petetan was convicted of a capital felony offense rather than a first degree felony offense (4 CR 1343).**

This point of error seeks modification of Petetan's judgment because it erroneously states he was convicted of a first degree felony offense (4 CR 1343). Petetan was convicted of a capital felony and punishment was assessed at death. *See* TEX. PEN. CODE §§ 12.04(a)(1), 12.31(a), and 19.03(a)(2). He was not convicted of a first degree felony as recited in the judgment.

Even if a defendant is not being harmed by a deficiency in a judgment, he nevertheless has an interest in having the judgment correctly reflect the findings of the trial court and the jury. *Howell v. State*, 563 S.W.2d 933, 936 (Tex. Crim. App. 1978). A judgment should properly recite the degree of the offense for which the defendant was convicted. TEX. CRIM. PROC. CODE art. 42.01 § 14.

The general rule is that if an appellate court has the necessary data and evidence before it, the judgment may be modified or reformed on appeal. *Splawn v. State*, 160 S.W.3d 103, 107 (Tex. App. - Texarkana 2005, pet. ref'd). This Court

has the authority to modify the judgment of a trial court. TEX. R. APP. P. 78.1(b). The authority to modify a judgment includes reformation of a judgment which fails to correctly reflect the degree of the offense for which the defendant was convicted. *Land v. State*, 291 S.W.3d 23, 31 (Tex. App. – Texarkana 2009, pet. ref'd); *Jackson v. State*, 288 S.W.3d 60, 64 (Tex. App. – Houston [1st Dist.] 2009, pet. ref'd).

The record contains the necessary data and information for modification of the judgment. This Court should modify the judgment to properly reflect the degree of felony for which Petetan was convicted was that of a capital felony rather than that of a first degree felony offense.

## Point of Error Twenty-Nine

**The judgment should be modified to properly reflect punishment was assessed by the trial court rather than the jury (4 CR 1343).**

At the conclusion of the punishment phase, the jury returned answers to the four special issues submitted in the court's charge (60 RR 67-68, 4 CR 1336-1339). Based on the jury's answers to the special issues, punishment was assessed by the trial court at death (60 RR 71). Despite the trial court's assessment of punishment, the judgment erroneously recites the jury assessed punishment (4 CR 1343).

When there is a variation between the oral pronouncement of sentence and the written memorialization of the sentence, the oral pronouncement controls. *Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998). An appellate court is authorized to reform or modify the judgment to conform to the record of the proceedings and to render an appropriate judgment, in accordance with its authority under TEX. R. APP. P. 78.1(b). *See French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992) (appellate court has authority to reform a judgment to include an affirmative finding to make the record speak the truth when the matter has been called to its attention by any source); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993) (appellate court has the power to modify incorrect judgments when the necessary data and information are available to do so).

Petetan suggests it is appropriate to modify the trial court's judgment to reflect that the trial court, and not the jury, assessed the sentence in this case, in accordance with the trial court's oral pronouncement at trial and the provisions of TEX. CRIM. PROC. CODE art. 37.071§ 2(g) (providing for court sentencing based on the jury's responses to the special issues submitted within the court's charge).

**Prayer**

Appellant prays this Court will reverse the judgment of conviction and reform to an acquittal, remand for a new trial, remand for a new punishment hearing, reform the sentence to a life sentence, remand for a new competency hearing, modify the judgment, or enter any other relief appropriate under the law and the facts.

Respectfully submitted,

/s/Richard E. Wetzel
Richard E. Wetzel
State Bar No. 21236300

1411 West Ave., Suite 100
Austin, Texas 78701

(512) 469-7943
(512) 474-5594
wetzel_law@1411west.com

Attorney for Appellant
US Carnell Petetan, Jr.

## Certificate of Compliance

This pleading complies with TEX. R. APP. P. 9.4. According to the word count function of the computer program used to prepare the document, the brief contains 36,879 words excluding the items not to be included within the word count limit.

/s/ Richard E. Wetzel
Richard E. Wetzel
State Bar No. 21236300

## Certificate of Service

This is to certify a true and correct copy of this pleading was mailed to Counsel for the State of Texas, Sterling Harmon, Assistant Criminal District Attorney, at his email address maintained at Sterling.Harmon@co.mclennan.tx.us on this the 27th day of August, 2015.

/s/Richard E. Wetzel
Richard E. Wetzel
State Bar No. 21236300